

FILED
2020 APR 22 PM 1:08
LESLIE A. MILLIKEN
CLERK OF COURTS
HARRISON COUNTY, OHIO

## IN THE COURT OF COMMON PLEAS
## HARRISON COUNTY, OHIO

|  |  |
|---|---|
| SCOTT A. MADZIA<br>84125 Merryman Road<br>Cadiz, Ohio 43907 | )<br>)<br>)<br>) |
| and | )<br>) |
| BECKERT MINERALS, LLC<br>c/o Nancy A. Beckert<br>44208 Meadowlark Lane<br>Cadiz, Ohio 43907 | )<br>)<br>)<br>) |
| and | )<br>) |
| RICHARD D. BECKERT<br>11620 127th Avenue Northeast<br>Lake Stephens, Washington 98258 | )<br>)<br>) |
| and | )<br>) |
| JOY K. BECKERT<br>11620 127th Avenue Northeast<br>Lake Stephens, Washington 98258 | )<br>)<br>) |
| and | )<br>) |
| DEBORAH A. MCDONOUGH<br>6618 Burkettsville-St. Henry Road<br>Celina, Ohio 45822 | )<br>)<br>) |
| and | )<br>) |
| DAVID J. MCDONOUGH<br>6618 Burkettsville-St. Henry Road<br>Celina, Ohio 45822 | )<br>)<br>)<br>) |

CASE NO. CVH2020-0040

JUDGE:

**COMPLAINT**

(JURY DEMAND ENDORSED
HEREON)

and                                    )

WELLS MINERALS, LLC         )
c/o Paul Wells                )
39377 Gilmore Ridge Road    )
Cadiz, Ohio 43907           )

          Plaintiffs,          )

v.                                    )

ECLIPSE RESOURCES-OHIO, LLC  )
c/o CT Corporation System, Statutory Agent )
4400 Easton Commons Way, Suite 125  )
Columbus, Ohio 43219        )

          Defendant.        )



---

Now come Plaintiffs, Scott A. Madzia, Beckert Minerals, LLC, Richard D. Beckert, Joy K. Beckert, Deborah A. McDonough, David J. McDonough, and Wells Minerals, LLC (collectively hereinafter the "Plaintiffs"), and for their Complaint against Defendant, Eclipse Resources-Ohio, LLC (hereinafter "Eclipse"), hereby state the following:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Scott A. Madzia is an individual who resides at 84125 Merryman Road, Cadiz, Ohio 43907.

2. Plaintiff Beckert Minerals, LLC is an Ohio limited liability company with its registered address being 44208 Meadowlark Lane, Cadiz, Ohio 43907 and is the successor in interest to the lease rights of Francis R. Beckert and Nancy A. Beckert, husband and wife.

3. Plaintiff Richard D. Beckert is an individual who resides at 11620 127th Avenue Northeast, Lake Stephens, Washington 98258.

2

4. Plaintiff Joy K. Beckert is an individual who resides at 11620 127th Avenue Northeast, Lake Stephens, Washington 98258.

5. Plaintiff Deborah A. McDonough is an individual who resides at 6618 Burkettsville-St. Henry Road, Celina, Ohio 45822.

6. Plaintiff David J. McDonough is an individual who resides at 6618 Burkettsville-St. Henry Road, Celina, Ohio 45822.

7. Plaintiff Wells Minerals, LLC is an Ohio limited liability company with its registered address being 39377 Gilmore Ridge Road, Cadiz, Ohio 43907 and is the successor in interest to the lease rights of Ross B. Wells and Glenna L. Wells, husband and wife.

8. Eclipse Resources-Ohio, LLC, ("Eclipse") is a Delaware limited liability company (file number 5547529) and has its principal office located at 122 West John Carpenter Freeway, Suite 300, Irving, Texas 75039.

9. Eclipse is registered to do business in the state of Ohio with its registered address being c/o CT Corporation System, Statutory Agent, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

10. Eclipse is the successor in interest to The Oxford Oil Company of Zanesville, Ohio ("Oxford").

11. Eclipse conducts business in Harrison County, Ohio.

12. Venue is proper in this Court under Ohio Rule of Civil Procedure 3(C)(3), (5), and (6) because Eclipse conducted activity in Harrison County that gave rise to Plaintiffs' claims; the real property that is the subject of this action is located in Harrison County; and all or part of Plaintiffs' claims arose in Harrison County.

13. The Court has personal jurisdiction over Eclipse pursuant to Ohio Revised Code §

3

2307.382(A)(1) because Eclipse transacts business in this state and the claims alleged herein arise from those business transactions. The Court also has personal jurisdiction over Eclipse pursuant to R.C. § 2307.382(A)(8) because Eclipse has an interest in real property in this state and the claims alleged herein arise, in part, from their interests in said property.

14. The Court's exercise of jurisdiction over Eclipse is consistent with due process because (1) Eclipse purposefully avails itself of the privilege of acting in this state or causing a consequence in this state; (2) the case arises from Eclipse's activities in this state; (3) Eclipse has a substantial connection with this state such that the Court's exercise of jurisdiction is reasonable: and (4) Eclipse is a limited liability company registered to do business within the state of Ohio.

## FACTS COMMON TO ALL CLAIMS

15. Plaintiff Scott A. Madzia is the titled owner to three (3) parcels of real estate located in the Township of Stock, Harrison County, Ohio, and identified as tax parcel numbers 29-0000760.000, 29-0000761.000, and 29-0000762.000 (the "Madzia Parcels").

16. Plaintiffs Richard D. Beckert, Joy K. Beckert, Deborah A. McDonough, David J. McDonough, and Beckert Minerals, LLC are the titled owners to two (2) parcels of real estate located in the Township of Stock, Harrison County, Ohio, and identified as tax parcel numbers 29-0000075.000 and 29-0000076.000 (the "Beckert Parcels").

17. Plaintiff Wells Minerals, LLC is the titled owner to one (1) parcel of real estate located in the Township of Stock, Harrison County, Ohio, and identified as tax parcel number 29-0000216.000 (the "Wells Parcel").

18. The above-identified parcels of real estate, being the Madzia Parcels, the Beckert Parcels, and the Wells Parcel, shall be referred to collectively herein as the "Property".

19. The Madzia Parcels are subject to an Oil and Gas Lease (the "Madzia Lease") dated April

10, 2006 and executed by Scott A. Madzia in favor of The Oxford Oil Company ("Oxford"). A true and accurate copy of the Madzia Lease is attached as Exhibit A.

20. The Beckert Parcels are subject to an Oil and Gas Lease (the "Beckert Lease") dated February 28, 2006 and executed by Francis R. Beckert and Nancy A Beckert, Richard D. Beckert and Joy K. Beckert, and Deborah A. McDonough and David J. McDonough in favor of Oxford. A true and accurate copy of the Beckert Lease is attached as Exhibit B.

21. The Wells Parcel is subject to an Oil and Gas Lease (the "Wells Lease") dated February 17, 2006 and executed by Ross B. Wells and Glenna L. Wells in favor of Oxford. A true and accurate copy of the Wells Lease is attached as Exhibit C.

22. The above-identified Oil and Gas Leases, being the Madzia Lease, the Beckert Lease, and the Wells Lease, shall be referred to collectively herein as the "Leases".

23. The Leases each contain the following provision: "Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all cost and expense except taxes applicable thereto, a royalty of one-eighth (1/8) **of the oil produced.** Lessor shall receive on a monthly basis, as a royalty, one-eighth (1/8) **of the proceeds realized at the well from the sale of all gas marketed from the premises** after deduction of all costs attributable to marketing the gas, including, but not limited to, costs to transport, collect, compress, dehydrate and make the gas ready for market." Emphasis added. See Exhibit A, Exhibit B, and Exhibit C.

24. The Madzia Lease is subject to an Amendment and Ratification of Oil and Gas Lease (the "Madzia Amendment") dated June 26, 2013 and executed by Scott A. Madzia in favor of Eclipse (successor in interest to Oxford). A true and accurate copy of the Madzia Amendment is attached as Exhibit D.

25. The Beckert Lease is subject to an Amendment and Ratification of Oil and Gas Lease (the

5

"Beckert Amendment") dated July 24, 2013 and executed by Francis R. Beckert and Nancy A. Beckert, A/K/A Nancy F. Beckert, Richard D. Beckert and Joy K. Beckert, and Deborah A. McDonough and David J. McDonough in favor of Eclipse (successor in interest to Oxford). A true and accurate copy of the Beckert Amendment is attached as Exhibit E.

26. The Wells Lease is subject to an Amendment and Ratification of Oil and Gas Lease (the "Wells Amendment") dated July 6, 2013 and executed by Ross B. Wells and Glenna L. Wells in favor of Eclipse (successor in interest to Oxford). A true and accurate copy of the Wells Amendment is attached as Exhibit F.

27. The above-identified Amendments and Ratifications of Oil and Gas Lease, being the Madzia Amendment, the Beckert Amendment, and the Wells Amendment, shall be referred to collectively herein as the "Amendments".

28. Upon information and belief, Eclipse acquired the Leases from Oxford sometime prior to July 6, 2013 and subsequently entered into Amendment and Ratification of the Oil and Gas Leases in the year 2013 as well.

29. The Amendments each contain the following provision: "Cost Free Royalty. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all royalties for oil, gas or other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder." See Exhibit D, Exhibit E, and Exhibit F.

30. Upon information and belief, sometime prior to March 1, 2014, Eclipse pooled and unitized the Leases into the Madzia 2H, Madzia 4H, Madzia 6H, Madzia 8H, and Madzia 10H well units

6

(the "Madzia Wells").

31. Upon information and belief, on or around March 1, 2014, Eclipse drilled the Madzia Wells.

32. Ohio Revised Code Section 1509.11 (A) (2) states that, "The owner of any horizontal well that is producing or capable of producing oil or gas shall file with the chief, on the forty-fifth day following the close of each calendar quarter, **a statement of production of oil**, gas, and brine for the preceding calendar quarter in a form that the chief prescribes. An owner that has more than one hundred horizontal wells in this state shall submit electronically the statement of production in a format that is approved by the chief." Emphasis added.

33. Concerning the Madzia Wells, Eclipse has regularly filed statements of production of oil with the Ohio Department of Natural Resources ("ODNR"), in accordance with O.R.C. § 1509.11 (A) (2).

34. These statements of production of oil reflect the amount of oil produced from the Madzia Wells and reported to the ODNR.

35. Plaintiffs noticed a discrepancy between the oil royalties Eclipse has paid to each, versus the oil production numbers Eclipse has reported to the ODNR.

36. Plaintiffs, upon advice of counsel and at their sole cost and expense, requested that counsel conduct an audit of the oil royalties that Eclipse had paid them for the third and fourth quarters of 2016, all of 2017, all of 2018, and the first three quarters of 2019. This audit confirmed Plaintiffs' suspicion, finding that the oil royalties Eclipse had paid them represented only a portion of the oil production reported to the ODNR. A true and accurate copy of the auditor's report is attached as Exhibit G.

37. The auditor found that for the timeframe examined, and based upon the oil production

7

reported to the ODNR, Eclipse should have paid Plaintiff Scott A. Madzia an additional $265,692.00 in oil royalties. See Exhibit G.

38. The auditor found that for the timeframe examined, and based upon the oil production reported to the ODNR, Eclipse should have paid Plaintiffs Richard D. Beckert, Joy K. Beckert an additional $90,961.00 in oil royalties. See Exhibit G.

39. The auditor found that for the timeframe examined, and based upon the oil production reported to the ODNR, Eclipse should have paid Plaintiffs Deborah A. McDonough and David J. McDonough an additional $90,961.00 in oil royalties. See Exhibit G.

40. The auditor found that for the timeframe examined, and based upon the oil production reported to the ODNR, Eclipse should have paid Plaintiff Beckert Minerals, LLC an additional $90,961.00 in oil royalties. See Exhibit G.

41. The auditor found that for the timeframe examined, and based upon oil production reported to the ODNR, Eclipse should have paid Plaintiff Wells Minerals, LLC an additional $99,015.00 in oil royalties. See Exhibit G.

42. Eclipse, therefore, has been improperly withholding and not paying to Plaintiffs the full amount of oil royalties due to them under the express terms of the Leases, for at least the period of time covered by the above-referenced audit and thereafter to date.

## COUNT I – DECLARATORY JUDGMENT

43. Plaintiffs incorporate each of the foregoing paragraphs as if fully restated herein.

44. Plaintiffs and Eclipse disagree over whether Eclipse has paid Plaintiffs the full amount of oil royalties due under the terms of the Leases and Amendments.

45. Real and justiciable controversies exist among the Plaintiffs and Eclipse concerning whether Eclipse has paid Plaintiffs the full amount of oil royalties due under the terms of the Leases

and Amendments.

46. A declaratory judgment will terminate the uncertainty and controversy giving rise to these proceedings.

47. Pursuant to Ohio Revised Code section 2721.01 *et seq.*, Plaintiffs request a declaration that Eclipse owes Plaintiffs oil royalties reflecting the full amount of oil produced from the Properties as measured pursuant to the express terms of each Plaintiff's Lease and Amendment, respectively, and as reported to the ODNR.

<u>**COUNT II – BREACH OF THE LEASES AND AMENDMENTS**</u>

48. Plaintiffs incorporate each of the foregoing paragraphs as if fully restated herein.

49. Plaintiffs, or their predecessors in interest, and Oxford entered into the Leases.

50. Eclipse is the successor in interest to Oxford as Lessee under the Leases.

51. Plaintiffs and Eclipse entered into the Amendments.

52. Plaintiffs have, at all times, fully performed their obligations under the Leases and Amendments.

53. Plaintiffs have provided written notice to Eclipse as required by the Leases and Amendments prior to commencing this suit.

54. The Leases and Amendments require Eclipse to pay Plaintiffs as a royalty, free of cost, one-eighth (1/8) of the oil **produced**. See Exhibit A through Exhibit F.

55. Eclipse has not paid Plaintiffs oil royalties reflecting the full amount of oil produced from the Madzia Well. See Exhibit G.

56. Eclipse has, therefore, breached the Leases by paying Plaintiffs less than the full amount of oil royalties due under the express terms of the Leases and Amendments, and Plaintiffs are entitled to all of the wrongfully, improperly withheld royalties, plus interest, and any other amounts

9

payable under the terms of the Leases and Amendments, including, but not limited to, the costs of the aforementioned audit and any attorney expenses and fees involved in this cause of action.

57. As a direct and proximate result of Eclipse's breach of the Leases and Amendments, Plaintiffs have been damaged in an amount believed to be in excess of $25,000, the exact amount to be shown at the trial of this matter.

## COUNT III – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING OF THE LEASES AND AMENDMENTS

58. Plaintiffs incorporate each of the foregoing paragraphs as if fully restated herein.

59. The Leases and Amendments, like all contracts governed by Ohio law, have a covenant of good faith and fair dealing, which requires Eclipse to comply with the terms, covenants, and conditions found within the Leases and Amendments.

60. The covenant of good faith and fair dealing also requires honesty and reasonableness in the enforcement and performance of a contract.

61. Eclipse has refused to comply with the clear and concise language expressly included in the Leases and Amendments, despite Plaintiffs' request to do so.

62. As a direct and proximately result of Eclipse's breach of its duty of good faith and fair dealing, Plaintiffs have been damaged in an amount believed to be in excess of $25,000, the exact amount to be shown at the trial of this matter, because, among other things, they have not received the full amount of royalties due to them under the Leases and Amendments for production of oil from the Madzia Well.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that judgment be granted against Defendant

as follows:

a. On Count I, a declaratory judgment that Eclipse owes Plaintiffs oil royalties reflecting the full amount of oil produced from the Madzia Well, as reported to the ODNR and thereafter;

b. On Count II, compensatory damages in an amount to be specifically proven at trial, but in excess of $25,000;

c. On Count III, compensatory damages in an amount to be specifically proven at trial, but in excess of $25,000;

d. Costs and expenses, including reimbursement for the cost of the aforementioned audit and reasonable attorneys' fees, costs and expenses;

e. Pre- and post-judgment interest; and

f. Any other relief, at law or in equity, which the court deems just and equitable.

Respectfully submitted,

Charles L. Kidder            (0047265)
Steven R. R. Anderson        (0088409)
Kidder Law Firm, LLC
6375 Riverside Drive, Suite 200
Dublin, OH  43017
Telephone:     (614) 717-1788
Facsimile:     (614) 717-4440
E-mail:        ckidder@kidderlegal.com
               sanderson@kidderlegal.com

*Counsel for Plaintiffs*

11

## EXHIBITS

**Exhibit A** – Oil and Gas Lease (the "Madzia Lease")

**Exhibit B** – Oil and Gas Lease (the "Beckert Lease")

**Exhibit C** – Oil and Gas Lease (the "Wells Lease")

**Exhibit D** – Amendment and Ratification of Oil and Gas Lease (the "Madzia Amendment")

**Exhibit E** – Amendment and Ratification of Oil and Gas Lease (the "Beckert Amendment")

**Exhibit F** – Amendment and Ratification of Oil and Gas Lease (the "Wells Amendment")

**Exhibit G** – Auditor's Report

## JURY DEMAND

Plaintiffs hereby demand a jury of eight (8) persons for all triable jury issues related to Count II and Count III contained herein, including all issues related to damages, and any additional claims or defenses that can or will be asserted in this action.

Charles L. Kidder          (0047265)
Steven R. R. Anderson      (0088409)
Kidder Law Firm, LLC
6375 Riverside Drive, Suite 200
Dublin, OH  43017
Telephone:    (614) 717-1788
Facsimile:    (614) 717-4440
E-mail:       ckidder@kidderlegal.com
              sanderson@kidderlegal.com

*Counsel for Plaintiffs*

*OH-067- OX-S-9646*

## OIL AND GAS LEASE

EXHIBIT
A

THIS AGREEMENT, made and entered into this _10TH_ day of _April_ , 20_06_ by and between _Scott A. Marzia (Single)_

of _349 Bounty Way, Avon Lake, Oh. 44012_ Phone:( _440_ ) _930 - 0590_ hereinafter called the Lessor, and

THE OXFORD OIL COMPANY, of P.O. Box 910, Zanesville, Ohio 43702-0910, the Lessee.

**GRANT OF RIGHTS AND TERM:** WITNESSETH, That the said Lessor, in consideration of the sum of One Dollar, the receipt of which is hereby acknowledged, and of the mutual covenants and agreements herein contained, does hereby grant unto the Lessee all of the oil and natural gas from any source, which includes methane produced or gathered from coal seams or other sources generally described as coalbed methane, and their constituents, in and under the lands hereinafter described, together with the exclusive rights to drill for, produce, collect, store and market oil and gas and their constituents and to inject air, gas, brine, and any other substance from any source into any subsurface strata other than potable water and minable coal stratas. Lessee shall have the exclusive right to conduct geophysical, seismic and other methods of exploration for oil or gas by parties other than Lessor without the express prior written permission of the Lessee. Lessee shall have the right to transport from, across and through lands hereinafter described oil and gases and their constituents from the subject lands and other lands which right to transport shall survive the term of this lease so long as the transportation is continued. Lessee shall have the right to possess, use and occupy so much of said premises as is necessary and convenient to conduct its oil and gas and related activities, including but not limited to the right to install, maintain and replace pipelines, meters, tanks, power stations, communication facilities and other structures required to produce, store and transport oil and gases and their constituents. All of the above described rights shall extend for a term of _FIVE_ ( _5_ ) years and so much longer as oil, gas or their constituents are produced or are capable of being produced in paying quantities (in the sole opinion of Lessee) or as long as gas is stored or gas, air, brine or any other substance is injected as provided herein or operations and/or transportation is maintained on all or any part of that certain tract of land situated in:

**LOCATION OF PROPERTY:**

Lot No.: _____ (District)

Sec. No.: _26, 32_ Township of _STOCK_ County of _HARRISON_ and State of _OHIO_ , bounded

substantially as follows:

On the North by the lands of _R. B. WELLS, J.+D. TAGGART_

On the East by the lands of _R. B. WELLS_

On the South by the lands of _SECTION LINE_

On the West by the lands of _J. + D. TAGGART_

containing _One hundred twenty eight_ ( _128_ ) acres, more or less, being all the land owned by Lessor in said Township, provided, however, that if at the termination of said term, either primary or extended, there is a well in process of being drilled on said lands, then this lease shall continue in force so long as the drilling of such well is continued with reasonable diligence and so much longer thereafter as oil or gas or their constituents are found on said premises in paying quantities, in sole opinion of Lessee. It being understood, however, that no well shall be drilled within two hundred feet of the existing barn or dwelling on said premises without the consent of Lessor.

**ROYALTY:** In consideration of the premises, the said parties covenant and agree as follows: Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all cost and expense except taxes applicable thereto, a royalty of one-eighth (1/8) of the oil produced. Lessor shall receive on a monthly basis, as a royalty, one-eighth (1/8) of the proceeds realized at the well from the sale of all gas marketed from the premises after deduction of all costs attributable to marketing the gas, including, but not limited to, costs to transport, collect, compress, dehydrate and make the gas ready for market. Lessee shall have the option to make such payments on a quarterly basis if such monthly net royalty proceeds are less than $100.

**DELAY RENTAL:** Lessee shall commence operations for a well on the premises by _April 10, 2006_, or pay to Lessor delay rental of _Six Hundred Forty dollars_ dollars ($_640.00_) each year, payable ~~quarterly in advance~~ The first ~~quarterly~~ ANNUAL payment shall be due on _June 10, 2006_ and shall give un: Lessee the privilege of deferring the commencement of a well for _TWELVE_ ( _12_ ) months following the due date. The payment herein referred to may be made in currency, draft or Lessee's check, at the option of the Lessee. Tender thereof may be made either to Lessor in person or by mailing the same to Lessor at his last known address on or before the date on which said rental is due. In a like manner, and upon like payments or tenders, the commencement of a well may be further deferred for

to receive free gas from the leased premises, such change shall not be effective until and unless the owner of the subsequent solo dwelling house on the leased premises executes the agreement regarding the use of gas described below and the owner or seller of the original sole dwelling house executes a release of his right to the use of free gas. No subdivision of the leased premises, replacement, removal or construction of a dwelling house will entitle the owner of a dwelling house on the leased premises to free gas without the express prior written consent of Lessee. No subdivision of the leased premises or change in the number or character of dwelling houses on the leased premises shall affect the fact that only one dwelling house on the premises described in this lease shall ever during the term of this lease be entitled to free gas. The use of such gas shall be subject to rules and regulations required by law or adopted by Lessee from time to time and also subject to curtailment of gas flow for any reason including, but not limited to, freeze offs, maintenance and repair of well and production equipment and shall also be subject to the right of Lessee to abandon the well or wells located on the leased premises. Lessor acknowledges that an alternate source of fuel would prevent damage to property in the event of such curtailment or abandonment. Lessor shall be solely responsible for maintaining all lines, regulators, drips, valves and other equipment installed for free gas purposes (including a meter as specified by Lessee). The first 200,000 cubic feet of gas taken by Lessor each calendar year shall be free of cost to Lessor and all gas taken in excess of 200,000 cubic feet per calendar year shall be charged to Lessor at the average rate Lessee has received for gas sold from the leased premises during the year. Lessee may, at its discretion, supply a meter to be installed by Lessor according to the terms of the Gas Use Agreement. Failure to provide a meter does not preclude the requirement of a meter at a later date.

Lessor's privilege of taking free gas shall be upon the condition that Lessor will maintain his pipeline, regulators, drips, valves and (meter) and other equipment in good repair and free of all gas leaks and will operate such equipment so as not to cause waste or unnecessary leaks of gas.

If Lessor shall take and refuse to pay for any excess gas used during the calendar year, Lessee may deduct, if possible, payment for such excess gas from any rentals or royalties accruing to Lessor hereunder. Should the Lessee be unable to deduct rentals or royalties for any reason, it shall have the right to discontinue the free gas usage until payments are tendered.

Lessor acknowledges the fact that natural gas is a dangerous commodity and that he is aware of the risks inherent in the taking and use of gas from wells or production equipment. Lessor further acknowledges he understands natural gas produced by oil and or gas wells contains moisture and may contain dirt, dust and petroleum liquids which may affect the quality and quantity of gas available to Lessor and may cause the flow of gas to cease altogether at any time or cause serious damage to the pipeline and equipment used to deliver the gas to the dwelling house or to the furnace or other gas consuming appliances. Damage to that equipment can result in serious problems or even an explosion with a resulting loss or injury to property or persons. Lessor or the owner of the sole designated dwelling using free gas shall be responsible for the proper construction, maintenance, inspection and repair of the pipeline and other equipment used to deliver the gas from our well or pipeline to the dwelling. The delivery system should contain regulators, drips and other important safety equipment, which require periodic maintenance and inspection. If Lessor is not willing to undertake this serious responsibility, he shall immediately switch to another fuel for the dwelling. Because Lessee is concerned with safety, it strongly recommends that the free gas user have his system inspected by a licensed plumber at least one time each year. Although this inspection will require some expense and effort by Lessor, it is reasonable and necessary for his continued safety. If at any time a gas leak or other safety problem is suspected, Lessor shall immediately contact a licensed plumber and vacate the premises. Lessor agrees to assume all such risks whether same be caused by Lessor's lines or equipment, or whether same be caused by Lessee's production equipment or well operations. Lessor agrees to hold Lessee and the well operator and all parties in interest in any well or wells located on the leasehold premises harmless from any claims of any nature whatsoever which may arise by the usage of gas from such well or wells by Lessor, his heirs, executors, administrators and assigns.

The use of gas on the leased premises shall be conditioned upon the execution and compliance with the terms of this lease and Gas Use Agreements in forms prescribed by Lessee which may be amended from time to time. Failure to execute or comply with the terms of such agreements or this lease shall entitle Lessee to terminate the use of gas on the leased premises without notice.

UNDERGROUND GAS STORAGE: At any time during the effective term of this lease or extension thereof, Lessee may notify the Lessor by certified or registered mail at Lessor's last known address, that Lessee intends to use the leased premises and any wells located thereon or subsequently drilled thereon, for the purpose of injecting into, storing or holding in storage, and removing gas from any sands, coal seams, geologic reservoir or rock formations underlying the premises, and upon the giving of such notice the Lessee may use any such well and/or the leased premises for any and all of said purposes. The Lessee shall pay to the Lessor a rental of $300 each year for each well while so used; provided that the rental for the first year for a well so used shall be equivalent to the one-eighth gas royalty payments to the Lessor, if more than $300. for gas produced and marketed from such well during the consecutive period of time aggregating 180 days next preceding the giving of such notice, and for each year thereafter a rental for such well so used equivalent to said first year's well rental, if more than $300 reduced each year by the amount of $300 until reduced to $300, and for each year thereafter a rental of $300 for each such well so used. If no well is used for gas storage purposes on the leased premises, but if a well used Lessee for any of the gas storage purposes hereinbefore specified shall be located on other lands and such well shall be located within one mile of any property line of the leased premises, the Lessee may give like written notice to the Lessor of its intention to use the leased premises for any and all of said gas storage purposes, and thereupon may use the lease premises for said purposes and shall be the sole judge as to whether gas is being stored, held in storage or withdrawn from storage within or under the leased premises. The rental each year for such use shall be the same amount as, but in lieu of, the delay land rental hereinbefore provided to be paid to continue this lease in effect until a well is commenced or the premises are used for any of the herein stated gas storage purposes and shall have the same effect of continuing this lease in force as though a producing well or well used for gas storage purposes were drilled on the leased premises; provided that, if a well or wells are thereafter drilled and used for any of the gas storage purposes on the leased premises, the rental for such use of the leased premises, in lieu of the foregoing rental, shall be $300 each year for such well and the same sum each year for each additional well so drilled and used. If the Lessee ceases to use a well for gas storage purposes but continues to use the premises for gas storage purposes and there shall be no other well located thereon, the rental for such use shall be the land rental hereinbefore provided. All land rentals and well-delay rentals may be paid by the Lessee in quarter-year installments.

SUBDIVISION OF LEASED PREMISES: Lessee is hereby granted the right to operate the herein leased premises as one entity, and in the event Lessor subdivides or sells part of the leased premises or oil and gas rights under the leased premises to one or more parties, Lessee shall not be obligated to construct separate oil and gas processing, storage or measurement facilities to account for production from existing wells or new wells drilled on separate tracts created by subdivision or sale. Lessee shall have the right to locate processing, storage, measurement and pipeline facilities that best suits its operation of the wells drilled on the premises, and it shall be the sole responsibility of the royalty and/or property owners, whether one or more, to decide among themselves as to the division of royalty and disbursement of funds accruing to the Lessors under the terms of this oil and gas lease. Rental or production payments due under this lease shall not be apportioned among owners of subdivided parcels comprising the leased premises unless Lessee is so directed by a binding written Apportionment Agreement executed by all parties in interest to the leased premises. In the absence of an Apportionment Agreement, Lessee shall pay production payments to the owner of the subdivided parcel upon which the well or wells are situated. All rentals due under the terms of this lease for a well or wells used for gas storage purposes, shall be payable to the owner or owners upon whose respective parcel the storage well is located. The drilling or existence of a producing well or gas storage well upon any parcel shall have the same effect of continuing this lease in force as in the entire acreage covered hereby as though the premises had not been subdivided.

SHUT-IN CLAUSE: Notwithstanding anything herein to the contrary, this lease shall continue in full force for so long as there is a well or wells on the leased premises capable of producing oil or gas or their constituents, but in the event all such wells are shut in for any reason for 12 consecutive months, Lessee shall pay to Lessor an advance royalty in the amount and under the same terms as provided herein for delay rental under production is resumed. If no delay rentals are stated, the advance royalty shall be $1 per acre per year. Lessee shall be entitled to credit advance royalty payments to amounts due Lessor upon resumption of production until all royalties advanced are repaid.

INJECTION: If a well drilled hereunder is incapable or becomes incapable of production of oil, gas or their constituents in paying quantities in the opinion of Lessee, Lessee may use such well or wells for the injection of brine, water and any other substances from any source on or off this lease into any subsurface strata other than potable water and minable coal strata. Lessee shall notify Lessor of its election to utilize a well for injection by certified or registered mail at Lessor's last known address. Lessee agrees to conduct all injection operations in accordance with all applicable local, State and Federal regulations. If brine, water or any other substance from a source off this lease is injected into a well on this lease, Lessee shall pay Lessor a rental of $1,000 each year the lease is used for injection. The rental each year for such use shall have the same effect of continuing this lease in full force as though a producing well or well used for gas storage purposes were drilled and operated on the leased premises.

-2-

**UNITIZATION:** Lessee is hereby granted the right at any time and from time to time to unitize the leased premises, or any portion or portions thereof as to all strata, or any stratum or strata, with any lands as to all strata, or any stratum or strata, for the production of oil or gas. However, no units for the production of oil or gas shall embrace more than 160 acres, provided that if any governmental regulation shall prescribe a spacing pattern for the development of the field, or allocate a producing allowable based upon acreage per well, then, any such unit may embrace as much additional acreage as may be so prescribed or as may be used in such allocation of allowable. Lessee shall file written unit designations in the county in which the leased premises are located. The entire acreage so pooled into a tract or unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease whether the well or wells are located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified the Lessor shall be entitled to a royalty on all oil and gas produced from the pooled unit in the same proportion the acreage contributed by the Lessor to the unit bears to the total acreage comprising the unit; provided Lessee shall be under no obligation whatsoever, expressed or implied, to drill more than one well to each such unitized tract. Any unit established hereunder may be enlarged or diminished by Lessee at any time, either before or after production is obtained. Any such change resulting in any increase or decrease of Lessor's royalty shall not be retroactive. The enlargement or diminishment of any unit shall be accomplished by filing written designations as herein provided.

**OPTION TO DRILL:** It is agreed that the rentals or royalties on any well, or wells, paid and to be paid as herein provided are and shall be accepted by Lessor as adequate and full consideration to render it optional with Lessee whether or not it shall drill a well, additional wells or wells to offset producing wells on adjoining or adjacent premises.

**PARTIAL OWNERSHIP:** Should a search of the records in the county in which the leased lands are located reveal that Lessor is not the sole owner of the oil and gas rights located under the herein described real estate, land, tract or premises, then and thereupon Lessor agrees to accept and shall receive rentals and royalties in proportion to Lessor's ownership in the oil and gas rights as reflected by the recorded records. Lessor further agrees to sign any documents as may requested by Lessee to perfect Lessee's rights to conduct the operations described herein as well as such other documents relating to production, storage or injection as may be required by Lessee or others.

**PAYMENT INSTRUCTIONS:** Payments of all moneys due under this lease may be made by cash or check to

_Same as On Front_

**ABANDONMENT AND CHANGE IN OWNERSHIP:** Lessor agrees that Lessee shall have the privilege of using sufficient oil, gas or water in operating the premises and the right at any time to remove any machinery or fixtures placed on said premises. Further, except as to the storage terms as provided above, upon the payment to the Lessor of $1 and all amounts due hereunder, said Lessee shall have the right to surrender this lease or any portion thereof by written notice to Lessor describing the portion of the above tract that it elects to surrender or by returning to Lessor the lease with the endorsement of surrender thereon or recording the surrender of this lease on the margin of the record thereof, either of which shall be a full and legal surrender of this lease, to all of said tract or such portion thereof as said surrender shall indicate and a cancellation of all liabilities under same of each and all parties hereto, to the extent indicated on said surrender, and the acreage rental hereinbefore set forth shall be reduced in proportion to the acreage surrendered. No change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer or a certified copy thereof.

**GOVERNMENTAL LAW AND FORCE MAJEURE:** All terms and conditions of this lease shall be subject to governmental law, rules and regulations, and this lease shall not be terminated nor Lessee held liable in damages for failure to comply with the terms and conditions hereof if compliance is prevented by or such failure is the result of any such law, rule or regulation. Lessor grants Lessee the authority to compromise or settle any disputes with governmental agencies relating to this lease or production therefrom. If Lessee is unable to comply with any requirement under this lease due to any such law, rule, regulation or force majeure including but not limited to acts of God, strikes or governmental restrictions such as restrictions on the use of roads, this lease shall remain in full force and effect and shall not expire until 90 days after the termination of any such law, rule, regulation or force majeure.

**NOTICE OF NONCOMPLIANCE:** If Lessor contends that Lessee has not complied with any of its obligations or covenants under this lease, Lessor shall notify Lessee in writing setting forth specifically how Lessee has failed to comply with its obligations. Lessee shall then have 90 days after receipt of written notice to correct or commence to correct all or any of the obligations specified by Lessor. The service of said notice shall be a condition precedent to the commencement of any action by Lessor for breach of any obligation or covenant hereunder and no such action shall be commenced before 90 days from Lessee's receipt of written notice. Neither the service of said notice nor any acts by Lessee after said notice shall be deemed as admission or presumption that Lessee has filed to perform any of its obligations hereunder.

**SUCCESSORS, ASSIGNS, WARRANTY OF TITLE AND REDEMPTION:** All covenants and conditions between the parties hereto shall extend to their heirs, executors, successors and assigns and the Lessor hereby warrants and agrees to defend the title to the land herein described. Lessee shall have the right to assign this lease in whole or in part and Lessor waives notice of any assignment. Failure of payment of rental or royalty on any part of this lease shall not affect the rest of the lease upon which Lessee's obligations have been performed. Lessor agrees that when and if this lease is assigned, the Lessee named herein shall have no further obligation hereunder. Lessor further agrees that the Lessee shall have the right at any time to redeem for Lessor, or otherwise acquire by payment, any mortgage or any other liens upon the above-described lands which in any manner affect the Lessee's interest therein in the event of default of payment by Lessor and be subrogated in full to all the rights of the holder thereof the same as if Lessee were the original owner of said mortgage or lien, and Lessee may reimburse itself from any payments accruing to Lessor hereunder.

**RECORDING:** Neither Lessor nor Lessee shall record this lease. Lessor and Lessee agree to execute a short form of this lease suitable for recordation with the recorder of deeds in the county(ies) in which the land is situated.

**ENTIRE AGREEMENT:** It is mutually agreed that this instrument contains all of the agreements and understandings of the Lessor and Lessee; that no verbal representations or promises have been made or relied upon by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto and; that no implied covenant, agreement of obligation shall be read into this agreement or imposed upon the Lessee. The judgment of the Lessee, when not fraudulently exercised, in carrying out the purpose of this lease, shall be conclusive.

**OTHER CONDITIONS:** _Location of Access Road, Tank Battery, and Pipeline by mutual consent between Lessor and Lessee; however, said consent not to be unreasonably withheld._

_SA_

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands.

Signed and acknowledged
in the presence of:

**LESSOR:**

(Witnesses please type or print name
under signature)

X _____
Social Security # X

_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_
Social Security #

-3-

_____     Social Security #  _____

_____
_____     Social Security #  _____
_____

State of Ohio, ss:                                                    (Individual)

The foregoing instrument was acknowledged before me this _10th_ day of _April_ , 20_06_ by _Scott A. Madzia_

_____     _~signature~_
MELISSA L. THOMPSON            Notary Public
Notary Public, State of Ohio
My Commission Expires April 27, 2006

State of Ohio, ss:                                                    (Individual)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____

_____

_____
Notary Public

State of Ohio, ss:                                                    (Corporation)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____
the _____ of _____ on behalf of said
corporation.

_____
Notary Public

## RELEASE

_____, the owner of the Lessee interest hereunder, in consideration for $1.00,
hereby releases all rights in this lease this _____ day of _____, 20___.

WITNESSES:                                LESSEE:

_____             _____

_____             _____

## ASSIGNMENT OF LEASE

In consideration for $1.00, _____, ASSIGNEE, does
hereby sell and assign, without warranty express of implied, _____ of the right, title and interest in this lease, to _____
_____, excepting and reserving_____ unto
ASSIGNOR this _____ day of _____, 20___.

WITNESSES:                                ASSIGNOR:

_____             _____

_____             _____

State of Ohio, ss:                                                    (Individual)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____

_____

_____
Notary Public

This instrument prepared by
The Oxford Oil Company
P.O. Box 910
Zanesville, Ohio 43702-0910
Wjt/forms/oil&gaslease

-4-

**EXHIBIT**

**B**

FRANCIS R. BECKERT AND
NANCY A. BECKERT (H+W)
RICHARD D. BECKERT AND
JOY K. BECKERT (H+W)
DEBORAH A. McDONOUGH A
DAVID J. McDONOUGH (H+W

**OIL AND GAS LEASE**

THIS AGREEMENT, made and entered into this 28TH day of FEBRUARY , 2006, by and between _____ OF 44208 MEADOWLARK LANE, CADIZ, OH, 43907  11620 127TH AVE. NE, LAKE STEVENS, WA, 98258

(740) 942-2985
of 6678 HILLSIDE COURT, CELINA, OH, 45822         Phone:( 360 ) 653-5464         hereinafter called the Lessor, and
(419) 268-9255
THE OXFORD OIL COMPANY, of P.O. Box 910, Zanesville, Ohio 43702-0910, the Lessee.

**GRANT OF RIGHTS AND TERM:** WITNESSETH, That the said Lessor, in consideration of the sum of One Dollar, the receipt of which is hereby acknowledged, and of the mutual covenants and agreements herein contained, does hereby grant unto the Lessee all of the oil and natural gas from any source, which includes methane produced or gathered from coal seams or other sources generally described as coalbed methane, and their constituents, in and under the lands hereinafter described, together with the exclusive rights to drill for, produce, collect, store and market oil and gas and their constituents and to inject air, gas, brine, and any other substance from any source into any subsurface strata other than potable water and minable coal stratas. Lessee shall have the exclusive right to conduct geophysical, seismic and other methods of exploration for oil or gas by parties other than Lessor without the express prior written permission of the Lessee. Lessee shall have the right to transport from, across and through lands hereinafter described oil and gases and their constituents from the subject lands and other lands which right to transport shall survive the term of this lease so long as the transportation is continued. Lessee shall have the right to possess, use and occupy so much of said premises as is necessary and convenient to conduct its oil and gas and related activities, including but not limited to the right to install, maintain and replace pipelines, meters, tanks, power stations, communication facilities and other structures required to produce, store and transport oil and gases and their constituents. All of the above described rights shall extend for a term of ____FIVE____ (_5_) years and so much longer as oil, gas or their constituents are produced or are capable of being produced in paying quantities (in the sole opinion of Lessee) or as long as gas is stored or gas, air, brine or any other substance is injected as provided herein or operations and/or transportation is maintained on all or any part of that certain tract of land situated in:

**LOCATION OF PROPERTY:**

Lot No.: _____ (District)
Sec. No.: 25         Township of STOCK         County of HARRISON         and State of OHIO _____ , bounded
substantially as follows: T11N R5W NW QTR SEC 25
On the North by the lands of SECTION LINE , EDWARD COULTRAP, JR.
On the East by the lands of EDWARD COULTRAP, JR , SECTION LINE
On the South by the lands of EDITH, ELIZABETH, + KENNETH WELSH, EDWARD COULTRAP JR.
On the West by the lands of SECTION LINE

containing ____ONE HUNDRED TWENTY FIVE____ ( 125 ) acres, more or less, being all the land owned by Lessor in said Township, provided, however, that if at the termination of said term, either primary or extended, there is a well in process of being drilled on said lands, then this lease shall continue in force so long as the drilling of such well is continued with reasonable diligence and so much longer thereafter as oil or gas or their constituents are found on said premises in paying quantities, in sole opinion of Lessee. It being understood, however, that no well shall be drilled within two hundred feet of the existing barn or dwelling on said premises without the consent of Lessor.

**ROYALTY:** In consideration of the premises, the said parties covenant and agree as follows: Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all cost and expense except taxes applicable thereto, a royalty of one-eighth (1/8) of the oil produced. Lessor shall receive on a monthly basis, as a royalty, one-eighth (1/8) of the proceeds realized at the well from the sale of all gas marketed from the premises after deduction of all costs attributable to marketing the gas, including, but not limited to, costs to transport, collect, compress, dehydrate and make the gas ready for market. Lessee shall have the option to make such payments on a quarterly basis if such monthly net royalty proceeds are less than $100.

**DELAY RENTAL:** Lessee shall commence operations for a well on the premises by APRIL 28, 2006 _____ , or pay to Lessor delay rental of ____SIX HUNDRED TWENTY FIVE____ dollars ($ 625⁰⁰ ) each year, payable quarterly in advance. The first quarterly payment shall be due on APRIL 28, 2006 _____ and shall give the Lessee the privilege of deferring the commencement of a well for ANNUAL ____TWELVE____ ( 12 ) months following the due date. The payment herein referred to may be made in currency, draft or NAB Lessee's check, at the option of the Lessee. Tender thereof may be made either to Lessor in person or by mailing the same to Lessor at his last known address on or before the date on which said rental is due. In a like manner, and upon like payments or tenders, the commencement of a well may be further deferred for periods of the same number of months successively during the term of the lease. Lessee may drill a well or wells upon said premises at any time as long as this lease continues, or may decline to drill a first or subsequent well or wells, and instead pay the rental herein provided but in either event there shall be no implied covenant to drill additional wells or offset wells, and no part of this lease shall be forfeited or terminated by reason of the breach of any implied covenants thereof. Failure of Lessee to pay the Lessor the delay rental specified herein shall not cause this lease or any part thereof to terminate until and unless the Lessor gives the Lessee or his assigns written notice by certified or registered mail that the rental is past due, and the Lessee then fails to pay the Lessor or his assigns within ten (10) days after Lessee received such notification, all the past due rental.

**EXISTING WELLS:** Lessor and Lessee agree that this lease shall not grant Lessee the right to produce any existing wells on the property or any unitized property. Lessor and Lessee agree that Lessee shall not have any liability for existing wells on the property or any unitized property. Lessee shall be responsible for only the well or wells located on the leased premises that it drills or expressly acquires. Lessee assumes no rights to own or operate any pre-existing wells, and Lessor shall indemnify and save Lessee harmless from any known or unknown wells located on the leased premises not drilled or expressly acquired by Lessee.

**DRY HOLE:** Should the first well drilled on the above described land be a dry hole, then in that event if a second well is not commenced on said land within 12 months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties unless Lessee on or before the expiration of said 12 months shall commence or resume the payment of rentals in the same amount and in the same manner as hereinbefore provided, it being agreed that upon the commencement or resumption of payment of rentals as above provided, that the terms hereof governing payment of rentals and the effect thereof, shall continue in force as though there has been no interruption in the rental payments. If the Lessee shall commence to drill a well during the primary term or any extension thereof to completion with reasonable diligence and if oil and gas, or either of them, is found, this Lease shall continue and be in force with like effect as if such well had been completed within the primary term hereof. Lessor and Lessee agree that for the purposes of this lease a well shall be deemed to be commenced upon the date that a drilling machine of sufficient capacity to drill a hole to the target formation is moved upon the lands described herein provided a well is spudded within 15 days after the rig is moved upon this lease.

**DAMAGES AND ARBITRATION:** Lessee shall bury, when so requested by Lessor, all pipe lines used to transport gas or oil off or across the premises and pay all damage to growing crops and fences caused by operations under this lease; said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons, one thereof to be appointed by the Lessor, one by the Lessee and the third by the two so appointed as aforesaid, and the award of such three persons shall be final and conclusive and binding on all parties. Each party shall bear the cost of their arbiter and shall share equally the cost of the third arbiter. Arbitration shall be mandatory. If Lessee buries any or all oil and/or gas pipelines used to conduct oil and/or gas from or across the premises, Lessor shall not require Lessee to recover said pipelines when abandoned.

**FREE GAS:** If a well or wells are drilled on the premises leased hereunder and said well or wells are capable of producing natural gas in quantities in excess of the quantities required by Lessee to operate the wells and equipment associated with the operations of the wells; Lessor may, at its sole and exclusive risk and cost, lay a pipeline to a point on Lessee's production facilities as designated by Lessee and take gas from said production facilities for domestic use in one now-existing or future dwelling house located on the leased premises. In the event that there are more than one dwelling house on the leased premises, Lessor shall designate the one dwelling house eligible for the right to receive such gas by executing the agreement regarding the use of gas described below. Once a dwelling house is designated by Lessor to use of such gas, it shall be the sole dwelling house entitled to free gas on the leased premises regardless of changes in title to Lessor or Lessee's interest in the leased premises. If the Lessor, his successors or assigns wish to change the ownership or the designation of the sole dwelling house entitled

Agreement. Failure to provide a meter does not preclude the requirement of a meter at a later date.

Lessor's privilege of taking free gas shall be upon the condition that Lessor will maintain his pipeline, regulators, drips, valves and (meter) and other equipment in good repair and free of all gas leaks and will operate such equipment so as not to cause waste or unnecessary leaks of gas.

If Lessor shall take and refuse to pay for any excess gas used during the calendar year, Lessee may deduct, if possible, payment for such excess gas from any rentals or royalties accruing to Lessor hereunder. Should the Lessee be unable to deduct rentals or royalties for any reason, it shall have the right to discontinue the free gas usage until payments are tendered.

Lessor acknowledges the fact that natural gas is a dangerous commodity and that he is aware of the risks inherent in the taking and use of gas from wells or production equipment. Lessor further acknowledges he understands natural gas produced by oil and or gas wells contains moisture and may contain dirt, dust and petroleum liquids which may affect the quality and quantity of gas available to Lessor and may cause the flow of gas to cease altogether at any time or cause serious damage to the pipeline and equipment used to deliver the gas to the dwelling house or to the furnace or other gas consuming appliances. Damage to that equipment can result in serious problems or even an explosion with a resulting loss or injury to property or persons. Lessor or the owner of the sole designated dwelling using free gas shall be responsible for the proper construction, maintenance, inspection and repair of the pipeline and other equipment used to deliver the gas from our well or pipeline to the dwelling. The delivery system should contain regulators, drips and other important safety equipment, which require periodic maintenance and inspection. If Lessor is not willing to undertake this serious responsibility, he shall immediately switch to another fuel for the dwelling. Because Lessee is concerned with safety, it strongly recommends that the free gas user have his system inspected by a licensed plumber at least one time each year. Although this inspection will require some expense and effort by Lessor, it is reasonable and necessary for his continued safety. If at any time a gas leak or other safety problem is suspected, Lessor shall immediately contact a licensed plumber and vacate the premises. Lessor agrees to assume all such risks whether same be caused by Lessor's lines or equipment, or whether same be caused by Lessee's production equipment or well operations. Lessee agrees to hold Lessee and the well operator and all parties in interest in any well or wells located on the leasehold premises harmless from any claims of any nature whatsoever which may arise by the usage of gas from such well or wells by Lessor, his heirs, executors, administrators and assigns.

The use of gas on the leased premises shall be conditioned upon the execution and compliance with the terms of this lease and Gas Use Agreements in forms prescribed by Lessee which may be amended from time to time. Failure to execute or comply with the terms of such agreements or this lease shall entitle Lessee to terminate the use of gas on the leased premises without notice.

UNDERGROUND GAS STORAGE: At any time during the effective term of this lease or extension thereof, Lessee may notify the Lessor by certified or registered mail at Lessor's last known address, that Lessee intends to use the leased premises and any wells located thereon or subsequently drilled thereon, for the purpose of injecting into, storing or holding in storage, and removing gas from any sands, coal seams, geologic reservoir or rock formations underlying the premises, and upon the giving of such notice the Lessee may use any such well and/or the leased premises for any and all of said purposes. The Lessee shall pay to the Lessor a rental of $300 each year for each well while so used; provided that the rental for the first year for a well so used shall be equivalent to the one-eighth gas royalty payments to the Lessor, if more than $300, for gas produced and marketed from such well during the consecutive period of time aggregating 180 days next preceding the giving of such notice, and for each year thereafter a rental for such well so used equivalent to said first year's well rental, if more than $300 reduced each year by the amount of $300 until reduced to $300, and for each year thereafter a rental of $300 for each such well so used. If no well is used for gas storage purposes on the leased premises, but if a well used Lessee for any of the gas storage purposes hereinbefore specified shall be located on other lands and such well shall be located within one mile of any property line of the leased premises, the Lessee may give like written notice to the Lessor of its intention to use the leased premises for any and all of said gas storage purposes, and thereupon may use the lease premises for said purposes and shall be the sole judge as to whether gas is being stored, held in storage or withdrawn from storage within or under the leased premises. The rental each year for such use shall be the same amount as, but in lieu of, the delay land rental hereinbefore provided to be paid to continue this lease in effect until a well is commenced or the premises are used for any of the herein stated gas storage purposes and shall have the same effect of continuing this lease in force as though a producing well or well used for gas storage purposes were drilled on the leased premises; provided that, if a well or wells are thereafter drilled and used for any of the gas storage purposes on the leased premises, the rental for such use of the leased premises, in lieu of the foregoing rental, shall be $300 each year for such well and the same sum each year for each additional well so drilled and used. If the Lessee ceases to use a well for gas storage purposes but continues to use the premises for gas storage purposes and there shall be no other well located thereon, the rental for such use shall be the land rental hereinbefore provided. All land rentals and well-delay rentals may be paid by the Lessee in quarter-year installments.

SUBDIVISION OF LEASED PREMISES: Lessee is hereby granted the right to operate the herein leased premises as one entity, and in the event Lessor subdivides or sells part of the leased premises or oil and gas rights under the leased premises to one or more parties, Lessee shall not be obligated to construct separate oil and gas processing, storage or measurement facilities to account for production from existing wells or new wells drilled on separate tracts created by subdivision or sale. Lessee shall have the right to locate processing, storage, measurement and pipeline facilities that best suits its operation of the wells drilled on the premises, and it shall be the sole responsibility of the royalty and/or property owners, whether one or more, to decide among themselves as to the division of royalty and disbursement of funds accruing to the Lessors under the terms of this oil and gas lease. Rental or production payments due under this lease shall not be apportioned among owners of subdivided parcels comprising the leased premises unless Lessee is so directed by a binding written Apportionment Agreement executed by all parties in interest to the leased premises. In the absence of an Apportionment Agreement, Lessee shall pay production payments to the owner of the subdivided parcel upon which the well or wells are situated. All rentals due under the terms of this lease for a well or wells used for gas storage purposes, shall be payable to the owner or owners upon whose respective parcel the storage well is located. The drilling or existence of a producing well or gas storage well upon any parcel shall have the same effect of continuing this lease in force as in the entire acreage covered hereby as though the premises had not been subdivided.

SHUT-IN CLAUSE: Notwithstanding anything herein to the contrary, this lease shall continue in full force for so long as there is a well or wells on the leased premises capable of producing oil or gas or their constituents, but in the event all such wells are shut in for any reason for 12 consecutive months, Lessee shall pay to Lessor an advance royalty in the amount and under the same terms as provided herein for delay rental under production is resumed. If no delay rentals are stated, the advance royalty shall be $1 per acre per year. Lessee shall be entitled to credit advance royalty payments to amounts due Lessor upon resumption of production until all royalties advanced are repaid.

INJECTION: If a well drilled hereunder is incapable or becomes incapable of production of oil, gas or their constituents in paying quantities in the opinion of Lessee, Lessee may use such well or wells for the injection of brine, water and any other substances from any source on or off this lease into any subsurface strata other than potable water and minable coal strata. Lessee shall notify Lessor of its election to utilize a well for injection by certified or registered mail at Lessor's last known address. Lessee agrees to conduct all injection operations in accordance with all applicable local, State and Federal regulations. If brine, water or any other substance from a source off this lease is injected into a well on this lease, Lessee shall pay Lessor a rental of $1,000 each year the lease is used for injection. The rental each year for such use shall have the same effect of continuing this lease in full force as though a producing well or well used for gas storage purposes were drilled and operated on the leased premises.

-2-

**UNITIZATION:** Lessee is hereby granted the right at any time and from time to time to unitize the leased premises, or any portion or portions thereof as to all strata, or any stratum or strata, with any lands as to all strata, or any stratum or strata, for the production of oil or gas. However, no units for the production of oil or gas shall embrace more than 160 acres, provided that if any governmental regulation shall prescribe a spacing pattern for the development of the field, or allocate a producing allowable based upon acreage per well, then, any such unit may embrace as much additional acreage as may be so prescribed or as may be used in such allocation of allowable. Lessee shall file written unit designations in the county in which the leased premises are located. The entire acreage so pooled into a tract or unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease whether the well or wells are located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified the Lessor shall be entitled to a royalty on all oil and gas produced from the pooled unit in the same proportion the acreage contributed by the Lessor to the unit bears to the total acreage comprising the unit; provided Lessee shall be under no obligation whatsoever, expressed or implied, to drill more than one well to each such unitized tract. Any unit established hereunder may be enlarged or diminished by Lessee at any time, either before or after production is obtained. Any such change resulting in any increase or decrease of Lessor's royalty shall not be retroactive. The enlargement or diminishment of any unit shall be accomplished by filing written designations as herein provided.

**OPTION TO DRILL:** It is agreed that the rentals or royalties on any well, or wells, paid and to be paid as herein provided are and shall be accepted by Lessor as adequate and full consideration to render it optional with Lessee whether or not it shall drill a well, additional wells or wells to offset producing wells on adjoining or adjacent premises.

**PARTIAL OWNERSHIP:** Should a search of the records in the county in which the leased lands are located reveal that Lessor is not the sole owner of the oil and gas rights located under the herein described real estate, land, tract or premises, then and thereupon Lessor agrees to accept and shall receive rentals and royalties in proportion to Lessor's ownership in the oil and gas rights as reflected by the recorded records. Lessor further agrees to sign any documents as may requested by Lessee to perfect Lessee's rights to conduct the operations described herein as well as such other documents relating to production, storage or injection as may be required by Lessee or others.

**PAYMENT INSTRUCTIONS:** Payments of all moneys due under this lease may be made by cash or check to

_100%    NANCY A. BECKERT    44208 MEADOWLARK LANE, CADIZ, OH, 43907_

**ABANDONMENT AND CHANGE IN OWNERSHIP:** Lessor agrees that Lessee shall have the privilege of using sufficient oil, gas or water in operating the premises and the right at any time to remove any machinery or fixtures placed on said premises. Further, except as to the storage terms as provided above, upon the payment to the Lessor of $1 and all amounts due hereunder, said Lessee shall have the right to surrender this lease or any portion thereof by written notice to Lessor describing the portion of the above tract that it elects to surrender or by returning to Lessor the lease with the endorsement of surrender thereon or recording the surrender of this lease on the margin of the record thereof, either of which shall be a full and legal surrender of this lease, to all of said tract or such portion thereof as said surrender shall indicate and a cancellation of all liabilities under same of each and all parties hereto, to the extent indicated on said surrender, and the acreage rental hereinbefore set forth shall be reduced in proportion to the acreage surrendered. No change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer or a certified copy thereof.

**GOVERNMENTAL LAW AND FORCE MAJEURE:** All terms and conditions of this lease shall be subject to governmental law, rules and regulations, and this lease shall not be terminated nor Lessee held liable in damages for failure to comply with the terms and conditions hereof if compliance is prevented by or such failure is the result of any such law, rule or regulation. Lessor grants Lessee the authority to compromise or settle any disputes with governmental agencies relating to this lease or production therefrom. If Lessee is unable to comply with any requirement under this lease due to any such law, rule, regulation or force majeure including but not limited to acts of God, strikes or governmental restrictions such as restrictions on the use of roads, this lease shall remain in full force and effect and shall not expire until 90 days after the termination of any such law, rule, regulation or force majeure.

**NOTICE OF NONCOMPLIANCE:** If Lessor contends that Lessee has not complied with any of its obligations or covenants under this lease, Lessor shall notify Lessee in writing setting forth specifically how Lessee has failed to comply with its obligations. Lessee shall then have 90 days after receipt of written notice to correct or commence to correct all or any of the obligations specified by Lessor. The service of said notice shall be a condition precedent to the commencement of any action by Lessor for breach of any obligation or covenant hereunder and no such action shall be commenced before 90 days from Lessee's receipt of written notice. Neither the service of said notice nor any acts by Lessee after said notice shall be deemed as admission or presumption that Lessee has filed to perform any of its obligations hereunder.

**SUCCESSORS, ASSIGNS, WARRANTY OF TITLE AND REDEMPTION:** All covenants and conditions between the parties hereto shall extend to their heirs, executors, successors and assigns and the Lessor hereby warrants and agrees to defend the title to the land herein described. Lessee shall have the right to assign this lease in whole or in part and Lessor waives notice of any assignment. Failure of payment of rental or royalty on any part of this lease shall not affect the rest of the lease upon which Lessee's obligations have been performed. Lessor agrees that when and if this lease is assigned, the Lessee named herein shall have no further obligation hereunder. Lessor further agrees that the Lessee shall have the right at any time to redeem for Lessor, or otherwise acquire by payment, any mortgage or any other liens upon the above-described lands which in any manner affect the Lessee's interest therein in the event of default of payment by Lessor and be subrogated in full to all the rights of the holder thereof the same as if Lessee were the original owner of said mortgage or lien, and Lessee may reimburse itself from any payments accruing to Lessor hereunder.

**RECORDING:** Neither Lessor nor Lessee shall record this lease. Lessor and Lessee agree to execute a short form of this lease suitable for recordation with the recorder of deeds in the county(ies) in which the land is situated.

**ENTIRE AGREEMENT:** It is mutually agreed that this instrument contains all of the agreements and understandings of the Lessor and Lessee; that no verbal representations or promises have been made or relied upon by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto and; that no implied covenant, agreement of obligation shall be read into this agreement or imposed upon the Lessee. The judgment of the Lessee, when not fraudulently exercised, in carrying out the purpose of this lease, shall be conclusive.

**OTHER CONDITIONS:** _Location of Access Road, Tank Battery, and Pipeline by mutual consent between Lessor and Lessee; however, said consent not to be unreasonably withheld._

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their.'

Signed and acknowledged
in the presence of:

(Witnesses please type or print name
under signature)

x _Nancy A. Beckert_

SS/# _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_

x _Francis R. Beckert_

LESSOR:

x _[signature]_

x _Richard D. Becker_
Social Security # _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_

x _Ululaad A McGaraugh_
Social Security # _273-56-32__

x _David J McDonof_

-3-

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____

_____.

_____

Notary Public

State of Ohio, ss:

(Individual)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____

_____.

_____

Notary Public

State of Ohio, ss:

(Corporation)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____

the _____ of _____ on behalf of said
corporation.

_____

Notary Public

## RELEASE

_____, the owner of the Lessee interest hereunder, in consideration for $1.00,
hereby releases all rights in this lease this _____ day of _____, 20___.

WITNESSES:                                      LESSEE:.

_____                _____

_____                _____

## ASSIGNMENT OF LEASE

In consideration for $1.00, _____, ASSIGNEE, does
hereby sell and assign, without warranty express of implied, _____ of the right, title and interest in this lease, to _____
ASSIGNOR this _____ day of _____, 20___. , excepting and reserving_____ unto

WITNESSES:                                      ASSIGNOR:.

_____                _____

_____                _____

State of Ohio, ss:

(Individual)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by ;

_____.

_____

Notary Public

This instrument prepared by
The Oxford Oil Company
P.O. Box 910
Zanesville, Ohio 43702-0910
Wjt/forms/oil&gaslease

-4-

6. The GRANTOR covenants that he is the true and lawful owner of the above described premises and that the undersigned include all parties known to be seized of the same in fee simple, or any other estate therein, and has the right and full power to bargain, sell and convey the right of way in the manner aforesaid, and the GRANTEE shall have quiet and peaceful possession of the same, and the GRANTOR will warrant and defend the same against the claims of all persons whomsoever.

7. All provisions hereof shall extend to and apply to the respective heirs, administrators, successors and assigns of the parties hereto, and wherever the singular is used herein the same shall include the plural.

IN WITNESS WHEREOF, _____I_____ have hereunto set our hands this _1ST_ day of _March_, 20_06_.

Signed and acknowledged by the GRANTORS in the presence of:*

WITNESSES-

x _Nancy a. Beckert_

x _Francis R Beckert_

GRANTORS:

x _Richard D Beckert_

SS #: _____

x _J Wheeler_

SS #: _____

x _Deborah A McDonough_

SS #: _____

x _Doug J McDong_

SS #: _____

SS #: _____

SS #: _____

*(two witnesses required)

THE STATE OF OHIO
COUNTY OF _Mercer_ , SS:

*Signatures to be identical as they appear in the first paragraph

Before me, the undersigned, a notary public of and within said county, this _1ST_ day of _March_, 20 _06_ personally appeared the above named _Deborah A. & David J. McDonough_ the GRANTOR_IS_ in the above instrument and in due form of law did acknowledge the signing thereof to be _____ voluntary act and deed for the uses and purposes therein named.

Witness my hand and seal.

[Notary Seal: Wilhelmina Kosterman, Notary Public - Ohio, Mercer County, My Comm. Exp. Sept. 1 2004]

_Wilhelmina Kosterman_
Notary Public

My Commission Expires: _Sept 9, 2006_

THE STATE OF ~~OHIO~~ Washington
COUNTY OF _Snohomish_ , SS:

Before me, the undersigned, a notary public of and within said county, this _15th_ day of _March_ 20 _06_ , personally appeared the above named _Richard D. Beckert + Joy Colette Beckert_ the GRANTOR_S_ in the above instrument and in due form of law did acknowledge the signing thereof to be their voluntary act and deed for the uses and purposes therein named.

Witness my hand and seal.

[Notary Seal: ANDREA K. BATEMAN, NOTARY PUBLIC, STATE OF WASHINGTON, COMMISSION EXPIRES FEBRUARY 22, 2009]

RECORDING DATA

_Andrea K Bateman_
Notary Public

My Commission Expires: _2/22/2009_

This instrument prepared by: **The Oxford Oil Company**

**EXHIBIT C**

OX-S-95

## OIL AND GAS LEASE

THIS AGREEMENT, made and entered into this _1TH_ day of _FEBRUARY_, 20_06_ by and between _____

_ROSS B. WELLS AND GLENNA L. WELLS (H+W)_

of _39377 GILMORE-RIDGE RD, CADIZ, OH, 43907_ Phone: _740_, _942-4262_ hereinafter called the Lessor, and

THE OXFORD OIL COMPANY, of P.O. Box 910, Zanesville, Ohio 43702-0910, the Lessee.

**GRANT OF RIGHTS AND TERM:** WITNESSETH, That the said Lessor, in consideration of the sum of One Dollar, the receipt of which is hereby acknowledged, and of the mutual covenants and agreements herein contained, does hereby grant unto the Lessee all of the oil and natural gas from any source, which includes methane produced or gathered from coal seams or other sources generally described as coalbed methane, and their constituents, in and under the lands hereinafter described, together with the exclusive rights to drill for, produce, collect, store and market oil and gas and their constituents and to inject air, gas, brine, and any other substance from any source into any subsurface strata other than potable water and minable coal stratas. Lessee shall have the exclusive right to conduct geophysical, seismic and other methods of exploration for oil or gas by parties other than Lessor without the express prior written permission of the Lessee. Lessee shall have the right to transport from, across and through lands hereinafter described oil and gases and their constituents from the subject lands and other lands which right to transport shall survive the term of this lease so long as the transportation is continued. Lessee shall have the right to possess, use and occupy so much of said premises as is necessary and convenient to conduct its oil and gas and related activities, including but not limited to the right to install, maintain and replace pipelines, meters, tanks, power stations, communication facilities and other structures required to produce, store and transport oil and gases and their constituents. All of the above described rights shall extend for a term of _FIVE_ (_5_) years and so much longer as oil, gas or their constituents are produced or are capable of being produced in paying quantities (in the sole opinion of Lessee) or as long as gas is stored or gas, air, brine or any other substance is injected as provided herein or operations and/or transportation is maintained on all or any part of that certain tract of land situated in:

**LOCATION OF PROPERTY:**

Lot No.: _____ (District)

Sec. No.: _26_ Township of _STARK_ County of _HARRISON_ and State of _OHIO_, bounded substantially as follows:

On the North by the lands of _EDWARD + ANITA COULTRAP_
On the East by the lands of _ARCHER TWP LINE_
On the South by the lands of _SECTION LINE_
On the West by the lands of _WM + CHRISTINA GRAHAM, SECTION LINE_

containing _ONE HUNDRED NINETEEN_ (_119_) acres, more or less, being all the land owned by Lessor in said Township, provided, however, that if at the termination of said term, either primary or extended, there is a well in process of being drilled on said lands, then this lease shall continue in force so long as the drilling of such well is continued with reasonable diligence and so much longer thereafter as oil or gas or their constituents are found on said premises in paying quantities, in sole opinion of Lessee. It being understood, however, that no well shall be drilled within two hundred feet of the existing barn or dwelling on said premises without the consent of Lessor.

**ROYALTY:** In consideration of the premises, the said parties covenant and agree as follows: Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all cost and expense except taxes applicable thereto, a royalty of one-eighth (1/8) of the oil produced. Lessor shall receive on a monthly basis, as a royalty, one-eighth (1/8) of the proceeds realized at the well from the sale of all gas marketed from the premises after deduction of all costs attributable to marketing the gas, including, but not limited to, costs to transport, collect, compress, dehydrate and make the gas ready for market. Lessee shall have the option to make such payments on a quarterly basis if such monthly net royalty proceeds are less than $100.

**DELAY RENTAL:** Lessee shall commence operations for a well on the premises by _April 27 2006_, or pay to Lessor delay rental of _FIVE HUNDRED-NINETY-FIVE_ dollars ($_595.00_) each year, payable quarterly in advance. The first quarterly _ANNUAL_ payment shall be due on _April 27, 2006_ and shall give the Lessee the privilege of deferring the commencement of a well for _TWELVE_ (_12_) months following the due date. The payment herein referred to may be made in currency, draft or Lessee's check, at the option of the Lessee. Tender thereof may be made either to Lessor in person or by mailing the same to Lessee at his last known address on or before the date on which said rental is due. In a like manner, and upon like payments or tenders, the commencement of a well may be further deferred for periods of the same number of months successively during the term of the lease. Lessee may drill a well or wells upon said premises at any time as long as this lease continues, or may decline to drill a first or subsequent well or wells, and instead pay the rental herein provided but in either event there shall be no implied covenant to drill additional wells or offset wells, and no part of this lease shall be forfeited or terminated by reason of the breach of any implied covenants thereof. Failure of Lessee to pay the Lessor the delay rental specified herein shall not cause this lease or any part thereof to terminate until and unless the Lessor gives the Lessee or his assigns written notice by certified or registered mail that the rental is past due, and the Lessee then fails to pay the Lessor or his assigns within ten (10) days after Lessee received such notification, all the past due rental.

**EXISTING WELLS:** Lessor and Lessee agree that this lease shall not grant Lessee the right to produce any existing wells on the property or any unitized property. Lessor and Lessee agree that Lessee shall not have any liability for existing wells on the property or any unitized property. Lessee shall be responsible for only the well or wells located on the leased premises that it drills or expressly acquires. Lessee assumes no rights to own or operate any pre-existing wells, and Lessor shall indemnify and save Lessee harmless from any known or unknown wells located on the leased premises not drilled or expressly acquired by Lessee.

**DRY HOLE:** Should the first well drilled on the above described land be a dry hole, then in that event if a second well is not commenced on said land within 12 months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties unless Lessee on or before the expiration of said 12 months shall commence or resume the payment of rentals in the same amount and in the same manner as hereinbefore provided, it being agreed that upon the commencement or resumption of payment of rentals as above provided, that the terms hereof governing payment of rentals and the effect thereof, shall continue in force as though there has been no interruption in the rental payments. If the Lessee shall commence to drill a well during the primary term or any extension thereof to completion with reasonable diligence and if oil and gas, or either of them, is found, this Lease shall continue and be in force with like effect as if such well had been completed within the primary term hereof. Lessor and Lessee agree that for the purposes of this lease a well shall be deemed to be commenced upon the date that a drilling machine of sufficient capacity to drill a hole to the target formation is moved upon the lands described herein provided a well is spudded within 15 days after the rig is moved upon this lease.

**DAMAGES AND ARBITRATION:** Lessee shall bury, when so requested by Lessor, all pipe lines used to transport gas or oil off or across the premises and pay all damage to growing crops and fences caused by operations under this lease; said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons, one thereof to be appointed by the Lessor, one by the Lessee and the third by the two so appointed as aforesaid, and the award of such three persons shall be final and conclusive and binding on all parties. Each party shall bear the cost of their arbiter and shall share equally the cost of the third arbiter. Arbitration shall be mandatory. If Lessee buries any or all oil and/or gas pipelines used to conduct oil and/or gas from or across the premises, Lessor shall not require Lessee to recover said pipelines when abandoned.

**FREE GAS:** If a well or wells are drilled on the premises leased hereunder and said well or wells are capable of producing natural gas in quantities in excess of the quantities required by Lessee to operate the wells and equipment associated with the operations of the wells, Lessor may, at its sole and exclusive risk and cost, lay a pipeline to a point on Lessee's production facilities as designated by Lessee and take gas from said production facilities for domestic use in one now-existing or future dwelling house located on the leased premises. In the event that there are more than one dwelling house on the leased premises, Lessor shall designate the one dwelling house eligible for the right to receive such gas by executing the agreement regarding the use of gas described below. Once a dwelling house is designated by Lessor to use of such gas, it shall be the sole dwelling house entitled to free gas on the leased premises regardless of changes in title to Lessor or Lessee's interest in the leased premises. If the Lessor, his successors or assigns wish to change the ownership or the designation of the sole dwelling house entitled

to receive free gas from the leased premises, such change shall not be effective until and unless the owner of the subsequent solo dwelling house on the leased premises executes the agreement regarding the use of gas described below and the owner or seller of the original solo dwelling house executes a release of his right to the use of free gas. No subdivision of the leased premises, replacement, removal or construction of a dwelling house will entitle the owner of a dwelling house on the leased premises to free gas without the express prior written consent of Lessee. No subdivision of the leased premises or change in the number or character of dwelling houses on the leased premises shall affect the fact that only one dwelling house on the premises described in this lease shall ever during the term of this lease be entitled to free gas. The use of such gas shall be subject to rules and regulations required by law or adopted by Lessee from time to time and also subject to curtailment of gas flow for any reason including, but not limited to, freeze offs, maintenance and repair of well and production equipment and shall also be subject to the right of Lessee to abandon the well or wells located on the leased premises. Lessor acknowledges that an alternate source of fuel would prevent damage to property in the event of such curtailment or abandonment. Lessor shall be solely responsible for maintaining all lines, regulators, drips, valves and other equipment installed for free gas purposes (including a meter as specified by Lessee). The first 200,000 cubic feet of gas taken by Lessor each calendar year shall be free of cost to Lessor and all gas taken in excess of 200,000 cubic feet per calendar year shall be charged to Lessor at the average rate Lessee has received for gas sold from the leased premises during the year. Lessee may, at its discretion, supply a meter to be installed by Lessor according to the terms of the Gas Use Agreement. Failure to provide a meter does not preclude the requirement of a meter at a later date.

Lessor's privilege of taking free gas shall be upon the condition that Lessor will maintain his pipeline, regulators, drips, valves and (meter) and other equipment in good repair and free of all gas leaks and will operate such equipment so as not to cause waste or unnecessary leaks of gas.

If Lessor shall take and refuse to pay for any excess gas used during the calendar year, Lessee may deduct, if possible, payment for such excess gas from any rentals or royalties accruing to Lessor hereunder. Should the Lessee be unable to deduct rentals or royalties for any reason, it shall have the right to discontinue the free gas usage until payments are tendered.

Lessor acknowledges the fact that natural gas is a dangerous commodity and that he is aware of the risks inherent in the taking and use of gas from wells or production equipment. Lessor further acknowledges he understands natural gas produced by oil and or gas wells contains moisture and may contain dirt, dust and petroleum liquids which may affect the quality and quantity of gas available to Lessor and may cause the flow of gas to cease altogether at any time or cause serious damage to the pipeline and equipment used to deliver the gas to the dwelling house or to the furnace or other gas consuming appliances. Damage to that equipment can result in serious problems or even an explosion with a resulting loss or injury to property or persons. Lessor or the owner of the sole designated dwelling using free gas shall be responsible for the proper construction, maintenance, inspection and repair of the pipeline and other equipment used to deliver the gas from our well or pipeline to the dwelling. The delivery system should contain regulators, drips and other important safety equipment, which require periodic maintenance and inspection. If Lessor is not willing to undertake this serious responsibility, he shall immediately switch to another fuel for the dwelling. Because Lessee is concerned with safety, it strongly recommends that the free gas user have his system inspected by a licensed plumber at least one time each year. Although this inspection will require some expense and effort by Lessor, it is reasonable and necessary for his continued safety. If at any time a gas leak or other safety problem is suspected, Lessor shall immediately contact a licensed plumber and vacate the premises: Lessor agrees to assume all such risks whether same be caused by Lessor's lines or equipment, or whether same be caused by Lessee's production equipment or well operations. Lessor agrees to hold Lessee and the well operator and all parties in interest in any well or wells located on the leasehold premises harmless from any claims of any nature whatsoever which may arise by the usage of gas from such well or wells by Lessor, his heirs, executors, administrators and assigns.

The use of gas on the leased premises shall be conditioned upon the execution and compliance with the terms of this lease and Gas Use Agreements in forms prescribed by Lessee which may be amended from time to time. Failure to execute or comply with the terms of such agreements or this lease shall entitle Lessee to terminate the use of gas on the leased premises without notice.

UNDERGROUND GAS STORAGE: At any time during the effective term of this lease or extension thereof, Lessee may notify the Lessor by certified or registered mail at Lessor's last known address, that Lessee intends to use the leased premises and any wells located thereon or subsequently drilled thereon, for the purpose of injecting into, storing or holding in storage, and removing gas from any sands, coal seams, geologic reservoir or rock formations underlying the premises, and upon the giving of such notice the Lessee may use any such well and/or the leased premises for any and all of said purposes. The Lessee shall pay to the Lessor a rental of $300 each year for each well while so used; provided that the rental for the first year for a well so used shall be equivalent to the one-eighth gas royalty payments to the Lessor, if more than $300, for gas produced and marketed from such well during the consecutive period of time aggregating 180 days next preceding the giving of such notice, and for each year thereafter a rental for such well so used equivalent to said first year's well rental, if more than $300 reduced each year by the amount of $300 until reduced to $300, and for each year thereafter a rental of $300 for each such well so used. If no well is used for gas storage purposes on the leased premises, but if a well used Lessee for any of the gas storage purposes hereinbefore specified shall be located on other lands and such well shall be located within one mile of any property line of the leased premises, the Lessee may give like written notice to the Lessor of its intention to use the leased premises for any and all of said gas storage purposes, and thereupon may use the lease premises for said purposes and shall be the sole judge as to whether gas is being stored, held in storage or withdrawn from storage within or under the leased premises. The rental each year for such use shall be the same amount as, but in lieu of, the delay land rental hereinbefore provided to be paid to continue this lease in effect until a well is commenced or the premises are used for any of the herein stated gas storage purposes and shall have the same effect of continuing this lease in force as though a producing well or well used for gas storage purposes were drilled on the leased premises; provided that, if a well or wells are thereafter drilled and used for any of the gas storage purposes on the leased premises, the rental for such use of the leased premises, in lieu of the foregoing rental, shall be $300 each year for such well and the same sum each year · for each additional well so drilled and used. If the Lessee ceases to use a well for gas storage purposes but continues to use the premises for gas storage purposes and there shall be no other well located thereon, the rental for such use shall be the land rental hereinbefore provided. All land rentals and well-delay rentals may be paid by the Lessee in quarter-year installments.

SUBDIVISION OR LEASED PREMISES: Lessee is hereby granted the right to operate the herein leased premises as one entity, and in the event Lessor subdivides or sells part of the leased premises or oil and gas rights under the leased premises to one or more parties, Lessee shall not be obligated to construct separate oil and gas processing, storage or measurement facilities to account for production from existing wells or new wells drilled on separate tracts created by subdivision or sale. Lessee shall have the right to locate processing, storage, measurement and pipeline facilities that best suits its operation of the wells drilled on the premises, and it shall be the sole responsibility of the royalty and/or property owners, whether one or more, to decide among themselves as to the division of royalty and disbursement of funds accruing to the Lessors under the terms of this oil and gas lease. Rental or production payments due under this lease shall not be apportioned among owners of subdivided parcels comprising the leased premises unless Lessee is so directed by a binding written Apportionment Agreement executed by all parties in interest to the leased premises. In the absence of an Apportionment Agreement, Lessee shall pay production payments to the owner of the subdivided parcel upon which the well or wells are situated. All rentals due under the terms of this lease for a well or wells used for gas storage purposes, shall be payable to the owner or owners upon whose respective parcel the storage well is located. The drilling or existence of a producing well or gas storage well upon any parcel shall have the same effect of continuing this lease in force as in the entire acreage covered hereby as though the premises had not been subdivided.

SHUT-IN CLAUSE: Notwithstanding anything herein to the contrary, this lease shall continue in full force for so long as there is a well or wells on the leased premises capable of producing oil or gas or their constituents, but in the event all such wells are shut in for any reason for 12 consecutive months, Lessee shall pay to Lessor an advance royalty in the amount and under the same terms as provided herein for delay rental under production is resumed. If no delay rentals are stated, the advance royalty shall be $1 per acre per year. Lessee shall be entitled to credit advance royalty payments to amounts due Lessor upon resumption of production until all royalties advanced are repaid.

INJECTION: If a well drilled hereunder is incapable or becomes incapable of production of oil, gas or their constituents in paying quantities in the opinion of Lessee, Lessee may use such well or wells for the injection of brine, water and any other substances from any source on or off this lease into any subsurface strata other than potable water and minable coal strata. Lessee shall notify Lessor of its election to utilize a well for injection by certified or registered mail at Lessor's last known address. Lessee agrees to conduct all injection operations in accordance with all applicable local, State and Federal regulations. If brine, water or any other substance from a source off this lease is injected into a well on this lease, Lessee shall pay Lessor a rental of $1,000 each year the lease is used for injection. The rental each year for such use shall have the same effect of continuing this lease in full force as though a producing well or well used for gas storage purposes were drilled and operated on the leased premises.

-2-

**UNITIZATION:** Lessee is hereby granted the right at any time and from time to time to unitize the leased premises, or any portion or portions thereof as to all strata, or any stratum or strata, with any lands as to all strata, or any stratum or strata, for the production of oil or gas. However, no units for the production of oil or gas shall embrace more than 160 acres, provided that if any governmental regulation shall prescribe a spacing pattern for the development of the field, or allocate a producing allowable based upon acreage per well, then, any such unit may embrace as much additional acreage as may be so prescribed or as may be used in such allocation of allowable. Lessee shall file written unit designations in the county in which the leased premises are located. The entire acreage so pooled into a tract or unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. If production is found on the pooled acreage, it shall be treated as if production is had from this lease whether the well or wells are located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified the Lessor shall be entitled to a royalty on all oil and gas produced from the pooled unit in the same proportion the acreage contributed by the Lessor to the unit bears to the total acreage comprising the unit; provided Lessee shall be under no obligation whatsoever, expressed or implied, to drill more than one well on each such unitized tract. Any unit established hereunder may be enlarged or diminished by Lessee at any time, either before or after production is obtained. Any such change resulting in any increase or decrease of Lessor's royalty shall not be retroactive. The enlargement or diminishment of any unit shall be accomplished by filing written designations as herein provided.

**OPTION TO DRILL:** It is agreed that the rentals or royalties on any well, or wells, paid and to be paid as herein provided are and shall be accepted by Lessor as adequate and full consideration to render it optional with Lessee whether or not it shall drill a well, additional wells or wells to offset producing wells on adjoining or adjacent premises.

**PARTIAL OWNERSHIP:** Should a search of the records in the county in which the leased lands are located reveal that Lessor is not the sole owner of the oil and gas rights located under the herein described real estate, land, tract or premises, then and thereupon Lessor agrees to accept and shall receive rentals and royalties in proportion to Lessor's ownership in the oil and gas rights as reflected by the recorded records. Lessor further agrees to sign any documents as may requested by Lessee to perfect Lessee's rights to conduct the operations described herein as well as such other documents relating to production, storage or injection as may be required by Lessee or others.

**PAYMENT INSTRUCTIONS:** Payments of all moneys due under this lease may be made by cash or check to

_Same As On Front_

**ABANDONMENT AND CHANGE IN OWNERSHIP:** Lessor agrees that Lessee shall have the privilege of using sufficient oil, gas or water in operating the premises and the right at any time to remove any machinery or fixtures placed on said premises. Further, except as to the storage terms as provided above, upon the payment to the Lessor of $1 and all amounts due hereunder, said Lessee shall have the right to surrender this lease or any portion thereof by written notice to Lessor describing the portion of the above tract that it elects to surrender or by returning to Lessor the lease with the endorsement of surrender thereon or recording the surrender of this lease on the margin of the record thereof, either of which shall be a full and legal surrender of this lease, to all of said tract or such portion thereof as said surrender shall indicate and a cancellation of all liabilities under same of each and all parties hereto, to the extent indicated on said surrender, and the acreage rental hereinbefore set forth shall be reduced in proportion to the acreage surrendered. No change in the ownership of the land or assignment of rentals or royalties shall be binding on the Lessee until after the Lessee has been furnished with a written transfer or a certified copy thereof.

**GOVERNMENTAL LAW AND FORCE MAJEURE:** All terms and conditions of this lease shall be subject to governmental law, rules and regulations, and this lease shall not be terminated nor Lessee held liable in damages for failure to comply with the terms and conditions hereof if compliance is prevented by or such failure is the result of any such law, rule or regulation. Lessor grants Lessee the authority to compromise or settle any disputes with governmental agencies relating to this lease or production therefrom. If Lessee is unable to comply with any requirement under this lease due to any such law, rule, regulation or force majeure including but not limited to acts of God, strikes or governmental restrictions such as restrictions on the use of roads, this lease shall remain in full force and effect and shall not expire until 90 days after the termination of any such law, rule, regulation or force majeure.

**NOTICE OF NONCOMPLIANCE:** If Lessor contends that Lessee has not complied with any of its obligations or covenants under this lease, Lessor shall notify Lessee in writing setting forth specifically how Lessee has failed to comply with its obligations. Lessee shall then have 90 days after receipt of written notice to correct or commence to correct all or any of the obligations specified by Lessor. The service of said notice shall be a condition precedent to the commencement of any action by Lessor for breach of any obligation or covenant hereunder and no such action shall be commenced before 90 days from Lessee's receipt of written notice. Neither the service of said notice nor any acts by Lessee after said notice shall be deemed as admission or presumption that Lessee has filed to perform any of its obligations hereunder.

**SUCCESSORS, ASSIGNS, WARRANTY OF TITLE AND REDEMPTION:** All covenants and conditions between the parties hereto shall extend to their heirs, executors, successors and assigns and the Lessor hereby warrants and agrees to defend the title to the land herein described. Lessee shall have the right to assign this lease in whole or in part and Lessor waives notice of any assignment. Failure of payment of rental or royalty on any part of this lease shall not affect the rest of the lease upon which Lessee's obligations have been performed. Lessor agrees that when and if this lease is assigned, the Lessee named herein shall have no further obligation hereunder. Lessor further agrees that the Lessee shall have the right at any time to redeem for Lessor, or otherwise acquire by payment, any mortgage or any other liens upon the above-described lands which in any manner affect the Lessee's interest therein in the event of default of payment by Lessor and be subrogated in full to all the rights of the holder thereof the same as if Lessee were the original owner of said mortgage or lien, and Lessee may reimburse itself from any payments accruing to Lessor hereunder.

**RECORDING:** Neither Lessor nor Lessee shall record this lease. Lessor and Lessee agree to execute a short form of this lease suitable for recordation with the recorder of deeds in the county(ies) in which the land is situated.

**ENTIRE AGREEMENT:** It is mutually agreed that this instrument contains all of the agreements and understandings of the Lessor and Lessee; that no verbal representations or promises have been made or relied upon by Lessor or Lessee supplementing or modifying this lease or as an inducement thereto and; that no implied covenant, agreement of obligation shall be read into this agreement or imposed upon the Lessee. The judgment of the Lessee, when not fraudulently exercised, in carrying out the purpose of this lease, shall be conclusive.

**OTHER CONDITIONS:** _Location of Access Road, Tank Battery, and Pipeline by mutual consent between Lessor and Lessee; however, said consent not to be unreasonably withheld._ _No Maintenance Structures To Be Built without written Consent_ _(GE)_

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands.

Signed and acknowledged
in the presence of:

LESSOR:

(Witnesses please type or print name under signature)

_X Ross B Mills_
Social Security #

_X Gleana Louise Well_
Social Security #        _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_

-3-



EXHIBIT
D

## AMENDMENT AND RATIFICATION OF
## OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this "Amendment"), effective as of June 26, 2013 (the "**Effective Date**"), by and between SCOTT A. MADZIA, single, whose address is 84125 Merryman Road P.O. Box 81, Cadiz, Ohio 43907 ("Lessor") and THE OXFORD OIL COMPANY, an Ohio corporation, with its principal office located at 4900 Boggs Road, Zanesville, Ohio 43701 ("**Lessee**") (the aforementioned parties being referred to herein as a "**Party**" and collectively and the "**Parties**").

### RECITALS:

WHEREAS, Lessor and Lessee entered into that certain Oil and Gas Lease dated April 10, 2006 and recorded in the official land records of Harrison County, Ohio at Instrument Number 200600001559 and at Book 166 and Page 641 on May 25, 2006 (the "**Oil and Gas Lease**"), covering the oil and gas interests in certain lands in the Township of Stock, County of Harrison, State of Ohio, as more particularly described in the attached **Schedule I**, attached hereto and made a part hereof (the "**Leased Premises**"); and

WHEREAS, Lessor and Lessee for their mutual benefit, desire to amend and modify the Oil and Gas Lease, as provided for herein, in order to facilitate the formation of drilling units upon the Leased Premises and other lands.

### AGREEMENT:

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid to the Lessor, and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

### I. AMENDMENT TO THE OIL AND GAS LEASE

1. <u>Shut-In Clause</u>. The Oil and Gas Lease provision entitled Shut-In Clause is hereby amended and replaced in its entirety with the following:

> <u>Shut-In Clause</u>. In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of more than twelve (12) months, or should Lessee elect to shut-in a producing well for a period of more than twelve (12) months, and there is no producing well on the Leased Premises or lands pooled or unitized therewith, Lessee shall thereafter, as royalty for constructive production, pay to Lessor an annual shut-in royalty equal to Ten Dollars ($10.00) per net mineral acre of the Leased Premises (proportionally reduced to Lessor's percentage of ownership in the Leased Premises) until such time as production is re-established or Lessee surrenders the Lease (a "Shut-In Royalty") and this Lease shall thereafter remain in full force and effect. During such shut-in, Lessee shall have the right to rework, stimulate, and/or deepen any well on the Leased Premises or to drill a new well on the Leased Premises in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leased Premises is interrupted for a period of less than twelve (12) months or

Lessor elects to shut-in a producing well for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of delay rental, royalty or Shut-in Royalty.

2.    Pooling and Unitization. The Oil and Gas Lease provision entitled Unitization is hereby amended and replaced in its entirety with the following:

Pooling. Lessee is given and granted the right, at its option, at any time and from time to time, within the Primary Term of this Lease or at any time during which this Lease may be extended by any of its provisions, to pool, unitize, and reform, enlarge and/or reduce a unit or pool, and re-pool, all or any part or parts of the Leased Premises or rights, depths, strata, or formations, with any other land, or with any leasehold, operating, or other rights or interests in other lands to create units of such size and surface acreage as Lessee may desire, but containing not more than: (i) six hundred forty (640) acres, plus, in each case, a ten percent (10%) acreage tolerance for any horizontal well drilled; or (ii) one hundred sixty (160) acres for any vertical well drilled. If at any time larger units are specified or permitted under any then applicable law, rule, regulation, or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable, any unit may be established or enlarged to conform to the size authorized or permitted. Each unit or reformation of a unit may be created by governmental authority or by recording in the appropriate county office a declaration containing a description of the pooled or unitized acreage. Any well which is commenced, or is drilled, or is on any part of any lands which have been or later pooled with the lands covered by this Lease shall, except for the payment of royalties, be considered a well commenced, drilled, and producing on the lands subject to this Lease. There shall be allocated to the portion of the Leased Premise included in any unit, pooling or re-pooling the proportion of the actual production from all lands unitized, pooled or re-pooled as the portion of Leased Premises, computed on an acreage basis, bears to the entire acreage of the lands unitized, pooled or re-pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production from the portion of the Leased Premises included in the unit, pooling or re-pooling in the same manner as though produced from the portion of the leased premises under the terms of this Lease. A unit established by the terms of this Lease shall be valid and effective for all purposes of this Lease even though there may be land, oil and gas rights, royalty, and/or leasehold interests in land within the unit which are not pooled or unitized, or even though there may be a failure of the leasehold title (in whole or in part) to any tract or interest included in a pooled unit.

3.    Surface Damage Payment. The following provision is hereby added to and made a part of the Oil and Gas Lease and shall amend and replace any provisions relating to the payment of surface damages or damages to growing crops:

Surface Damage Payment. Provided that Lessor is the then current surface owner of the Leased Premises at the time of Lessee's surface operations, Lessee agrees to pay Lessor, as surface damages, a one-time payment of Fifty Thousand and 00/100 Dollars ($50,000.00) for the first six (6) acres of surface disturbance upon the surface of the Leased Premises, as well as One Thousand and 00/100 Dollars ($1,000.00) per acre for each additional surface acre disturbed by

Page 2 of 11

Lessee's surface operations, except that to the extent that if only a portion of the surface operations are located upon the surface of the herein described Leased Premises, the payments described herein shall be proportionately reduced to reflect the percent of the surface operations that is located upon the Leased Premises. For example, in the event Lessee's surface operations disturb ten (10) acres of the herein described Leased Premises, Lessee shall be required to pay Lessor a one-time payment of Fifty-Four Thousand and 00/100 Dollars ($54,000.00).

4.  Cost Free Royalty. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Cost Free Royalty. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all royalties for oil, gas or other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder.

5.  No Storage Rights. The following provision is hereby added to and made a part of the Oil and Gas Lease:

No Storage Rights. Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described Leased Premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to Lessee's rights to store gas within the Leased Premises that are contained in this Lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the Leased Premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within thirty (30) calendar days of receipt of notice from Lessor.

6.  Disposal Wells. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Disposal Wells. Lessee is not granted any right whatsoever to use the Leased Premises, or any portion thereof, for construction and/ or operation of any disposal well, injection well, or the construction and/ or operation of water disposal facilities.

7.  Compliance with Laws. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Compliance with Laws. Lessee shall at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on the Leased Premises.

8.     Timber Damage and Removal. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Timber Damage and Removal. In the event Lessee determines it must remove any timber from the Leased Premises in the conduct of its operations hereunder, Lessee agrees to obtain an appraisal of the local fair market value of the timber to be harvested prior to the removal. The appraisal shall be conducted by a qualified third party selected by Lessee at Lessee's sole cost and expense. Lessor shall have the option to receive payment from Lessee for the timber value as determined by the appraiser or to take possession of the timber after it has been removed. In the event Lessor elects to take possession of the timber, Lessee will not be required to compensate Lessor for the value of the timber harvested.

9.     Fences. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Fences. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install fencing for the protection of livestock around any wells, tank batteries, pits, separators, drip stations, pumps or other equipment or facilities installed by Lessee on the Leased Premises. Lessee shall promptly replace any fence, wall or similar barrier damaged, altered or removed by Lessee during its operations on said lands.

10.     Gates. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Gates. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install a gate at the entrance of any road constructed by Lessee on the Leased Premises.

11.     Surface Reclamation and Restoration. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Surface Reclamation and Restoration. Lessee shall construct or install all well sites, access roads and pipelines in a manner that would reasonably minimize any related soil erosion. Within a commercially reasonable amount of time following the conduct of the activity on the Leased Premises, Lessee shall repair and restore the surface of all disturbed areas of the Leased Premises to as near as reasonably possible to the condition that existed prior to Lessee's activities upon the Premises.

12.     Firearms on Leased Premises. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Firearms on Leased Premises. Lessee agrees that its employees, agents and independent contractors will not bring any firearms on the Leased Premises, and hunting and fishing on the Leased Premises is strictly prohibited

13. Recordable Release. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Recordable Release. Upon termination, expiration or surrender of this Lease, in whole or in part, and upon written request by Lessor, Lessee shall provide Lessor with an appropriate release or discharge suitable in form for recording with appropriate governmental real estate recording offices.

14. Water Testing. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Testing. Lessee shall test Lessor's domestic water well located within 2,000' (or such longer distance as may be required by applicable law) of any proposed well pad prior to commencement of and following drilling operations on said land in order to ensure that said water supply is not adversely affected by said operations. In the event it is determined that said operations have adversely affected said water supply, then Lessee shall, at its own expense, use its best efforts to correct any such damage, disturbance or injury and shall supply Lessor with a potable water supply until such time as Lessor's domestic water supply quality is restored.

15. Water Usage. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Usage. Lessee agrees not to use any water from Lessor's wells, ponds, springs, lakes, reservoirs or creeks located on the Leased Premises without Lessor's written consent.

16. Pipelines – Double Ditch Method. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Pipelines – Double Ditch Method. Lessee agrees to bury all pipelines below normal plow depth of at least thirty-six inches (36") from the soil surface to the top of the pipeline. If Lessee wishes to lay pipelines on farm or grazing lands within the Leased Premises, Lessee agrees to use a "double ditch" method for laying pipelines, in which the surface soil shall be separately removed for the full width of the line trench to the depth of the top soil, and the topsoil shall be replaced on top of the backfill for each trench.

17. Audit. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Audit. Lessee grants to Lessor the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of the Oil and Gas Lease. In exercising this right, Lessor shall give reasonable written notice to

Page 5 of 11

Lessee of their intended audit and such audit shall be conducted during normal business hours at the office of Lessee where such records are kept in the ordinary course of business. Such examination and audit shall be at the sole cost and expense of Lessor.

18.     Increase in Real Property Taxes. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Increase in Real Property Taxes. Lessee agrees to reimburse Lessor for any increase in real property taxes attributable to, or resulting from, Lessee's oil and gas related operations upon the Leased Premises. Lessee shall tender such reimbursement payment to Lessor no later than thirty (30) calendar days following Lessee's receipt of documents properly evidencing Lessor's timely payment of such taxes.

19.     Indemnify and Hold Harmless. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Indemnify and Hold Harmless. Lessee shall indemnify and hold Lessor harmless from any and all losses, liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of the Oil and Gas Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability, except to the extent any Losses are caused by the negligence or willful misconduct of Lessor (hereinafter referred to as "Losses"). Lessee further covenants and agrees to defend any suits brought against Lessor regarding any such Losses, and to pay any judgment against Lessor resulting from any such suit or suits, together with all costs and expenses relating to any Losses, including reasonable attorney's fees. Lessor, if it so elects, shall have the right to participate, at its sole expense, in its defense in any suit or suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor. The terms hereof will survive the expiration or surrender of this Lease and/or the completion of operations on the Leased Premises. NOTWITHSTANDING ANYTHING IN THIS OIL AND GAS LEASE TO THE CONTRARY, LESSEE SHALL NOT BE LIABLE FOR PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL LOSSES OR DAMAGES WHATSOEVER FOR ANY MATTER RELATING TO OR ARISING OUT OF THIS OIL AND GAS LEASE, INCLUDING LOSS OF PROFITS, WHETHER BASED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT LIABILITY (INCLUDING NEGLIGENCE AND STRICT LIABILITY), STRICT LIABILITY, OR OTHER LEGAL THEORY, EXCEPT TO THE EXTENT OF THE EXPRESS REMEDIES PROVIDED FOR HEREIN. NOTHING CONTAINED IN THIS OIL AND GAS LEASE SHALL BE CONSTRUED TO RELIEVE EITHER PARTY OF ITS OBLIGATION TO MITIGATE DAMAGES FOR THE OTHER PARTY'S BREACH. THE TOTAL MONETARY AMOUNT FOR LOSSES AND DAMAGES, FOR ANY MATTER RELATING TO OR ARISING OUT OF A BREACH OF THIS OIL AND GAS LEASE THAT LESSEE SHALL BE OBLIGATED TO PAY TO LESSOR SHALL NOT EXCEED AN AMOUNT EQUAL TO THE ACTUAL,

DIRECT LOSSES OR DAMAGES SUSTAINED BY LESSOR FOR SUCH MATTER.

## 1. MISCELLANEOUS

1        Effect. Lessor and Lessee each hereby ratify and confirm the Oil and Gas Lease and all of its terms and provisions to the full extent of Lessor's right, title and interest in and to the oil, gas and other minerals on or underlying the Leased Premises, and each acknowledge and agree that, except as herein specifically modified, the Oil and Gas Lease remains unmodified and in full force and effect, except that reference to "this Lease" or "this Oil and Gas Lease" or words of similar import in the Oil and Gas Lease or in this Amendment shall mean the Oil and Gas Lease as modified, revised and supplemented hereby.

2        Further Assurances. At any time and from time to time, Lessor agrees to promptly and duly execute and deliver any and all such further instruments, endorsements, agreements, consents, assignments and other documents (including, without limitation, driveway permits), make such filings, give such notices, and take such further action as may reasonably be deemed necessary or convenient to carry out the provisions of this Amendment and the Oil and Gas Lease.

3        Counterparts. This Amendment may be executed in any number of counterparts and by the different Parties hereto on separate counterparts each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

4        Entire Agreement. This Amendment (including Schedule 1 hereto) constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, superseding all prior negotiations, discussions, agreements and understandings, whether written or oral, relating to such subject matter.

5        Defined Terms. Any capitalized terms that are not defined herein shall have the meaning given to such terms in the Oil and Gas Lease.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE AND ACKNOWLEDGEMENT PAGES AND SCHEDULE I FOLLOW.]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date set forth in the appropriate acknowledgement below, to be effective, however, as of the Effective Date.

**LESSOR:**

Name: Scott A. Madzia, single

Date: _6-26-13_

**LESSEE:**

**THE OXFORD OIL COMPANY**
an Ohio corporation

By: _____
Name: Christopher K. Hulburt
Title: Exec. VP of Eclipse Resources-Ohio, LLC, Successor in interest by merger

Date: _6-28-13_

## LESSOR ACKNOWLEDGMENT

**STATE OF OHIO** §
§
**COUNTY OF** Harrison §

On this 26 day of June, 2013, before me, the undersigned officer, personally appeared Scott A. Madzia, single, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires: May 17, 2014

_____
Notary Public

SHELBY D. JONES
Notary Public, State of Ohio
My Commission Expires
May 17, 2014

## LESSEE ACKNOWLEDGMENT:

**COMMONWEALTH OF PENNSYLVANIA** §
§
**COUNTY OF CENTRE** §

On this 28th day of June, 2013, before me, the undersigned officer, personally appeared Christopher K. Hulburt, who acknowledged himself to be the Executive Vice President of Eclipse Resources – Ohio, LLC, an Ohio limited liability company, successor in interest by merger to the Oxford Oil Company, and that he, as such officer, being authorized to do so on behalf of Eclipse Resources – Ohio, LLC, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Marilou Wright, Notary Public
Ferguson Twp., Centre County
My Commission Expires Aug. 26, 2014
My MEMBER PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public

## SCHEDULE I

Attached to and made a part of that certain
Amendment and Ratification of Oil and Gas Lease by and between
Scott A. Madzia, single, as "Lessor", and
The Oxford Oil Company as "Lessee",
effective June 26, 2013

### DESCRIPTION OF THE LEASED PREMISES

The Leased Premises is located in Stock Township, Harrison County, State of Ohio, and described as follows:

**Parcel No. 1:** TOWNSHIP: 11N    RANGE:    5W    SECTION: 32
           QUARTER:    SE

Property Tax Parcel Identification Number: **29-0000760.000** and is bounded formerly or currently as follows:

| | | |
|---|---|---|
| **On the North by lands of: Taggart** | **(Tax Parcel: 29-0000663.000)** |
| **On the East by lands of: Madzia** | **(Tax Parcel: 29-0000762.000)** |
| **On the South by lands of: Yoss** | **(Tax Parcel: 29-0000417.000)** |
| **On the West by lands of : Taggart** | **(Tax Parcel: 29-0000663.000)** |

including lands described in **Official Record Book 165, Page 191,** in the Office of the Clerk of the County Commission of Harrison County,

**Parcel No. 2:** TOWNSHIP: 11N    RANGE:    5W    SECTION: 32
           QUARTER:    SE

Property Tax Parcel Identification Number: **29-0000761.000** and is bounded formerly or currently as follows:

| | | |
|---|---|---|
| **On the North by lands of: Yoss** | **(Tax Parcel: 29-0000415.000)** |
| **On the East by lands of: Madzia** | **(Tax Parcel: 29-0000762.000)** |
| **On the South by lands of: Meyer** | **(Tax Parcel: 29-0000497.000)** |
| **On the West by lands of : Yoss** | **(Tax Parcel: 29-0000415.000)** |

including lands described in **Official Record Book 165, Page 191,** in the Office of the Clerk of the County Commission of Harrison County,

**Parcel No. 3:**  TOWNSHIP:  11N  RANGE:  5W  SECTION: 26
QUARTER:  SW

Property Tax Parcel Identification Number: **29-0000762.000** and is bounded formerly or currently as follows:

| | |
|---|---|
| **On the North by lands of: Wells** | **(Tax Parcel: 29-0000216.001)** |
| **On the East by lands of:  Wells** | **(Tax Parcel: 29-0000216.000)** |
| **On the South by lands of: Beckert** | **(Tax Parcel: 29-0000076.000)** |
| **On the West by lands of : Madzia** | **(Tax Parcel: 29-0000760.000)** |

including lands described in **Official Record Book 165, Page 191,** in the Office of the Clerk of the County Commission of Harrison County, and described for the purpose of this Amendment and Ratification of Oil and Gas Lease as containing a total of **128 leasehold acres,** whether actually more or less, and including contiguous lands owned by Lessor. The Leased Premises also covers and includes, in addition to the lands described specifically above, all lands (including, without limitation, any lakes, rivers, streams, roads, easements and right of ways), if any, contiguous or adjacent to or adjoining the land above described which are: (a) owned or claimed by Lessor, whether by limitation, prescription, possession, reversion or unrecorded instrument or other any other right or claim; or (b) as to which Lessor has a preference right of acquisition.

**END**



EXHIBIT

E

## AMENDMENT AND RATIFICATION OF
## OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this "Amendment"), effective as of ‾‾‾‾ ‾‾‾‾, 2013 (the "Effective Date"), by and between FRANCIS R. BECKERT AND NANCY A. BECKERT, A/K/A NANCY F. BECKERT, husband and wife, whose address is 44208 Meadowlark Lane, Cadiz, Ohio 43907, RICHARD D. BECKERT AND JOY K. BECKERT, husband and wife, whose address is 11620 127ᵗʰ Ave. NE, Lake Stevens, Washington 98258, DEBORAH A. MCDONOUGH AND DAVID J. MCDONOUGH, wife and husband, whose address is 6618 Burkettsville-St. Henry Road, Celina, Ohio 45822 ("Lessor") and ECLIPSE RESOURCES-OHIO, LLC, an Ohio limited liability company, with its principal office located at 2121 Old Gatesburg Road, Suite 110, State College, Pennsylvania 16803 ("Lessee") (the aforementioned parties being referred to herein as a "Party" and collectively and the "Parties").

### RECITALS:

WHEREAS, Francis R. Beckert and Nancy A. Beckert, a/k/a Nancy F. Beckert, husband and wife, Richard D. Beckert and Joy K. Beckert, husband and wife, Deborah A. McDonough and David J. McDonough, wife and husband, and The Oxford Oil Company (predecessor-in-interest to Lessee) entered into that certain Oil and Gas Lease dated February 28, 2006 and recorded in the official land records of Harrison County, Ohio at Instrument Number 200600001553 and at Book 166 and Page 634 on May 25, 2006 (the "Oil and Gas Lease"), covering the oil and gas interests in certain lands in Stock Township, County of Harrison, State of Ohio, as more particularly described in the attached Schedule I, attached hereto and made a part hereof (the "Leased Premises"); and

WHEREAS, Lessor and Lessee for their mutual benefit, desire to amend and modify the Oil and Gas Lease, as provided for herein, in order to facilitate the formation of drilling units upon the Leased Premises and other lands.

### AGREEMENT:

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid to the Lessor, and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

### I. AMENDMENT TO THE OIL AND GAS LEASE

1. Identification of Lessor(s). The preamble to the Oil and Gas Lease is amended to identify Francis R. Beckert and Nancy A. Beckert, a/k/a Nancy F. Beckert, husband and wife, Richard D. Beckert and Joy K. Beckert, husband and wife, Deborah A. McDonough and David J. McDonough, wife and husband, as Lessor(s) for all intents and purposes under the Oil and Gas Lease.

Page 1 of 11

2.  Shut-In Clause. The Oil and Gas Lease provision entitled Shut-In Clause is hereby amended and replaced in its entirety with the following:

Shut-In Clause. In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of more than twelve (12) months, or should Lessee elect to shut-in a producing well for a period of more than twelve (12) months, and there is no producing well on the Leased Premises or lands pooled or unitized therewith, Lessee shall thereafter, as royalty for constructive production, pay to Lessor an annual shut-in royalty equal to Twenty Dollars ($20.00) per net mineral acre of the Leased Premises (proportionally reduced to Lessor's percentage of ownership in the Leased Premises) until such time as production is re-established or Lessee surrenders the Lease (a "Shut-In Royalty") and this Lease shall thereafter remain in full force and effect. During such shut-in, Lessee shall have the right to rework, stimulate, and/or deepen any well on the Leased Premises or to drill a new well on the Leased Premises in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leased Premises is interrupted for a period of less than twelve (12) months or Lessor elects to shut-in a producing well for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of delay rental, royalty or Shut-In Royalty.

3.  Pooling and Unitization. The Oil and Gas Lease provision entitled Unitization is hereby amended and replaced in its entirety with the following:

Pooling. Lessee is given and granted the right, at its option, at any time and from time to time, within the Primary Term of this Lease or at any time during which this Lease may be extended by any of its provisions, to pool, unitize, and reform, enlarge and/or reduce a unit or pool, and re-pool, all or any part or parts of the Leased Premises or rights, depths, strata, or formations, with any other land, or with any leasehold, operating, or other rights or interests in other lands to create units of such size and surface acreage as Lessee may desire, but containing not more than: (i) six hundred forty (640) acres, plus, in each case, a ten percent (10%) acreage tolerance for any horizontal well drilled; or (ii) one hundred sixty (160) acres for any vertical well drilled. If at any time larger units are specified or permitted under any then applicable law, rule, regulation, or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable, any unit may be established or enlarged to conform to the size authorized or permitted. Each unit or reformation of a unit may be created by governmental authority or by recording in the appropriate county office a declaration containing a description of the pooled or unitized acreage. Any well which is commenced, or is drilled, or is on any part of any lands which have been or later pooled with the lands covered by this Lease shall, except for the payment of royalties, be considered a well commenced, drilled, and producing on the lands subject to this Lease. There shall be allocated to the portion of the Leased Premise included in any unit, pooling or re-pooling the proportion of the actual production from all lands unitized, pooled or re-pooled as the portion of Leased Premises, computed on an acreage basis, bears to the entire acreage of the lands unitized, pooled or re-pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production from the portion of the Leased Premises included in the unit, pooling or re-pooling in the same manner as though produced from the portion of the leased premises under the terms of this Lease. A unit established by the terms of this Lease shall be valid and effective for all purposes of this Lease even though there may be land, oil and gas rights, royalty, and/or leasehold interests in land within the unit which are not pooled or unitized, or even though there may be a failure of the leasehold title (in whole or in part) to any tract or interest included in a pooled unit.

4. Surface·Damage Payment. The following provision is hereby added to and made a part of the Oil and Gas Lease and shall amend and replace any provisions relating to the payment of surface·damages or damages to growing crops:

Surface Damage Payment. Provided that Lessor is the then current surface· owner of the Leased Premises at the time of Lessee's surface operations, Lessee. agrees to pay Lessor, as· surface damages, a one-time payment of Thirty Thousand and 00/100 Dollars ($30,000.00) for the first six (6) acres of surface disturbance upon the surface of the Leased Premises, as well as One Thousand and 00/100 Dollars ($1,000.00) per acre for each additional surface acre disturbed by Lessee's surface operations, except that to the extent that if only a portion of the surface operations are located upon the surface of the herein· described Leased Premises, the payments ·described herein shall· be proportionately reduced to reflect the percent of the surface operations that is located upon the Leased Premises. For example, in the event Lessee's surface operations disturb ten (10) acres of the·herein described· Leased Premises, Lessee shall be required to pay Lessor a one-time.payment of Thirty-Four Thousand and 00/100 Dollars ($34,000.00).

5. Cost Free Royalty. The following provision is hereby added to·and made a part of the Oil and Gas Lease:

Cost Free Royalty. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all royalties for oil, gas or other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, ·gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other·products·produced hereunder.

6. No Storage·Rights. The following provision is hereby added to and made a part of the Oil and Gas Lease:

.No Storage Rights. Notwithstanding anything herein· contained to the contrary, . Lessee agrees the herein described Leased ·Premises shall·.not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to Lessee's rights to store gas within the Leased Premises that are contained in this Lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage· using the Leased Premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which· the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes.· would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within thirty (30) calendar days of receipt of notice from Lessor.

7. Disposal Wells: The following provision is hereby added to and made a part of the Oil and Gas Lease:

Disposal Wells. Lessee is not granted any right whatsoever to use the Leased Premises, or any portion thereof, for construction and/ or operation of any disposal well, injection well, or the construction and/ or operation of water disposal facilities.

8. Compliance with Laws. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Compliance with Laws. Lessee shall at all times comply with all applicable federal, state and local·laws and regulations relative to its· operations conducted on the Leased Premises.

9.    Timber Damage and Removal. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Timber Damage and Removal. In the event Lessee determines it must remove any timber from the Leased Premises in the conduct of its operations hereunder, Lessee agrees to obtain an appraisal of the local fair market value of the timber to be harvested prior to the removal. The appraisal shall be conducted by a qualified third party selected by Lessee at Lessee's sole cost and expense. Lessor shall have the option to receive payment from Lessee for the timber value as determined by the appraiser or to take possession of the timber after it has been removed. In the event Lessor elects to take possession of the timber, Lessee will not be required to compensate Lessor for the value of the timber harvested.

10.    Fences. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Fences. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install fencing for the protection of livestock around any wells, tank batteries, pits, separators, drip stations, pumps or other equipment or facilities installed by Lessee on the Leased Premises. Lessee shall promptly replace any fence, wall or similar barrier damaged, altered or removed by Lessee during its operations on said lands.

11.    Gates. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Gates. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install a gate at the entrance of any road constructed by Lessee on the Leased Premises.

12.    Surface Reclamation and Restoration. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Surface Reclamation and Restoration. Lessee shall construct or install all well sites, access roads and pipelines in a manner that would reasonably minimize any related soil erosion. Within a commercially reasonable amount of time following the conduct of the activity on the Leased Premises, Lessee shall repair and restore the surface of all disturbed areas of the Leased Premises to as near as reasonably possible to the condition that existed prior to Lessee's activities upon the Premises.

13.    Firearms on Leased Premises. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Firearms on Leased Premises. Lessee agrees that its employees, agents and independent contractors will not bring any firearms on the Leased Premises, and hunting and fishing on the Leased Premises is strictly prohibited

14.    Recordable Release. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Recordable Release. Upon termination, expiration, or surrender of this Lease, in whole or in part, and upon written request by Lessor, Lessee shall provide Lessor with an appropriate release or discharge suitable in form for recording with appropriate governmental real estate recording offices.

15.     Water Testing. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Testing. Lessee shall test Lessor's domestic water well located within 2,000' (or such longer distance as may be required by applicable law) of any proposed well pad prior to commencement of and following drilling operations on said land in order to ensure that said water supply is not adversely affected by said operations. In the event it is determined that said operations have adversely affected said water supply, then Lessee shall, at its own expense, use its best efforts to correct any such damage, disturbance or injury and shall supply Lessor with a potable water supply until such time as Lessor's domestic water supply quality is restored.

16.     Water Usage. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Usage. Lessee agrees not to use any water from Lessor's wells, ponds, springs, lakes, reservoirs or creeks located on the Leased Premises without Lessor's written consent.

17.     Pipelines – Double Ditch Method. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Pipelines – Double Ditch Method. Lessee agrees to bury all pipelines below normal plow depth of at least thirty-six inches (36") from the soil surface to the top of the pipeline. If Lessee wishes to lay pipelines on farm or grazing lands within the Leased Premises, Lessee agrees to use a "double ditch" method for laying pipelines, in which the surface soil shall be separately removed for the full width of the line trench to the depth of the top soil, and the topsoil shall be replaced on top of the backfill for each trench.

18.     Audit. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Audit. Lessee grants to Lessor the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of the Oil and Gas Lease. In exercising this right, Lessor shall give reasonable written notice to Lessee of their intended audit and such audit shall be conducted during normal business hours at the office of Lessee where such records are kept in the ordinary course of business. Such examination and audit shall be at the sole cost and expense of Lessor.

19.     Increase in Real Property Taxes. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Increase in Real Property Taxes. Lessee agrees to reimburse Lessor for any increase in real property taxes attributable to, or resulting from, Lessee's oil and gas related operations upon the Leased Premises. Lessee shall tender such reimbursement payment to Lessor no later than thirty (30) calendar days following Lessee's receipt of documents properly evidencing Lessor's timely payment of such taxes.

20.    Indemnify and Hold Harmless. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Indemnify and Hold Harmless. Lessee shall indemnify and hold Lessor harmless from any and all losses, liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of the Oil and Gas Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability, except to the extent any Losses are caused by the negligence or willful misconduct of Lessor (hereinafter referred to as "Losses"). Lessee further covenants and agrees to defend any suits brought against Lessor regarding any such Losses, and to pay any judgment against Lessor resulting from any such suit or suits, together with all costs and expenses relating to any Losses, including reasonable attorney's fees. Lessor, if it so elects, shall have the right to participate, at its sole expense, in its defense in any suit or suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor. The terms hereof will survive the expiration or surrender of this Lease and/or the completion of operations on the Leased Premises. NOTWITHSTANDING ANYTHING IN THIS OIL AND GAS LEASE TO THE CONTRARY, LESSEE SHALL NOT BE LIABLE FOR PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL LOSSES OR DAMAGES WHATSOEVER FOR ANY MATTER RELATING TO OR ARISING OUT OF THIS OIL AND GAS LEASE, INCLUDING LOSS OF PROFITS, WHETHER BASED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT LIABILITY (INCLUDING NEGLIGENCE AND STRICT LIABILITY), STRICT LIABILITY, OR OTHER LEGAL THEORY, EXCEPT TO THE EXTENT OF THE EXPRESS REMEDIES PROVIDED FOR HEREIN. NOTHING CONTAINED IN THIS OIL AND GAS LEASE SHALL BE CONSTRUED TO RELIEVE EITHER PARTY OF ITS OBLIGATION TO MITIGATE DAMAGES FOR THE OTHER PARTY'S BREACH. THE TOTAL MONETARY AMOUNT FOR LOSSES AND DAMAGES, FOR ANY MATTER RELATING TO OR ARISING OUT OF A BREACH OF THIS OIL AND GAS LEASE THAT LESSEE SHALL BE OBLIGATED TO PAY TO LESSOR SHALL NOT EXCEED AN AMOUNT EQUAL TO THE ACTUAL, DIRECT LOSSES OR DAMAGES SUSTAINED BY LESSOR FOR SUCH MATTER.

4. MISCELLANEOUS

1    Effect. Lessor and Lessee each hereby ratify and confirm the Oil and Gas Lease and all of its terms and provisions to the full extent of Lessor's right, title and interest in and to the oil, gas and other minerals on or underlying the Leased Premises, and each acknowledge and agree that, except as herein specifically modified, the Oil and Gas Lease remains unmodified and in full force and effect, except that reference to "this Lease" or "this Oil and Gas Lease" or words of similar import in the Oil and Gas Lease or in this Amendment shall mean the Oil and Gas Lease as modified, revised and supplemented hereby.

2    Further Assurances. At any time and from time to time, Lessor agrees to promptly and duly execute and deliver any and all such further instruments, endorsements, agreements, consents, affidavits, assignments and other documents (including, without limitation, driveway permits), make such filings, give such notices, and take such further action as may reasonably be deemed necessary or convenient to carry out the provisions of this Amendment and the Oil and Gas Lease.

3    Counterparts. This Amendment may be executed in any number of counterparts and by the different Parties hereto on separate counterparts each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

4    Entire Agreement. This Amendment (including Schedule I hereto) constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, superseding all prior negotiations, discussions, agreements and understandings, whether written or oral, relating to such subject matter.

5    Defined Terms: Any capitalized terms that are not defined herein shall have the meaning given to such terms in the Oil and Gas Lease.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE AND ACKNOWLEDGEMENT PAGES AND SCHEDULE I FOLLOW.]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date set forth in the appropriate acknowledgement below, to be effective, however, as of the Effective Date.

LESSOR:                                          LESSEE:

                                                 ECLIPSE RESOURCES-OHIO, LLC
                                                 an Ohio limited liability company
Name: Francis R. Beckert

                                                 By:
LESSOR:                                          Name: Marty L. Byrd
                                                 Title:   Vice President of Land

Name: Nancy A. Beckert, a/k/a Nancy F.
Beckert

LESSOR:

Name: Richard D. Beckert

LESSOR:

Name: Joy K. Beckert

LESSOR:

Name: Deborah A. McDonough

LESSOR:

Name: David J. McDonough

Page 8 of 11

LESSOR ACKNOWLEDGMENT

STATE OF OHIO                              §
                                          §
COUNTY OF __Harrison__                    §

On this ⅔ day of __July__, 2013, before me, the undersigned officer, personally appeared Francis R. Beckert and Nancy A. Beckert, a/k/a Nancy F. Beckert, husband and wife, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires:

GRANT A. SEVEK
Notary Public, State of Ohio
My Comm. Expires Aug. 03, 2016

_____
Notary Public

LESSOR ACKNOWLEDGMENT

STATE OF WASHINGTON                       §
                                          §
COUNTY OF __Snohomish__                   §

On this 24 day of __July__, 2013, before me, the undersigned officer, personally appeared Richard D. Beckert and Joy K. Beckert, husband and wife, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires: July 19-20 14

RHONDA R. GIECEK
NOTARY PUBLIC
STATE OF WASHINGTON
MY COMMISSION EXPIRES
07-19-14

_____
Notary Public

LESSOR ACKNOWLEDGMENT

STATE OF OHIO                             §
                                         §
COUNTY OF __Mercer__                     §

On this 30 day of __July__, 2013, before me, the undersigned officer, personally appeared Deborah A. McDonough and David J. McDonough, wife and husband, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires:

GRANT A. SEVEK
Notary Public, State of Ohio
My Comm. Expires Aug. 03, 2016

_____
Notary Public

Page 9 of 11

LESSEE ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA    §
                                §
COUNTY OF _____              §

On this 22nd day of ~~July~~ August 2013, before me, the undersigned officer, personally appeared Marty L. Byrd, who acknowledged himself to be the Vice President of Land for ECLIPSE RESOURCES-OHIO, LLC, an Ohio limited liability company, and that he, as such officer, being authorized to do so on behalf of the limited liability company, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires:

> COMMONWEALTH OF PENNSYLVANIA
> Notarial Seal
> Jessica Sheroko, Notary Public
> Ferguson Twp., Centre County
> My Commission Expires Oct. 7, 2014
> MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
Notary Public

## SCHEDULE I

Attached to and made a part of that certain
Amendment and Ratification of Oil and Gas Lease by and between
Francis R. Beckert, et·ux., et al., as "Lessor", and
Eclipse Resources-Ohio, LLC as "Lessee",
effective ___July 24th___, 2013

### DESCRIPTION OF THE LEASED PREMISES

The Leased Premises is.located in Stock Township,.Harrison County, State of Ohio, and described as follows:

| Parcel No. 1: | TOWNSHIP | 11N | RANGE | 5W | SECTION 25 |
| | QUARTER | NW | | | |

Property Tax Parcel Identification Number: 29-0000075.000 and is bounded formerly or currently as follows:

| On the North by lands of: Madzia | (Tax Parcel: 29-0000762.000) |
| On the East by lands of: Coultrap | (Tax Parcel: 29-0000048.000) |
| On the South by lands of: Beckert | (Tax Parcel: 29-0000076.000) |
| On the West by lands of : Beckert | (Tax Parcel: 29-0000076.000) |

including lands described in Official Record Book 167, Page 478, in the Office of the Clerk of the County Commission of Harrison County,

| Parcel No. 2: | TOWNSHIP | 11N | RANGE | 5W | SECTION 25 |
| | QUARTER | NW | | | |

Property Tax Parcel Identification Number: 29-0000076.000 and is bounded formerly or currently as follows:

| On the North by lands of: Madzia | (Tax.Parcel: 29-0000762:000) |
| On the East by lands of: Coultrap | (Tax Parcel: 01-0000103.000) |
| On the South by lands of: Coultrap | (Tax Parcel: 29-0000049.000) |
| On the West by lands of : Cofner | (Tax Parcel: 29-0000755.001) |

including lands described in Official Record Book 127, Page 487, in the Office of the Clerk of the County Commission of Harrison County, and described· for the purpose of this Amendment and Ratification of Oil and Gas Lease as containing a total of 125 leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. The Leased Premises also covers and includes, in addition to the lands described· specifically above, ·all lands (including, without limitation, any lakes, rivers, streams; roads, easements and right of ways), if any, contiguous or adjacent to or adjoining the land above described which· are: (a) owned or claimed by Lessor, whether by limitation, prescription, possession, reversion or unrecorded instrument or other any other right or claim; or (b) as to which Lessor has a preference right·of acquisition.

END



**EXHIBIT**

tabbies

F

### .AMENDMENT AND RATIFICATION OF
### OIL AND GAS LEASE

THIS AMENDMENT AND RATIFICATION OF OIL AND GAS LEASE (this "Amendment"), effective as of ___7/6___, 2013 (the "**Effective Date**"), by and between ROSS B. WELLS AND GLENNA L. WELLS, husband and wife, whose address is 39377 Gilmore-Ridge Road, Cadiz, Ohio 43907 ("**Lessor**") and ECLIPSE RESOURCES-OHIO, LLC, an Ohio limited liability company, with its principal office located at 2121 Old Gatesburg Road, Suite 110, State College, Pennsylvania 16803 ("**Lessee**") (the aforementioned parties being referred to herein as a "**Party**" and collectively and the "**Parties**").

### RECITALS:

WHEREAS, Ross B. Wells and Glenna L. Wells, husband and wife, and The Oxford Oil Company (predecessor-in-interest to Lessee) entered into that certain Oil and Gas Lease dated February 17, 2006 and recorded in the official land records of Harrison County, Ohio at Instrument Number 200600000818 and at Book 165 and Page 427 on March 20, 2006 (the "**Oil and Gas Lease**"), covering the oil and gas interests in certain lands in Stock Township, County of Harrison, State of Ohio, as more particularly described in the attached **Schedule I**, attached hereto and made a part hereof (the "**Leased Premises**"); and

WHEREAS, Lessor and Lessee for their mutual benefit, desire to amend and modify the Oil and Gas Lease, as provided for herein, in order to facilitate the formation of drilling units upon the Leased Premises and other lands.

### AGREEMENT:

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid to the Lessor, and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the Parties hereto agree as follows:

### I.   AMENDMENT TO THE OIL AND GAS LEASE

1.     Shut-In Clause. The Oil and Gas Lease provision entitled Shut-In Clause is hereby amended and replaced in its entirety with the following:

> Shut-In Clause. In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of more than twelve (12) months, or should Lessee elect to shut-in a producing well for a period of more than twelve (12) months, and there is no producing well on the Leased Premises or lands pooled or unitized therewith, Lessee shall thereafter, as royalty for constructive production, pay to Lessor an annual shut-in royalty equal to Ten Dollars ($10.00) per net mineral acre of the Leased Premises (proportionally reduced to Lessor's percentage of ownership in the Leased Premises) until such time as production is re-established or Lessee surrenders the Lease (a "**Shut-In Royalty**") and this Lease shall thereafter remain in full force and effect. During such shut-in, Lessee shall have the right to rework, stimulate, and/or deepen any well on the Leased Premises or to drill a new well on the Leased Premises in an effort to re-establish

production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leased Premises is interrupted for a period of less than twelve (12) months or Lessor elects to shut-in a producing well for a period of less than twelve (12) months, this Lease shall remain in full force and effect without payment of delay rental, royalty or Shut-in Royalty.

2.    Pooling and Unitization. The Oil and Gas Lease provision entitled Unitization is hereby amended and replaced in its entirety with the following:

Pooling. Lessee is given and granted the right, at its option, at any time and from time to time, within the Primary Term of this Lease or at any time during which this Lease may be extended by any of its provisions, to pool, unitize, and reform, enlarge and/or reduce a unit or pool, and re-pool, all or any part or parts of the Leased Premises or rights, depths, strata, or formations, with any other land, or with any leasehold, operating, or other rights or interests in other lands to create units of such size and surface acreage as Lessee may desire, but containing not more than: (i) six hundred forty (640) acres, plus, in each case, a ten percent (10%) acreage tolerance for any horizontal well drilled; or (ii) one hundred sixty (160) acres for any vertical well drilled. If at any time larger units are specified or permitted under any then applicable law, rule, regulation, or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable, any unit may be established or enlarged to conform to the size authorized or permitted. Each unit or reformation of a unit may be created by governmental authority or by recording in the appropriate county office a declaration containing a description of the pooled or unitized acreage. Any well which is commenced, or is drilled, or is on any part of any lands which have been or later pooled with the lands covered by this Lease shall, except for the payment of royalties, be considered a well commenced, drilled, and producing on the lands subject to this Lease. There shall be allocated to the portion of the Leased Premise included in any unit, pooling or re-pooling the proportion of the actual production from all lands unitized, pooled or re-pooled as the portion of Leased Premises, computed on an acreage basis, bears to the entire acreage of the lands unitized, pooled or re-pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production from the portion of the Leased Premises included in the unit, pooling or re-pooling in the same manner as though produced from the portion of the leased premises under the terms of this Lease. A unit established by the terms of this Lease shall be valid and effective for all purposes of this Lease even though there may be land, oil and gas rights, royalty, and/or leasehold interests in land within the unit which are not pooled or unitized, or even though there may be a failure of the leasehold title (in whole or in part) to any tract or interest included in a pooled unit.

3.    Surface Damage Payment. The following provision is hereby added to and made a part of the Oil and Gas Lease and shall amend and replace any provisions relating to the payment of surface damages or damages to growing crops:

Surface Damage Payment. Provided that Lessor is the then current surface owner of the Leased Premises at the time of Lessee's surface operations, Lessee agrees to pay Lessor, as surface damages, a one-time payment of Thirty

Thousand and 00/100 Dollars ($30,000.00) for the first six (6) acres of surface disturbance upon the surface of the Leased Premises, as well as One Thousand and 00/100 Dollars ($1,000.00) per acre for each additional surface acre disturbed by Lessee's surface operations, except that to the extent that if only a portion of the surface operations are located upon the surface of the herein described Leased Premises, the payments described herein shall be proportionately reduced to reflect the percent of the surface operations that is located upon the Leased Premises. For example, in the event Lessee's surface operations disturb ten (10) acres of the herein described Leased Premises, Lessee shall be required to pay Lessor a one-time payment of Thirty-Four Thousand and 00/100 Dollars ($34,000.00).

4. Cost Free Royalty. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Cost Free Royalty. It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all royalties for oil, gas or other production accruing to the Lessor under this Lease shall be paid without deduction, directly or indirectly, for the costs or expenses of Lessee relating to producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder.

5. No Storage Rights. The following provision is hereby added to and made a part of the Oil and Gas Lease:

No Storage Rights. Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described Leased Premises shall not be used for the purpose of gas storage as defined by the Federal Energy Regulatory Commission. Any reference to Lessee's rights to store gas within the Leased Premises that are contained in this Lease is hereby deleted. If Lessor wishes to enter into an agreement regarding gas storage using the Leased Premises with a third party, Lessor shall first give Lessee written notice of the identity of the third party, the price or the consideration for which the third party is prepared to offer, the effective date and closing date of the transaction and any other information respecting the transaction which Lessee believes would be material to the exercise of the offering. Lessor does hereby grant Lessee the first option and right to purchase the gas storage rights by matching and tendering to the Lessor any third party's offering within thirty (30) calendar days. of receipt of notice from Lessor.

6. Disposal Wells. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Disposal Wells. Lessee is not granted any right whatsoever to use the Leased Premises, or any portion thereof, for construction and/ or operation of any disposal well, injection well, or the construction and/ or operation of water disposal facilities.

7. Compliance with Laws. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Compliance with Laws. Lessee shall at all times comply with all applicable federal, state and local laws and regulations relative to its operations conducted on the Leased Premises.

8. Timber Damage and Removal. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Timber Damage and Removal. In the event Lessee determines it must remove any timber from the Leased Premises in the conduct of its operations hereunder, Lessee agrees to obtain an appraisal of the local fair market value of the timber to be harvested prior to the removal. The appraisal shall be conducted by a qualified third party selected by Lessee at Lessee's sole cost and expense. Lessor shall have the option to receive payment from Lessee for the timber value as determined by the appraiser or to take possession of the timber after it has been removed. In the event Lessor elects to take possession of the timber, Lessee will not be required to compensate Lessor for the value of the timber harvested.

9. Fences. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Fences. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install fencing for the protection of livestock around any wells, tank batteries, pits, separators, drip stations, pumps or other equipment or facilities installed by Lessee on the Leased Premises. Lessee shall promptly replace any fence, wall or similar barrier damaged, altered or removed by Lessee during its operations on said lands.

10. Gates. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Gates. Upon Lessor's written request, but only in the event that Lessor is the then owner of the surface of the Leased Premises, Lessee shall, at its sole cost and expense, install a gate at the entrance of any road constructed by Lessee on the Leased Premises.

11. Surface Reclamation and Restoration. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Surface Reclamation and Restoration. Lessee shall construct or install all well sites, access roads and pipelines in a manner that would reasonably minimize any related soil erosion. Within a commercially reasonable amount of time following the conduct of the activity on the Leased Premises, Lessee shall repair and restore the surface of all disturbed areas of the Leased Premises to as near as reasonably possible to the condition that existed prior to Lessee's activities upon the Premises.

12. Firearms on Leased Premises. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Firearms on Leased Premises. Lessee agrees that its employees, agents and independent contractors will not bring any firearms on the Leased Premises, and hunting and fishing on the Leased Premises is strictly prohibited

13.     Recordable Release. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Recordable Release. Upon termination, expiration or surrender of this Lease, in whole or in part, and upon written request by Lessor, Lessee shall provide Lessor with an appropriate release or discharge suitable in form for recording with appropriate governmental real estate recording offices.

14.     Water Testing. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Testing. Lessee shall test Lessor's domestic water well located within 2,000' (or such longer distance as may be required by applicable law) of any proposed well pad prior to commencement of and following drilling operations on said land in order to ensure that said water supply is not adversely affected by said operations. In the event it is determined that said operations have adversely affected said water supply, then Lessee shall, at its own expense, use its best efforts to correct any such damage, disturbance or injury and shall supply Lessor with a potable water supply until such time as Lessor's domestic water supply quality is restored.

15.     Water Usage. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Water Usage. Lessee agrees not to use any water from Lessor's wells, ponds, springs, lakes, reservoirs or creeks located on the Leased Premises without Lessor's written consent.

16.     Pipelines – Double Ditch Method. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Pipelines – Double Ditch Method. Lessee agrees to bury all pipelines below normal plow depth of at least thirty-six inches (36") from the soil surface to the top of the pipeline. If Lessee wishes to lay pipelines on farm or grazing lands within the Leased Premises, Lessee agrees to use a "double ditch" method for laying pipelines, in which the surface soil shall be separately removed for the full width of the line trench to the depth of the top soil, and the topsoil shall be replaced on top of the backfill for each trench.

17.     Audit. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Audit. Lessee grants to Lessor the right annually to examine, audit, or inspect books, records, and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of the Oil and Gas Lease. In exercising this right, Lessor shall give reasonable written notice to

Page 5 of 10

Lessee of their intended audit and such audit shall be conducted during normal business hours at the office of Lessee where such records are kept in the ordinary course of business. Such examination and audit shall be at the sole cost and expense of Lessor.

18. Increase in Real Property Taxes. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Increase in Real Property Taxes. Lessee agrees to reimburse Lessor for any increase in real property taxes attributable to, or resulting from, Lessee's oil and gas related operations upon the Leased Premises. Lessee shall tender such reimbursement payment to Lessor no later than thirty (30) calendar days following Lessee's receipt of documents properly evidencing Lessor's timely payment of such taxes.

19. Indemnify and Hold Harmless. The following provision is hereby added to and made a part of the Oil and Gas Lease:

Indemnify and Hold Harmless. Lessee shall indemnify and hold Lessor harmless from any and all losses, liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or relating to Lessee's operations under the terms of the Oil and Gas Lease, including, but not limited to, environmental issues, claims for injury to or death of any persons, or damage, loss or destruction of any property, real or personal, under any theory of tort, contract, or strict liability, except to the extent any Losses are caused by the negligence or willful misconduct of Lessor (hereinafter referred to as "Losses"). Lessee further covenants and agrees to defend any suits brought against Lessor regarding any such Losses, and to pay any judgment against Lessor resulting from any such suit or suits, together with all costs and expenses relating to any Losses, including reasonable attorney's fees. Lessor, if it so elects, shall have the right to participate, at its sole expense, in its defense in any suit or suits in which it may be a party, without relieving Lessee of the obligation to defend Lessor. The terms hereof will survive the expiration or surrender of this Lease and/or the completion of operations on the Leased Premises. NOTWITHSTANDING ANYTHING IN THIS OIL AND GAS LEASE TO THE CONTRARY, LESSEE SHALL NOT BE LIABLE FOR PUNITIVE, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL LOSSES OR DAMAGES WHATSOEVER FOR ANY MATTER RELATING TO OR ARISING OUT OF THIS OIL AND GAS LEASE, INCLUDING LOSS OF PROFITS, WHETHER BASED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, TORT LIABILITY (INCLUDING NEGLIGENCE AND STRICT LIABILITY), STRICT LIABILITY, OR OTHER LEGAL THEORY, EXCEPT TO THE EXTENT OF THE EXPRESS REMEDIES PROVIDED FOR HEREIN. NOTHING CONTAINED IN THIS OIL AND GAS LEASE SHALL BE CONSTRUED TO RELIEVE EITHER PARTY OF ITS OBLIGATION TO MITIGATE DAMAGES FOR THE OTHER PARTY'S BREACH. THE TOTAL MONETARY AMOUNT FOR LOSSES AND DAMAGES, FOR ANY MATTER RELATING TO OR ARISING OUT OF A BREACH OF THIS OIL AND GAS LEASE THAT LESSEE SHALL BE OBLIGATED TO PAY TO LESSOR SHALL NOT EXCEED AN AMOUNT EQUAL TO THE ACTUAL,

DIRECT LOSSES OR DAMAGES SUSTAINED BY LESSOR FOR SUCH MATTER.

## 1. MISCELLANEOUS

1  Effect. Lessor and Lessee each hereby ratify and confirm the Oil and Gas Lease and all of its terms and provisions to the full extent of Lessor's right, title and interest in and to the oil, gas and other minerals on or underlying the Leased Premises, and each acknowledge and agree that, except as herein specifically modified, the Oil and Gas Lease remains unmodified and in full force and effect, except that reference to "this Lease" or "this Oil and Gas Lease" or words of similar import in the Oil and Gas Lease or in this Amendment shall mean the Oil and Gas Lease as modified, revised and supplemented hereby.

2  Further Assurances. At any time and from time to time, Lessor agrees to promptly and duly execute and deliver any and all such further instruments, endorsements, agreements, consents, affidavits, assignments and other documents (including, without limitation, driveway permits), make such filings, give such notices, and take such further action as may reasonably be deemed necessary or convenient to carry out the provisions of this Amendment and the Oil and Gas Lease.

3  Counterparts. This Amendment may be executed in any number of counterparts and by the different Parties hereto on separate counterparts each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

4  Entire Agreement. This Amendment (including Schedule I hereto) constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, superseding all prior negotiations, discussions, agreements and understandings, whether written or oral, relating to such subject matter.

5  Defined Terms. Any capitalized terms that are not defined herein shall have the meaning given to such terms in the Oil and Gas Lease.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE AND ACKNOWLEDGEMENT PAGES AND SCHEDULE I FOLLOW.]

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment as of the date set forth in the appropriate acknowledgement below, to be effective, however, as of the Effective Date.

LESSOR:                                    LESSEE:

                                           ECLIPSE RESOURCES-OHIO, LLC
                                           an Ohio limited liability company

Name: Ross B. Wells

                                           By: _____
LESSOR:                                    Name:  Marty L. Byrd
                                           Title:  Vice President of Land

Name: Glenna L. Wells


## LESSOR ACKNOWLEDGMENT


STATE OF OHIO                          §
                                       §
COUNTY OF Harrison                     §

On this 6 day of July, 2013, before me, the undersigned officer, personally appeared Ross B. Wells and Glenna L. Wells, husband and wife, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires: September-25-2016

SCOTT A MCELRAVY
NOTARY PUBLIC, STATE OF OHIO
COLUMBIANA COUNTY
My Comm. Expires September 25, 2016

_____
                        Notary Public

## LESSEE ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA     §

COUNTY OF _Centre_             §
                                          §

On this 22 day of July 2013, before me, the undersigned officer, personally appeared Marty L. Byrd, who acknowledged himself to be the Vice President of Land for ECLIPSE RESOURCES-OHIO, LLC, an Ohio limited liability company, and that he, as such officer, being authorized to do so on behalf of the limited liability company, executed the foregoing instrument for the purposes therein contained by signing the name of the limited liability company by himself as such officer.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My commission expires: _May 31, 2017_

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Michael A. Sennett, Notary Public
Ferguson Twp., Centre County
My Commission Expires May 31, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## SCHEDULE I

Attached to and made a part of that certain
Amendment and Ratification of Oil and Gas Lease by and between
Ross B. Wells and Glenna L. Wells, husband and wife, as "Lessor", and
Eclipse Resources-Ohio, LLC as "Lessee",
effective ___7/6___, 2013

---

### DESCRIPTION OF THE LEASED PREMISES

The Leased Premises is located in Stock Township, Harrison County, State of Ohio, and described as follows:

Parcel No. 1:  TOWNSHIP   1 1N   RANGE   5W   SECTION   26
QUARTER   NW/SW

Property Tax Parcel Identification Number: **29-0000216.000** and is bounded formerly or currently as follows:

On the North by lands of:  Coultrap   (Tax Parcel: 29-0000052.000)
On the East by lands of:   Byler     (Tax Parcel: 01-0000195.005)
On the South by lands of:  Coultrap   (Tax Parcel: 29-0000048.000)
On the West by lands of :  Madzia    (Tax Parcel: 29-0000762.000)

including lands described in **Deed Record Book 212, Page 405,** in the Office of the Clerk of the County Commission of Harrison County, and described for the purpose of this Amendment and Ratification of Oil and Gas Lease as containing a total of **119** leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. The Leased Premises also covers and includes, in addition to the lands described specifically above, all lands (including, without limitation, any lakes, rivers, streams, roads, easements and right of ways), if any, contiguous or adjacent to or adjoining the land above described which are: (a) owned or claimed by Lessor, whether by limitation, prescription, possession, reversion or unrecorded instrument or other any other right or claim; or (b) as to which Lessor has a preference right of acquisition.

END

## Production Volumes (ODNR)

| API Number | Well Name | Production Year | Production Quarter | Oil (BBL) | Gas (MCF) | Brine (BBL) | Production Days |
|---|---|---|---|---|---|---|---|
| 34067212880000 | MADZIA UNIT 2H | 2016 | 3 | 1,750 | 8,282 | 1,182 | 3 |
| 34067212880000 | MADZIA UNIT 2H | 2016 | 4 | 35,322 | 205,782 | 9,675 | 89 |
| 34067212880000 | MADZIA UNIT 2H | 2017 | 1 | 26,924 | 220,041 | 6,111 | 90 |
| 34067212880000 | MADZIA UNIT 2H | 2017 | 2 | 22,893 | 233,731 | 6,435 | 91 |
| 34067212880000 | MADZIA UNIT 2H | 2017 | 3 | 14,623 | 220,855 | 5,196 | 91 |
| 34067212880000 | MADZIA UNIT 2H | 2017 | 4 | 7,685 | 177,495 | 3,683 | 92 |
| 34067212880000 | MADZIA UNIT 2H | 2018 | 1 | 5,167 | 145,351 | 2,876 | 90 |
| 34067212880000 | MADZIA UNIT 2H | 2018 | 2 | 3,996 | 126,382 | 2,447 | 90 |
| 34067212880000 | MADZIA UNIT 2H | 2018 | 3 | 3,272 | 113,908 | 2,144 | 90 |
| 34067212880000 | MADZIA UNIT 2H | 2018 | 4 | 2,640 | 102,941 | 1,888 | 92 |
| 34067212880000 | MADZIA UNIT 2H | 2019 | 1 | 2,263 | 91,710 | 1,628 | 90 |
| 34067212880000 | MADZIA UNIT 2H | 2019 | 2 | 2,017 | 84,670 | 1,410 | 91 |
| 34067212880000 | MADZIA UNIT 2H | 2019 | 3 | 1,568 | 75,184 | 1,330 | 92 |
| 34067212870000 | MADZIA UNIT 4H | 2016 | 3 | 842 | 4,078 | 0 | 1 |
| 34067212870000 | MADZIA UNIT 4H | 2016 | 4 | 37,523 | 208,966 | 10,338 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2017 | 1 | 28,390 | 226,505 | 4,472 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2017 | 2 | 21,344 | 242,049 | 4,781 | 91 |
| 34067212870000 | MADZIA UNIT 4H | 2017 | 3 | 11,599 | 212,775 | 3,555 | 91 |
| 34067212870000 | MADZIA UNIT 4H | 2017 | 4 | 5,583 | 161,992 | 2,404 | 92 |
| 34067212870000 | MADZIA UNIT 4H | 2018 | 1 | 3,654 | 131,109 | 1,898 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2018 | 2 | 2,575 | 112,866 | 1,602 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2018 | 3 | 1,987 | 100,319 | 1,415 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2018 | 4 | 1,563 | 89,728 | 1,284 | 92 |
| 34067212870000 | MADZIA UNIT 4H | 2019 | 1 | 1,287 | 78,576 | 1,123 | 90 |
| 34067212870000 | MADZIA UNIT 4H | 2019 | 2 | 1,136 | 74,522 | 1,044 | 91 |
| 34067212870000 | MADZIA UNIT 4H | 2019 | 3 | 869 | 64,936 | 903 | 92 |
| 34067212850000 | MADZIA UNIT 6H | 2016 | 4 | 34,717 | 201,326 | 10,836 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2017 | 1 | 26,479 | 217,822 | 5,079 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2017 | 2 | 19,838 | 234,250 | 5,221 | 91 |
| 34067212850000 | MADZIA UNIT 6H | 2017 | 3 | 12,243 | 228,256 | 4,316 | 91 |
| 34067212850000 | MADZIA UNIT 6H | 2017 | 4 | 5,502 | 176,795 | 2,948 | 92 |
| 34067212850000 | MADZIA UNIT 6H | 2018 | 1 | 3,353 | 141,069 | 2,271 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2018 | 2 | 2,453 | 121,033 | 1,915 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2018 | 3 | 1,868 | 107,119 | 1,670 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2018 | 4 | 1,402 | 95,543 | 1,487 | 92 |
| 34067212850000 | MADZIA UNIT 6H | 2019 | 1 | 1,140 | 83,948 | 1,286 | 90 |
| 34067212850000 | MADZIA UNIT 6H | 2019 | 2 | 609 | 75,130 | 1,964 | 89 |
| 34067212850000 | MADZIA UNIT 6H | 2019 | 3 | 782 | 69,875 | 1,363 | 92 |
| 34067212860000 | MADZIA UNIT 8H | 2016 | 4 | 36,154 | 217,968 | 13,617 | 89 |
| 34067212860000 | MADZIA UNIT 8H | 2017 | 1 | 30,323 | 244,090 | 6,356 | 90 |
| 34067212860000 | MADZIA UNIT 8H | 2017 | 2 | 20,184 | 256,452 | 6,928 | 91 |
| 34067212860000 | MADZIA UNIT 8H | 2017 | 3 | 11,833 | 235,077 | 5,872 | 91 |
| 34067212860000 | MADZIA UNIT 8H | 2017 | 4 | 5,544 | 278,907 | 4,100 | 92 |
| 34067212860000 | MADZIA UNIT 8H | 2018 | 1 | 3,140 | 141,803 | 3,196 | 90 |
| 34067212860000 | MADZIA UNIT 8H | 2018 | 2 | 2,380 | 119,754 | 2,687 | 90 |
| 34067212860000 | MADZIA UNIT 8H | 2018 | 3 | 1,800 | 105,225 | 2,327 | 90 |
| 34067212860000 | MADZIA UNIT 8H | 2018 | 4 | 1,273 | 94,102 | 2,043 | 92 |
| 34067212860000 | MADZIA UNIT 8H | 2019 | 1 | 1,060 | 82,823 | 1,729 | 90 |
| 34067212860000 | MADZIA UNIT 8H | 2019 | 2 | 326 | 32,780 | 5,455 | 48 |
| 34067212860000 | MADZIA UNIT 8H | 2019 | 3 | 756 | 57,519 | 4,914 | 92 |
| 34067212840000 | MADZIA UNIT 10H | 2016 | 4 | 33,387 | 228,555 | 10,563 | 87 |
| 34067212840000 | MADZIA UNIT 10H | 2017 | 1 | 28,038 | 258,170 | 5,090 | 90 |
| 34067212840000 | MADZIA UNIT 10H | 2017 | 2 | 20,930 | 273,438 | 6,249 | 91 |
| 34067212840000 | MADZIA UNIT 10H | 2017 | 3 | 13,162 | 257,394 | 5,580 | 91 |
| 34067212840000 | MADZIA UNIT 10H | 2017 | 4 | 6,525 | 201,259 | 3,999 | 92 |
| 34067212840000 | MADZIA UNIT 10H | 2018 | 1 | 4,325 | 160,852 | 3,035 | 90 |
| 34067212840000 | MADZIA UNIT 10H | 2018 | 2 | 3,460 | 139,101 | 2,655 | 90 |
| 34067212840000 | MADZIA UNIT 10H | 2018 | 3 | 2,726 | 125,007 | 2,389 | 90 |
| 34067212840000 | MADZIA UNIT 10H | 2018 | 4 | 2,140 | 113,496 | 1,999 | 92 |
| 34067212840000 | MADZIA UNIT 10H | 2019 | 1 | 1,828 | 101,063 | 1,730 | 90 |
| 34067212840000 | MADZIA UNIT 10H | 2019 | 2 | 1,639 | 29,486 | 13,387 | 52 |
| 34067212840000 | MADZIA UNIT 10H | 2019 | 3 | 6,448 | 81,200 | 23,310 | 92 |

## Production Volumes (RI Statements)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS |
|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 0 | 0 | 1,453 |
| Madzia 2H | 2016 | 4 | 173,470 | 19,481 | 845,219 |
| Madzia 2H | 2017 | 1 | 184,892 | 16,425 | 859,311 |
| Madzia 2H | 2017 | 2 | 198,979 | 12,707 | 942,165 |
| Madzia 2H | 2017 | 3 | 187,825 | 8,113 | 848,580 |
| Madzia 2H | 2017 | 4 | 150,002 | 4,968 | 616,044 |
| Madzia 2H | 2018 | 1 | 118,759 | 3,850 | 565,454 |
| Madzia 2H | 2018 | 2 | 105,036 | 3,075 | 482,617 |
| Madzia 2H | 2018 | 3 | 94,322 | 2,705 | 436,583 |
| Madzia 2H | 2018 | 4 | 86,812 | 2,282 | 375,929 |
| Madzia 2H | 2019 | 1 | 77,021 | 1,909 | 325,441 |
| Madzia 2H | 2019 | 2 | 71,989 | 1,521 | 290,275 |
| Madzia 2H | 2019 | 3 | 59,229 | 1,318 | 257,630 |
| Madzia 4H | 2016 | 3 | 0 | 0 | 699 |
| Madzia 4H | 2016 | 4 | 176,162 | 20,336 | 859,346 |
| Madzia 4H | 2017 | 1 | 190,325 | 16,610 | 882,473 |
| Madzia 4H | 2017 | 2 | 206,065 | 11,976 | 965,797 |
| Madzia 4H | 2017 | 3 | 180,979 | 6,606 | 807,412 |
| Madzia 4H | 2017 | 4 | 136,913 | 3,927 | 557,760 |
| Madzia 4H | 2018 | 1 | 107,121 | 2,941 | 506,698 |
| Madzia 4H | 2018 | 2 | 93,799 | 2,062 | 428,995 |
| Madzia 4H | 2018 | 3 | 83,073 | 1,690 | 383,713 |
| Madzia 4H | 2018 | 4 | 75,670 | 1,389 | 326,371 |
| Madzia 4H | 2019 | 1 | 65,990 | 1,128 | 276,553 |
| Madzia 4H | 2019 | 2 | 63,369 | 884 | 253,983 |
| Madzia 4H | 2019 | 3 | 51,084 | 744 | 222,469 |
| Madzia 6H | 2016 | 4 | 159,775 | 18,622 | 824,078 |
| Madzia 6H | 2017 | 1 | 183,031 | 16,031 | 849,914 |
| Madzia 6H | 2017 | 2 | 199,424 | 10,813 | 928,246 |
| Madzia 6H | 2017 | 3 | 194,115 | 6,669 | 861,810 |
| Madzia 6H | 2017 | 4 | 149,428 | 3,525 | 603,332 |
| Madzia 6H | 2018 | 1 | 115,260 | 2,535 | 541,006 |
| Madzia 6H | 2018 | 2 | 100,582 | 1,865 | 458,974 |
| Madzia 6H | 2018 | 3 | 88,703 | 1,521 | 409,387 |
| Madzia 6H | 2018 | 4 | 80,574 | 1,199 | 346,914 |
| Madzia 6H | 2019 | 1 | 70,502 | 962 | 221,360 |
| Madzia 6H | 2019 | 2 | 63,779 | 614 | 255,950 |
| Madzia 6H | 2019 | 3 | 55,004 | 637 | 239,282 |
| Madzia 8H | 2016 | 4 | 183,785 | 18,945 | 886,265 |
| Madzia 8H | 2017 | 1 | 205,102 | 17,230 | 948,095 |
| Madzia 8H | 2017 | 2 | 218,327 | 10,880 | 1,008,173 |
| Madzia 8H | 2017 | 3 | 199,925 | 6,317 | 883,043 |
| Madzia 8H | 2017 | 4 | 151,208 | 3,317 | 608,801 |
| Madzia 8H | 2018 | 1 | 115,863 | 2,220 | 541,767 |
| Madzia 8H | 2018 | 2 | 99,520 | 1,728 | 453,682 |
| Madzia 8H | 2018 | 3 | 87,139 | 1,397 | 402,034 |
| Madzia 8H | 2018 | 4 | 79,359 | 1,061 | 341,403 |
| Madzia 8H | 2019 | 1 | 69,556 | 874 | 290,066 |
| Madzia 8H | 2019 | 2 | 21,771 | 240 | 86,879 |
| Madzia 8H | 2019 | 3 | 45,210 | 615 | 197,323 |
| Madzia 10H | 2016 | 4 | 192,711 | 17,424 | 920,368 |
| Madzia 10H | 2017 | 1 | 216,933 | 16,705 | 998,625 |
| Madzia 10H | 2017 | 2 | 312,657 | 11,280 | 1,072,321 |
| Madzia 10H | 2017 | 3 | 139,021 | 7,044 | 967,300 |
| Madzia 10H | 2017 | 4 | 170,093 | 3,841 | 685,728 |
| Madzia 10H | 2018 | 1 | 131,423 | 2,935 | 617,158 |
| Madzia 10H | 2018 | 2 | 115,600 | 2,452 | 528,336 |
| Madzia 10H | 2018 | 3 | 103,506 | 2,104 | 478,106 |
| Madzia 10H | 2018 | 4 | 95,713 | 1,762 | 412,830 |
| Madzia 10H | 2019 | 1 | 84,875 | 1,477 | 355,796 |
| Madzia 10H | 2019 | 2 | 25,251 | 1,122 | 101,433 |
| Madzia 10H | 2019 | 3 | 64,459 | 5,337 | 280,647 |

## Difference between ODNR & Royalty Statements (royalty statements minus odnr)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS | % error Oil | QTR Avg Oil Price | Whole Well Potential losses - Oil | Owner-Madzia Decimal Interest - Gas | Owner-Madzia Potential losses - Oil |
|---|---|---|---|---|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 8,282.00 | 1,750.00 | 1,453.04 | 100.0% | $0.00 | $0.00 | 0.02413399 | $0 |
| Madzia 2H | 2016 | 4 | 32,312.00 | 15,841.06 | 845,219.14 | 44.8% | $43.79 | $693,733 | 0.02413399 | $16,742.54 |
| Madzia 2H | 2017 | 1 | 35,149.00 | 10,498.63 | 859,311.09 | 39.0% | $47.10 | $494,450 | 0.02413399 | $11,933.06 |
| Madzia 2H | 2017 | 2 | 34,752.00 | 10,185.80 | 942,165.32 | 44.5% | $42.03 | $428,150 | 0.02413399 | $10,332.97 |
| Madzia 2H | 2017 | 3 | 33,030.00 | 6,509.99 | 848,579.85 | 44.5% | $41.94 | $273,041 | 0.02413399 | $6,589.57 |
| Madzia 2H | 2017 | 4 | 27,493.00 | 2,716.97 | 616,043.58 | 35.4% | $49.14 | $133,514 | 0.02413399 | $3,222.22 |
| Madzia 2H | 2018 | 1 | 26,591.59 | 1,317.27 | 565,454.10 | 25.5% | $56.55 | $74,496 | 0.02413399 | $1,797.88 |
| Madzia 2H | 2018 | 2 | 21,345.56 | 920.84 | 482,616.75 | 23.0% | $61.61 | $56,731 | 0.02413399 | $1,369.15 |
| Madzia 2H | 2018 | 3 | 19,586.45 | 566.58 | 436,582.61 | 17.3% | $63.25 | $35,838 | 0.02413399 | $864.92 |
| Madzia 2H | 2018 | 4 | 16,129.37 | 358.15 | 375,929.06 | 13.6% | $52.54 | $18,818 | 0.02413399 | $454.14 |
| Madzia 2H | 2019 | 1 | 14,688.56 | 353.73 | 325,440.85 | 15.6% | $48.27 | $17,075 | 0.02413399 | $412.06 |
| Madzia 2H | 2019 | 2 | 12,681.00 | 495.73 | 290,274.86 | 24.6% | $52.78 | $26,166 | 0.02413399 | $631.50 |
| Madzia 2H | 2019 | 3 | 15,955.00 | 249.56 | 257,630.38 | 15.9% | $49.41 | $12,330 | 0.02413399 | $297.58 |
| Madzia 4H | 2016 | 3 | 4,078.00 | 842.00 | 699.12 | 100.0% | $0.00 | $0.00 | 0.02413399 | $0 |
| Madzia 4H | 2016 | 4 | 32,804.00 | 17,187.10 | 859,345.70 | 45.8% | $43.79 | $752,680 | 0.02413399 | $18,165.18 |
| Madzia 4H | 2017 | 1 | 36,180.00 | 11,780.11 | 882,472.62 | 41.5% | $47.10 | $554,804 | 0.02413399 | $13,389.63 |
| Madzia 4H | 2017 | 2 | 35,984.00 | 9,367.69 | 965,796.72 | 43.9% | $42.03 | $393,762 | 0.02413399 | $9,503.05 |
| Madzia 4H | 2017 | 3 | 31,796.00 | 4,993.09 | 807,412.08 | 43.0% | $41.94 | $209,419 | 0.02413399 | $5,054.11 |
| Madzia 4H | 2017 | 4 | 25,079.00 | 1,656.12 | 557,759.96 | 29.7% | $49.14 | $81,383 | 0.02413399 | $1,964.09 |
| Madzia 4H | 2018 | 1 | 23,987.91 | 713.01 | 506,698.12 | 19.5% | $56.55 | $40,323 | 0.02413399 | $973.16 |
| Madzia 4H | 2018 | 2 | 19,067.04 | 513.16 | 428,994.98 | 19.9% | $61.61 | $31,615 | 0.02413399 | $762.99 |
| Madzia 4H | 2018 | 3 | 17,245.75 | 296.92 | 383,713.00 | 14.9% | $63.25 | $18,780 | 0.02413399 | $453.24 |
| Madzia 4H | 2018 | 4 | 14,058.22 | 174.21 | 326,371.11 | 11.1% | $52.54 | $9,153 | 0.02413399 | $220.90 |
| Madzia 4H | 2019 | 1 | 12,586.00 | 158.57 | 276,552.84 | 12.3% | $48.27 | $7,654 | 0.02413399 | $184.72 |
| Madzia 4H | 2019 | 2 | 11,152.73 | 251.58 | 253,982.85 | 22.1% | $52.78 | $13,279 | 0.02413399 | $320.48 |
| Madzia 4H | 2019 | 3 | 13,852.00 | 124.66 | 222,469.03 | 14.3% | $49.41 | $6,159 | 0.02413399 | $148.65 |
| Madzia 6H | 2016 | 4 | 31,551.00 | 16,095.49 | 824,078.38 | 46.4% | $43.79 | $704,875 | 0.02413399 | $17,011.45 |
| Madzia 6H | 2017 | 1 | 34,791.00 | 10,447.60 | 849,913.77 | 39.5% | $47.10 | $492,047 | 0.02413399 | $11,875.06 |
| Madzia 6H | 2017 | 2 | 34,826.00 | 9,024.65 | 928,245.82 | 45.5% | $42.03 | $379,342 | 0.02413399 | $9,155.05 |
| Madzia 6H | 2017 | 3 | 34,141.00 | 5,573.99 | 861,810.06 | 45.5% | $41.94 | $233,765 | 0.02413399 | $5,641.67 |
| Madzia 6H | 2017 | 4 | 27,367.00 | 1,977.48 | 603,332.23 | 35.9% | $49.14 | $97,175 | 0.02413399 | $2,345.21 |
| Madzia 6H | 2018 | 1 | 25,809.31 | 817.58 | 541,005.84 | 24.4% | $56.55 | $46,237 | 0.02413399 | $1,115.88 |
| Madzia 6H | 2018 | 2 | 20,450.68 | 583.05 | 458,973.65 | 24.0% | $61.61 | $36,229 | 0.02413399 | $874.34 |
| Madzia 6H | 2018 | 3 | 18,416.33 | 347.31 | 409,387.46 | 18.6% | $63.25 | $21,969 | 0.02413399 | $530.19 |
| Madzia 6H | 2018 | 4 | 14,969.32 | 203.32 | 346,913.57 | 14.5% | $52.54 | $10,683 | 0.02413399 | $257.81 |
| Madzia 6H | 2019 | 1 | 13,446.29 | 178.25 | 221,360.25 | 15.6% | $48.27 | $8,604 | 0.02413399 | $207.65 |
| Madzia 6H | 2019 | 2 | 11,350.68 | 194.58 | 255,949.75 | 24.1% | $52.78 | $10,270 | 0.02413399 | $247.86 |
| Madzia 6H | 2019 | 3 | 14,871.00 | 144.63 | 239,282.41 | 18.5% | $49.41 | $7,146 | 0.02413399 | $172.46 |
| Madzia 8H | 2016 | 4 | 34,183.00 | 17,203.89 | 886,264.57 | 47.6% | $43.79 | $753,635 | 0.02413399 | $18,188.21 |
| Madzia 8H | 2017 | 1 | 38,938.00 | 13,092.55 | 948,098.75 | 43.2% | $47.10 | $616,615 | 0.02413399 | $14,881.39 |
| Madzia 8H | 2017 | 2 | 38,125.00 | 9,303.64 | 1,008,172.97 | 46.1% | $42.03 | $391,070 | 0.02413399 | $9,438.07 |
| Madzia 8H | 2017 | 3 | 35,152.00 | 5,515.57 | 883,043.00 | 46.6% | $41.94 | $231,314 | 0.02413399 | $5,582.54 |
| Madzia 8H | 2017 | 4 | 127,699.00 | 2,226.67 | 608,800.83 | 40.2% | $49.14 | $109,420 | 0.02413399 | $2,640.74 |
| Madzia 8H | 2018 | 1 | 25,939.91 | 919.72 | 541,767.23 | 29.3% | $56.55 | $52,013 | 0.02413399 | $1,255.29 |
| Madzia 8H | 2018 | 2 | 20,234.21 | 652.45 | 453,681.73 | 27.4% | $61.61 | $40,196 | 0.02413399 | $970.10 |
| Madzia 8H | 2018 | 3 | 18,035.55 | 403.36 | 402,034.29 | 22.4% | $63.25 | $25,514 | 0.02413399 | $615.75 |
| Madzia 8H | 2018 | 4 | 14,743.41 | 211.88 | 341,403.00 | 16.6% | $52.54 | $11,132 | 0.02413399 | $268.67 |
| Madzia 8H | 2019 | 1 | 13,266.88 | 186.03 | 290,066.36 | 17.6% | $48.27 | $8,980 | 0.02413399 | $216.72 |
| Madzia 8H | 2019 | 2 | 11,009.19 | 85.91 | 86,879.05 | 26.4% | $52.24 | $4,488 | 0.02413399 | $108.31 |
| Madzia 8H | 2019 | 3 | 12,309.00 | 141.39 | 197,322.83 | 18.7% | $49.41 | $6,981 | 0.02413399 | $168.48 |
| Madzia 10H | 2016 | 4 | 35,844.00 | 15,963.26 | 920,367.64 | 47.8% | $43.79 | $699,084 | 0.02413399 | $16,871.70 |
| Madzia 10H | 2017 | 1 | 41,237.00 | 11,332.74 | 998,624.96 | 40.4% | $47.10 | $533,734 | 0.02413399 | $12,881.14 |
| Madzia 10H | 2017 | 2 | 39,219.00 | 9,650.41 | 1,072,321.26 | 46.1% | $42.03 | $405,645 | 0.02413399 | $9,789.84 |
| Madzia 10H | 2017 | 3 | 118,373.00 | 6,117.82 | 967,300.39 | 46.5% | $41.94 | $256,572 | 0.02413399 | $6,192.11 |
| Madzia 10H | 2017 | 4 | 31,166.00 | 2,683.58 | 685,728.14 | 41.1% | $49.14 | $131,873 | 0.02413399 | $3,182.62 |
| Madzia 10H | 2018 | 1 | 29,429.36 | 1,390.16 | 617,157.70 | 32.1% | $56.55 | $78,618 | 0.02413399 | $1,897.36 |
| Madzia 10H | 2018 | 2 | 23,501.34 | 1,007.95 | 528,336.31 | 29.1% | $61.61 | $62,098 | 0.02413399 | $1,498.66 |
| Madzia 10H | 2018 | 3 | 21,501.43 | 621.97 | 478,106.42 | 22.8% | $63.25 | $39,340 | 0.02413399 | $949.42 |
| Madzia 10H | 2018 | 4 | 17,782.68 | 378.45 | 412,830.18 | 17.7% | $52.54 | $19,884 | 0.02413399 | $479.88 |
| Madzia 10H | 2019 | 1 | 16,188.21 | 350.88 | 355,796.38 | 19.2% | $48.27 | $16,937 | 0.02413399 | $408.76 |
| Madzia 10H | 2019 | 2 | 4,235.44 | 517.42 | 101,433.27 | 31.6% | $52.78 | $27,309 | 0.02413399 | $659.09 |
| Madzia 10H | 2019 | 3 | 16,741.00 | 1,110.91 | 280,647.24 | 17.2% | $49.41 | $54,888 | 0.02413399 | $1,324.67 |

TOTAL $10,954,148          $265,692



EXHIBIT 6

## Production Volumes (ODNR)

| API Number | Well Name | Production Year | Production Quarter | Oil (BBL) | Gas (MCF) | Brine (BBL) | Production Days |
|---|---|---|---|---|---|---|---|
| 3406721288000 | MADZIA UNIT 2H | 2016 | 3 | 1,750 | 8,282 | 1,182 | 3 |
| 3406721288000 | MADZIA UNIT 2H | 2016 | 4 | 35,322 | 205,782 | 9,675 | 89 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 1 | 26,924 | 220,041 | 6,111 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 2 | 22,893 | 233,731 | 6,435 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 3 | 14,623 | 220,855 | 5,196 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 4 | 7,685 | 177,495 | 3,683 | 92 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 1 | 5,167 | 145,351 | 2,876 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 2 | 3,996 | 126,382 | 2,447 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 3 | 3,272 | 113,908 | 2,144 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 4 | 2,640 | 102,941 | 1,888 | 92 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 1 | 2,263 | 91,710 | 1,628 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 2 | 2,017 | 84,670 | 1,410 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 3 | 1,568 | 75,184 | 1,330 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2016 | 3 | 842 | 4,078 | | 1 |
| 3406721287000 | MADZIA UNIT 4H | 2016 | 4 | 37,523 | 208,966 | 10,338 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 1 | 28,590 | 226,505 | 4,472 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 2 | 21,344 | 242,049 | 4,781 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 3 | 11,599 | 212,775 | 3,555 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 4 | 5,583 | 161,992 | 2,404 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 1 | 3,654 | 131,109 | 1,898 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 2 | 2,575 | 112,866 | 1,602 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 3 | 1,987 | 100,319 | 1,415 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 4 | 1,563 | 89,728 | 1,284 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 1 | 1,287 | 78,576 | 1,123 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 2 | 1,136 | 74,522 | 1,044 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 3 | 869 | 64,936 | 903 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2016 | 4 | 34,717 | 201,376 | 10,836 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 1 | 26,479 | 217,822 | 5,079 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 2 | 19,838 | 234,250 | 5,231 | 91 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 3 | 12,243 | 228,256 | 4,316 | 91 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 4 | 5,502 | 176,795 | 2,948 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 1 | 3,353 | 141,069 | 2,371 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 2 | 2,453 | 121,033 | 1,915 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 3 | 1,868 | 107,119 | 1,670 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 4 | 1,402 | 95,543 | 1,487 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 1 | 1,140 | 83,948 | 1,286 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 2 | 809 | 75,130 | 1,964 | 89 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 3 | 782 | 69,875 | 1,363 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2016 | 4 | 36,154 | 217,968 | 13,617 | 89 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 1 | 30,323 | 244,090 | 6,556 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 2 | 20,184 | 256,452 | 6,928 | 91 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 3 | 11,833 | 235,077 | 5,877 | 91 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 4 | 5,544 | 278,907 | 4,100 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 1 | 3,140 | 141,803 | 3,196 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 2 | 2,330 | 119,754 | 2,687 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 3 | 1,800 | 105,225 | 2,327 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 4 | 1,273 | 94,102 | 7,041 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 1 | 1,060 | 82,823 | 1,729 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 2 | 826 | 32,780 | 5,455 | 48 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 3 | 756 | 57,519 | 4,914 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2016 | 4 | 33,387 | 728,555 | 10,563 | 87 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 1 | 28,038 | 258,170 | 5,090 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 2 | 20,930 | 273,438 | 6,249 | 91 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 3 | 13,162 | 257,394 | 5,580 | 91 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 4 | 6,525 | 201,259 | 3,999 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 1 | 4,325 | 160,852 | 3,035 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 2 | 3,460 | 139,101 | 2,655 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 3 | 2,726 | 112,065 | 2,389 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 4 | 2,140 | 113,496 | 1,999 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 1 | 1,826 | 101,061 | 1,730 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 2 | 1,639 | 29,486 | 13,387 | 52 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 3 | 6,448 | 81,200 | 23,310 | 92 |

## Production Volumes (RI Statements)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS |
|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 0 | 0 | 1,453 |
| Madzia 2H | 2016 | 4 | 173,470 | 19,481 | 845,219 |
| Madzia 2H | 2017 | 1 | 184,892 | 16,425 | 859,311 |
| Madzia 2H | 2017 | 2 | 198,979 | 12,707 | 942,165 |
| Madzia 2H | 2017 | 3 | 187,825 | 8,113 | 848,580 |
| Madzia 2H | 2017 | 4 | 150,002 | 4,968 | 616,044 |
| Madzia 2H | 2018 | 1 | 118,758 | 3,850 | 565,454 |
| Madzia 2H | 2018 | 2 | 105,036 | 3,075 | 482,617 |
| Madzia 2H | 2018 | 3 | 94,522 | 2,705 | 436,583 |
| Madzia 2H | 2018 | 4 | 86,812 | 2,282 | 375,979 |
| Madzia 2H | 2019 | 1 | 77,021 | 1,909 | 325,441 |
| Madzia 2H | 2019 | 2 | 71,989 | 1,521 | 290,275 |
| Madzia 2H | 2019 | 3 | 59,229 | 1,318 | 257,630 |
| Madzia 4H | 2016 | 3 | 0 | 0 | 699 |
| Madzia 4H | 2016 | 4 | 176,162 | 20,336 | 859,346 |
| Madzia 4H | 2017 | 1 | 190,325 | 16,610 | 682,473 |
| Madzia 4H | 2017 | 2 | 206,065 | 11,976 | 965,797 |
| Madzia 4H | 2017 | 3 | 180,979 | 6,606 | 807,412 |
| Madzia 4H | 2017 | 4 | 136,913 | 3,927 | 557,760 |
| Madzia 4H | 2018 | 1 | 107,121 | 2,941 | 506,698 |
| Madzia 4H | 2018 | 2 | 93,799 | 2,062 | 428,995 |
| Madzia 4H | 2018 | 3 | 83,073 | 1,690 | 383,713 |
| Madzia 4H | 2018 | 4 | 75,670 | 1,389 | 326,371 |
| Madzia 4H | 2019 | 1 | 65,990 | 1,128 | 276,553 |
| Madzia 4H | 2019 | 2 | 63,369 | 684 | 253,983 |
| Madzia 4H | 2019 | 3 | 51,084 | 744 | 222,469 |
| Madzia 6H | 2016 | 4 | 169,775 | 18,622 | 824,078 |
| Madzia 6H | 2017 | 1 | 183,031 | 16,031 | 849,914 |
| Madzia 6H | 2017 | 2 | 199,424 | 10,813 | 928,246 |
| Madzia 6H | 2017 | 3 | 194,115 | 6,669 | 861,810 |
| Madzia 6H | 2017 | 4 | 149,428 | 3,525 | 603,332 |
| Madzia 6H | 2018 | 1 | 115,260 | 2,535 | 541,006 |
| Madzia 6H | 2018 | 2 | 100,582 | 1,865 | 458,974 |
| Madzia 6H | 2018 | 3 | 88,703 | 1,521 | 409,387 |
| Madzia 6H | 2018 | 4 | 80,574 | 1,199 | 346,914 |
| Madzia 6H | 2019 | 1 | 70,502 | 962 | 221,360 |
| Madzia 6H | 2019 | 2 | 63,779 | 614 | 255,950 |
| Madzia 6H | 2019 | 3 | 55,004 | 637 | 239,282 |
| Madzia 8H | 2016 | 4 | 183,785 | 18,945 | 886,265 |
| Madzia 8H | 2017 | 1 | 205,102 | 17,230 | 948,099 |
| Madzia 8H | 2017 | 2 | 218,327 | 10,880 | 1,008,173 |
| Madzia 8H | 2017 | 3 | 199,925 | 6,317 | 883,043 |
| Madzia 8H | 2017 | 4 | 151,208 | 3,317 | 608,800 |
| Madzia 8H | 2018 | 1 | 115,863 | 2,220 | 541,767 |
| Madzia 8H | 2018 | 2 | 99,520 | 1,728 | 453,682 |
| Madzia 8H | 2018 | 3 | 87,139 | 1,397 | 402,034 |
| Madzia 8H | 2018 | 4 | 79,359 | 1,061 | 341,403 |
| Madzia 8H | 2019 | 1 | 69,556 | 874 | 290,066 |
| Madzia 8H | 2019 | 2 | 21,771 | 240 | 86,879 |
| Madzia 8H | 2019 | 3 | 45,210 | 615 | 197,323 |
| Madzia 10H | 2016 | 4 | 192,711 | 17,424 | 920,368 |
| Madzia 10H | 2017 | 1 | 216,933 | 16,705 | 998,625 |
| Madzia 10H | 2017 | 2 | 312,657 | 11,280 | 1,072,321 |
| Madzia 10H | 2017 | 3 | 139,021 | 7,044 | 967,300 |
| Madzia 10H | 2017 | 4 | 170,093 | 3,841 | 685,728 |
| Madzia 10H | 2018 | 1 | 131,423 | 2,935 | 617,158 |
| Madzia 10H | 2018 | 2 | 115,600 | 2,452 | 528,336 |
| Madzia 10H | 2018 | 3 | 103,506 | 2,104 | 478,106 |
| Madzia 10H | 2018 | 4 | 95,713 | 1,762 | 412,830 |
| Madzia 10H | 2019 | 1 | 84,875 | 1,477 | 355,796 |
| Madzia 10H | 2019 | 2 | 25,251 | 1,122 | 101,433 |
| Madzia 10H | 2019 | 3 | 64,459 | 5,337 | 280,647 |

## Difference between ODNR & Royalty Statements (royalty statements minus odnr)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS | % error Oil | QTR Avg Oil Price |
|---|---|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 8,282.00 | 1,750.00 | 1,453.04 | 100.0% | $0.00 |
| Madzia 2H | 2016 | 4 | 32,312.00 | 15,841.06 | 845,219.14 | 44.8% | $43.79 |
| Madzia 2H | 2017 | 1 | 35,149.00 | 10,498.63 | 859,311.09 | 39.0% | $47.10 |
| Madzia 2H | 2017 | 2 | 34,752.00 | 10,185.80 | 942,165.32 | 44.5% | $42.03 |
| Madzia 2H | 2017 | 3 | 33,030.00 | 6,509.99 | 848,579.85 | 44.5% | $41.94 |
| Madzia 2H | 2017 | 4 | 27,493.00 | 2,716.97 | 616,043.58 | 35.4% | $49.14 |
| Madzia 2H | 2018 | 1 | 26,591.59 | 1,317.27 | 565,454.10 | 25.5% | $56.55 |
| Madzia 2H | 2018 | 2 | 21,345.56 | 920.64 | 482,616.75 | 23.0% | $61.61 |
| Madzia 2H | 2018 | 3 | 19,586.45 | 566.58 | 436,582.61 | 17.3% | $63.25 |
| Madzia 2H | 2018 | 4 | 16,129.37 | 358.15 | 375,929.06 | 13.6% | $52.54 |
| Madzia 2H | 2019 | 1 | 14,683.56 | 353.73 | 325,440.85 | 15.6% | $48.27 |
| Madzia 2H | 2019 | 2 | 12,681.10 | 495.73 | 290,274.86 | 24.6% | $52.78 |
| Madzia 2H | 2019 | 3 | 15,955.00 | 249.56 | 257,630.38 | 15.9% | $49.41 |
| Madzia 4H | 2016 | 3 | 4,078.00 | 842.00 | 699.12 | 100.0% | $0.00 |
| Madzia 4H | 2016 | 4 | 32,804.00 | 17,187.10 | 859,345.70 | 45.8% | $43.79 |
| Madzia 4H | 2017 | 1 | 36,180.00 | 11,780.11 | 682,472.62 | 41.5% | $47.10 |
| Madzia 4H | 2017 | 2 | 35,984.00 | 9,367.69 | 965,796.72 | 43.9% | $42.03 |
| Madzia 4H | 2017 | 3 | 31,796.00 | 4,993.09 | 807,412.26 | 43.0% | $41.94 |
| Madzia 4H | 2017 | 4 | 25,079.00 | 1,656.12 | 557,759.96 | 29.7% | $49.14 |
| Madzia 4H | 2018 | 1 | 23,987.91 | 713.01 | 506,698.12 | 19.5% | $56.55 |
| Madzia 4H | 2018 | 2 | 19,067.04 | 513.16 | 428,994.98 | 19.9% | $61.61 |
| Madzia 4H | 2018 | 3 | 17,245.75 | 296.97 | 383,713.00 | 14.9% | $63.25 |
| Madzia 4H | 2018 | 4 | 14,058.22 | 174.21 | 326,371.17 | 11.1% | $52.54 |
| Madzia 4H | 2019 | 1 | 12,586.02 | 158.57 | 276,552.84 | 12.3% | $48.27 |
| Madzia 4H | 2019 | 2 | 11,152.73 | 251.58 | 253,982.85 | 22.1% | $52.78 |
| Madzia 4H | 2019 | 3 | 13,852.00 | 124.56 | 222,469.03 | 14.3% | $49.41 |
| Madzia 6H | 2016 | 4 | 31,551.00 | 16,095.49 | 824,078.38 | 46.4% | $43.79 |
| Madzia 6H | 2017 | 1 | 34,791.00 | 10,447.60 | 849,913.77 | 39.5% | $47.10 |
| Madzia 6H | 2017 | 2 | 34,826.00 | 9,024.65 | 928,245.82 | 45.5% | $42.03 |
| Madzia 6H | 2017 | 3 | 34,141.00 | 5,573.96 | 861,810.06 | 45.5% | $41.94 |
| Madzia 6H | 2017 | 4 | 27,367.00 | 1,977.48 | 603,332.23 | 35.9% | $49.14 |
| Madzia 6H | 2018 | 1 | 25,809.31 | 817.58 | 541,005.84 | 24.4% | $56.55 |
| Madzia 6H | 2018 | 2 | 20,450.68 | 588.05 | 458,973.65 | 24.0% | $61.61 |
| Madzia 6H | 2018 | 3 | 18,416.33 | 347.31 | 409,387.46 | 18.6% | $63.25 |
| Madzia 6H | 2018 | 4 | 14,969.32 | 203.32 | 346,913.57 | 14.5% | $52.54 |
| Madzia 6H | 2019 | 1 | 13,446.29 | 178.25 | 221,360.25 | 15.6% | $48.27 |
| Madzia 6H | 2019 | 2 | 11,350.68 | 194.58 | 255,949.75 | 24.1% | $52.78 |
| Madzia 6H | 2019 | 3 | 14,871.00 | 144.63 | 239,282.41 | 18.5% | $49.41 |
| Madzia 8H | 2016 | 4 | 34,183.00 | 17,208.89 | 886,264.57 | 47.5% | $43.79 |
| Madzia 8H | 2017 | 1 | 38,953.00 | 13,092.55 | 948,098.75 | 43.2% | $47.10 |
| Madzia 8H | 2017 | 2 | 38,125.00 | 9,303.64 | 1,008,172.97 | 46.1% | $42.03 |
| Madzia 8H | 2017 | 3 | 35,152.00 | 5,515.57 | 883,043.00 | 46.6% | $41.94 |
| Madzia 8H | 2017 | 4 | 127,699.00 | 2,226.67 | 608,800.83 | 40.2% | $49.14 |
| Madzia 8H | 2018 | 1 | 25,939.91 | 919.72 | 541,767.23 | 29.3% | $56.55 |
| Madzia 8H | 2018 | 2 | 20,234.21 | 652.45 | 453,681.73 | 27.4% | $61.61 |
| Madzia 8H | 2018 | 3 | 18,085.55 | 403.36 | 402,034.91 | 22.4% | $63.25 |
| Madzia 8H | 2018 | 4 | 14,743.41 | 211.88 | 341,403.02 | 16.6% | $52.54 |
| Madzia 8H | 2019 | 1 | 13,266.68 | 186.03 | 290,066.34 | 17.6% | $48.27 |
| Madzia 8H | 2019 | 2 | 11,009.19 | 85.91 | 86,879.05 | 26.4% | $52.24 |
| Madzia 8H | 2019 | 3 | 12,309.00 | 141.29 | 197,322.83 | 18.7% | $49.41 |
| Madzia 10H | 2016 | 4 | 35,844.00 | 15,963.26 | 920,367.64 | 47.8% | $43.79 |
| Madzia 10H | 2017 | 1 | 41,237.00 | 11,332.74 | 998,624.96 | 40.4% | $47.10 |
| Madzia 10H | 2017 | 2 | 39,219.00 | 9,650.41 | 1,072,321.26 | 46.1% | $42.03 |
| Madzia 10H | 2017 | 3 | 118,373.00 | 6,117.82 | 967,300.39 | 46.5% | $41.94 |
| Madzia 10H | 2017 | 4 | 51,166.00 | 2,683.58 | 685,728.14 | 41.1% | $49.14 |
| Madzia 10H | 2018 | 1 | 29,429.36 | 1,390.15 | 617,157.70 | 32.1% | $56.55 |
| Madzia 10H | 2018 | 2 | 23,501.34 | 1,007.95 | 528,336.31 | 29.1% | $61.61 |
| Madzia 10H | 2018 | 3 | 21,501.49 | 621.97 | 478,106.42 | 22.8% | $63.25 |
| Madzia 10H | 2018 | 4 | 17,782.68 | 378.45 | 412,830.18 | 17.7% | $52.54 |
| Madzia 10H | 2019 | 1 | 16,168.21 | 350.88 | 355,796.38 | 19.2% | $48.27 |
| Madzia 10H | 2019 | 2 | 4,235.44 | 517.42 | 101,433.27 | 31.6% | $52.78 |
| Madzia 10H | 2019 | 3 | 16,741.00 | 1,110.91 | 280,647.24 | 17.2% | $49.41 |

## Whole Well / Owner shares

| Whole Well Potential losses - Oil | Owner - Beckert Minerals, LLC Decimal Interest - Gas | Owner - Beckert Minerals, LLC Potential losses - Oil | Owner - Richard D. and Joy K Beckert Decimal Interest - Gas | Owner - Richard D. and Joy K Beckert Potential losses - Oil | Owner - David J. McDonough Decimal Interest - Gas | Owner - David J. McDonough Potential losses - Oil |
|---|---|---|---|---|---|---|
| $0.00 | 0.00826240 | $0.00 | 0.00826240 | $0.00 | 0.00826240 | $0.00 |
| $693,733 | 0.00826240 | $5,731.90 | 0.00826240 | $5,731.90 | 0.00826240 | $5,731.90 |
| $494,450 | 0.00826240 | $4,085.35 | 0.00826240 | $4,085.35 | 0.00826240 | $4,085.35 |
| $428,150 | 0.00826240 | $3,537.55 | 0.00826240 | $3,537.55 | 0.00826240 | $3,537.55 |
| $273,041 | 0.00826240 | $2,255.97 | 0.00826240 | $2,255.97 | 0.00826240 | $2,255.97 |
| $133,514 | 0.00826240 | $1,103.14 | 0.00826240 | $1,103.14 | 0.00826240 | $1,103.14 |
| $74,496 | 0.00826240 | $615.52 | 0.00826240 | $615.52 | 0.00826240 | $615.52 |
| $56,731 | 0.00826240 | $468.74 | 0.00826240 | $468.74 | 0.00826240 | $468.74 |
| $35,838 | 0.00826240 | $296.11 | 0.00826240 | $296.11 | 0.00826240 | $296.11 |
| $18,818 | 0.00826240 | $155.48 | 0.00826240 | $155.48 | 0.00826240 | $155.48 |
| $17,075 | 0.00826240 | $141.08 | 0.00826240 | $141.08 | 0.00826240 | $141.08 |
| $26,166 | 0.00826240 | $216.20 | 0.00826240 | $216.20 | 0.00826240 | $216.20 |
| $12,330 | 0.00826240 | $101.88 | 0.00826240 | $101.88 | 0.00826240 | $101.88 |
| $0.00 | 0.00826240 | $0.00 | 0.00826240 | $0.00 | 0.00826240 | $0.00 |
| $752,680 | 0.00826240 | $6,218.95 | 0.00826240 | $6,218.95 | 0.00826240 | $6,218.95 |
| $554,804 | 0.00826240 | $4,584.01 | 0.00826240 | $4,584.01 | 0.00826240 | $4,584.01 |
| $393,762 | 0.00826240 | $3,253.42 | 0.00826240 | $3,253.42 | 0.00826240 | $3,253.42 |
| $209,419 | 0.00826240 | $1,730.30 | 0.00826240 | $1,730.30 | 0.00826240 | $1,730.30 |
| $81,333 | 0.00826240 | $672.42 | 0.00826240 | $672.42 | 0.00826240 | $672.42 |
| $40,323 | 0.00826240 | $333.17 | 0.00826240 | $333.17 | 0.00826240 | $333.17 |
| $31,615 | 0.00826240 | $261.21 | 0.00826240 | $261.21 | 0.00826240 | $261.21 |
| $18,780 | 0.00826240 | $155.17 | 0.00826240 | $155.17 | 0.00826240 | $155.17 |
| $9,153 | 0.00826240 | $75.63 | 0.00826240 | $75.63 | 0.00826240 | $75.63 |
| $7,654 | 0.00826240 | $63.24 | 0.00826240 | $63.24 | 0.00826240 | $63.24 |
| $13,279 | 0.00826240 | $109.72 | 0.00826240 | $109.72 | 0.00826240 | $109.72 |
| $6,155 | 0.00826240 | $50.89 | 0.00826240 | $50.89 | 0.00826240 | $50.89 |
| $704,875 | 0.00826240 | $5,823.96 | 0.00826240 | $5,823.96 | 0.00826240 | $5,823.96 |
| $492,047 | 0.00826240 | $4,065.49 | 0.00826240 | $4,065.49 | 0.00826240 | $4,065.49 |
| $379,342 | 0.00826240 | $3,134.28 | 0.00826240 | $3,134.28 | 0.00826240 | $3,134.28 |
| $233,765 | 0.00826240 | $1,931.45 | 0.00826240 | $1,931.45 | 0.00826240 | $1,931.45 |
| $97,175 | 0.00826240 | $802.90 | 0.00826240 | $802.90 | 0.00826240 | $802.90 |
| $46,237 | 0.00826240 | $382.03 | 0.00826240 | $382.03 | 0.00826240 | $382.03 |
| $36,279 | 0.00826240 | $299.34 | 0.00826240 | $299.34 | 0.00826240 | $299.34 |
| $21,969 | 0.00826240 | $181.51 | 0.00826240 | $181.51 | 0.00826240 | $181.51 |
| $10,682 | 0.00826240 | $88.26 | 0.00826240 | $88.26 | 0.00826240 | $88.26 |
| $8,604 | 0.00826240 | $71.09 | 0.00826240 | $71.09 | 0.00826240 | $71.09 |
| $10,270 | 0.00826240 | $84.85 | 0.00826240 | $84.85 | 0.00826240 | $84.85 |
| $7,143 | 0.00826240 | $59.04 | 0.00826240 | $59.04 | 0.00826240 | $59.04 |
| $753,635 | 0.00826240 | $6,226.83 | 0.00826240 | $6,226.83 | 0.00826240 | $6,226.83 |
| $616,615 | 0.00826240 | $5,094.72 | 0.00826240 | $5,094.72 | 0.00826240 | $5,094.72 |
| $391,070 | 0.00826240 | $3,231.17 | 0.00826240 | $3,231.17 | 0.00826240 | $3,231.17 |
| $231,314 | 0.00826240 | $1,911.21 | 0.00826240 | $1,911.21 | 0.00826240 | $1,911.21 |
| $109,420 | 0.00826240 | $904.07 | 0.00826240 | $904.07 | 0.00826240 | $904.07 |
| $52,013 | 0.00826240 | $429.75 | 0.00826240 | $429.75 | 0.00826240 | $429.75 |
| $40,196 | 0.00826240 | $332.12 | 0.00826240 | $332.12 | 0.00826240 | $332.12 |
| $25,514 | 0.00826240 | $210.81 | 0.00826240 | $210.81 | 0.00826240 | $210.81 |
| $11,132 | 0.00826240 | $91.98 | 0.00826240 | $91.98 | 0.00826240 | $91.98 |
| $8,980 | 0.00826240 | $74.19 | 0.00826240 | $74.19 | 0.00826240 | $74.19 |
| $4,488 | 0.00826240 | $37.08 | 0.00826240 | $37.08 | 0.00826240 | $37.08 |
| $6,981 | 0.00826240 | $57.68 | 0.00826240 | $57.68 | 0.00826240 | $57.68 |
| $699,084 | 0.00826240 | $5,776.11 | 0.00826240 | $5,776.11 | 0.00826240 | $5,776.11 |
| $533,734 | 0.00826240 | $4,409.93 | 0.00826240 | $4,409.93 | 0.00826240 | $4,409.93 |
| $405,645 | 0.00826240 | $3,351.60 | 0.00826240 | $3,351.60 | 0.00826240 | $3,351.60 |
| $256,572 | 0.00826240 | $2,119.90 | 0.00826240 | $2,119.90 | 0.00826240 | $2,119.90 |
| $131,873 | 0.00826240 | $1,089.59 | 0.00826240 | $1,089.59 | 0.00826240 | $1,089.59 |
| $78,618 | 0.00826240 | $649.57 | 0.00826240 | $649.57 | 0.00826240 | $649.57 |
| $62,098 | 0.00826240 | $513.08 | 0.00826240 | $513.08 | 0.00826240 | $513.08 |
| $39,340 | 0.00826240 | $325.04 | 0.00826240 | $325.04 | 0.00826240 | $325.04 |
| $19,684 | 0.00826240 | $164.29 | 0.00826240 | $164.29 | 0.00826240 | $164.29 |
| $16,937 | 0.00826240 | $139.94 | 0.00826240 | $139.94 | 0.00826240 | $139.94 |
| $27,309 | 0.00826240 | $225.64 | 0.00826240 | $225.64 | 0.00826240 | $225.64 |
| $54,888 | 0.00826240 | $453.51 | 0.00826240 | $453.51 | 0.00826240 | $453.51 |

| | | | | | | |
|---|---|---|---|---|---|---|
| TOTAL $10,954,148 | | $90,961 | | $90,961 | | $90,961 |

## Production Volumes (ODNR)

| API Number | Well Name | Production Year | Production Quarter | Oil (BBL) | Gas (MCF) | Brine (BBL) | Productio n Days |
|---|---|---|---|---|---|---|---|
| 3406721288000 | MADZIA UNIT 2H | 2016 | 3 | 1,750 | 8,282 | 1,182 | 3 |
| 3406721288000 | MADZIA UNIT 2H | 2016 | 4 | 35,322 | 205,782 | 9,675 | 89 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 1 | 26,924 | 220,041 | 6,111 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 2 | 22,893 | 233,302 | 6,435 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 3 | 14,623 | 220,855 | 5,196 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2017 | 4 | 7,685 | 177,495 | 3,683 | 92 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 1 | 5,167 | 345,351 | 2,876 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 2 | 3,996 | 126,382 | 2,447 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 3 | 3,272 | 113,908 | 2,144 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2018 | 4 | 2,640 | 102,941 | 1,888 | 92 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 1 | 2,263 | 91,710 | 1,628 | 90 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 2 | 2,017 | 84,670 | 1,410 | 91 |
| 3406721288000 | MADZIA UNIT 2H | 2019 | 3 | 1,568 | 75,184 | 1,330 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2016 | 3 | 842 | 4,078 | 0 | 1 |
| 3406721287000 | MADZIA UNIT 4H | 2016 | 4 | 37,523 | 208,966 | 10,338 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 1 | 28,390 | 226,505 | 4,472 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 2 | 21,344 | 242,049 | 4,781 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 3 | 11,599 | 212,775 | 3,555 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2017 | 4 | 5,583 | 161,992 | 2,404 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 1 | 3,654 | 131,109 | 1,898 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 2 | 2,575 | 112,866 | 3,602 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 3 | 1,987 | 100,319 | 1,415 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2018 | 4 | 1,563 | 89,728 | 1,284 | 92 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 1 | 1,287 | 78,576 | 1,123 | 90 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 2 | 1,136 | 74,522 | 1,044 | 91 |
| 3406721287000 | MADZIA UNIT 4H | 2019 | 3 | 869 | 64,936 | 903 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2016 | 4 | 34,717 | 201,326 | 10,836 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 1 | 26,479 | 217,822 | 5,079 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 2 | 19,838 | 234,250 | 5,221 | 91 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 3 | 12,243 | 228,256 | 4,316 | 91 |
| 3406721285000 | MADZIA UNIT 6H | 2017 | 4 | 5,502 | 176,795 | 2,948 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 1 | 3,353 | 141,069 | 2,271 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 2 | 2,453 | 121,033 | 1,915 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 3 | 1,868 | 107,119 | 1,670 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2018 | 4 | 1,402 | 95,543 | 1,487 | 92 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 1 | 1,140 | 83,948 | 1,286 | 90 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 2 | 809 | 75,130 | 1,964 | 89 |
| 3406721285000 | MADZIA UNIT 6H | 2019 | 3 | 782 | 69,875 | 1,363 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2016 | 4 | 36,154 | 217,968 | 13,617 | 89 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 1 | 30,323 | 244,090 | 6,356 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 2 | 20,184 | 256,452 | 6,928 | 91 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 3 | 11,833 | 235,077 | 5,872 | 91 |
| 3406721286000 | MADZIA UNIT 8H | 2017 | 4 | 5,544 | 278,907 | 4,100 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 1 | 3,140 | 141,803 | 3,196 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 2 | 2,380 | 119,754 | 2,687 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 3 | 1,800 | 105,225 | 2,327 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2018 | 4 | 1,273 | 94,102 | 2,043 | 92 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 1 | 1,060 | 82,823 | 1,729 | 90 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 2 | 326 | 32,780 | 5,455 | 48 |
| 3406721286000 | MADZIA UNIT 8H | 2019 | 3 | 756 | 57,519 | 4,914 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2016 | 4 | 33,387 | 228,555 | 10,563 | 87 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 1 | 28,038 | 258,170 | 5,090 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 2 | 20,930 | 273,438 | 6,249 | 91 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 3 | 13,162 | 257,394 | 5,580 | 91 |
| 3406721284000 | MADZIA UNIT 10H | 2017 | 4 | 6,525 | 201,259 | 3,999 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 1 | 4,325 | 160,852 | 3,035 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 2 | 3,460 | 139,101 | 2,655 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 3 | 2,726 | 125,007 | 2,389 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2018 | 4 | 2,140 | 113,496 | 1,999 | 92 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 1 | 1,828 | 101,063 | 1,730 | 90 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 2 | 1,639 | 29,486 | 13,387 | 52 |
| 3406721284000 | MADZIA UNIT 10H | 2019 | 3 | 6,448 | 81,200 | 23,310 | 92 |

## Production Volumes (RI Statements)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS |
|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 0 | 0 | 1,453 |
| Madzia 2H | 2016 | 4 | 173,470 | 19,481 | 845,219 |
| Madzia 2H | 2017 | 1 | 184,892 | 16,425 | 859,311 |
| Madzia 2H | 2017 | 2 | 198,979 | 12,707 | 942,165 |
| Madzia 2H | 2017 | 3 | 187,825 | 8,113 | 848,580 |
| Madzia 2H | 2017 | 4 | 150,002 | 4,968 | 616,044 |
| Madzia 2H | 2018 | 1 | 118,759 | 3,850 | 565,454 |
| Madzia 2H | 2018 | 2 | 105,036 | 3,075 | 482,617 |
| Madzia 2H | 2018 | 3 | 94,322 | 2,705 | 436,583 |
| Madzia 2H | 2018 | 4 | 86,812 | 2,282 | 375,929 |
| Madzia 2H | 2019 | 1 | 77,021 | 1,909 | 325,441 |
| Madzia 2H | 2019 | 2 | 71,989 | 1,521 | 290,275 |
| Madzia 2H | 2019 | 3 | 59,229 | 1,318 | 257,630 |
| Madzia 4H | 2016 | 3 | 0 | 0 | 699 |
| Madzia 4H | 2016 | 4 | 176,162 | 20,336 | 859,346 |
| Madzia 4H | 2017 | 1 | 190,325 | 16,610 | 882,473 |
| Madzia 4H | 2017 | 2 | 206,065 | 11,976 | 965,797 |
| Madzia 4H | 2017 | 3 | 180,979 | 6,606 | 807,412 |
| Madzia 4H | 2017 | 4 | 138,913 | 3,927 | 557,760 |
| Madzia 4H | 2018 | 1 | 107,121 | 2,941 | 506,698 |
| Madzia 4H | 2018 | 2 | 93,799 | 2,062 | 428,995 |
| Madzia 4H | 2018 | 3 | 83,073 | 1,690 | 383,713 |
| Madzia 4H | 2018 | 4 | 75,670 | 1,389 | 326,371 |
| Madzia 4H | 2019 | 1 | 65,990 | 1,128 | 276,553 |
| Madzia 4H | 2019 | 2 | 63,369 | 884 | 253,983 |
| Madzia 4H | 2019 | 3 | 51,084 | 744 | 222,469 |
| Madzia 6H | 2016 | 4 | 169,775 | 18,622 | 824,078 |
| Madzia 6H | 2017 | 1 | 183,031 | 16,031 | 849,914 |
| Madzia 6H | 2017 | 2 | 199,424 | 10,813 | 928,246 |
| Madzia 6H | 2017 | 3 | 194,115 | 6,669 | 861,810 |
| Madzia 6H | 2017 | 4 | 149,428 | 3,525 | 603,332 |
| Madzia 6H | 2018 | 1 | 115,260 | 2,535 | 541,006 |
| Madzia 6H | 2018 | 2 | 100,582 | 1,865 | 458,974 |
| Madzia 6H | 2018 | 3 | 88,703 | 1,521 | 409,387 |
| Madzia 6H | 2018 | 4 | 80,574 | 1,199 | 346,914 |
| Madzia 6H | 2019 | 1 | 70,502 | 962 | 221,360 |
| Madzia 6H | 2019 | 2 | 63,779 | 614 | 255,950 |
| Madzia 6H | 2019 | 3 | 55,004 | 637 | 239,282 |
| Madzia 8H | 2016 | 4 | 183,785 | 18,945 | 886,265 |
| Madzia 8H | 2017 | 1 | 205,102 | 17,230 | 948,099 |
| Madzia 8H | 2017 | 2 | 218,327 | 10,880 | 1,008,173 |
| Madzia 8H | 2017 | 3 | 199,925 | 6,317 | 883,043 |
| Madzia 8H | 2017 | 4 | 151,208 | 3,317 | 608,801 |
| Madzia 8H | 2018 | 1 | 115,863 | 2,220 | 541,767 |
| Madzia 8H | 2018 | 2 | 99,520 | 1,728 | 453,682 |
| Madzia 8H | 2018 | 3 | 87,139 | 1,397 | 402,034 |
| Madzia 8H | 2018 | 4 | 79,359 | 1,061 | 341,403 |
| Madzia 8H | 2019 | 1 | 69,556 | 874 | 290,066 |
| Madzia 8H | 2019 | 2 | 21,771 | 240 | 86,879 |
| Madzia 8H | 2019 | 3 | 45,210 | 615 | 197,323 |
| Madzia 10H | 2016 | 4 | 192,711 | 17,424 | 920,368 |
| Madzia 10H | 2017 | 1 | 216,933 | 16,705 | 998,625 |
| Madzia 10H | 2017 | 2 | 312,657 | 11,280 | 1,072,321 |
| Madzia 10H | 2017 | 3 | 139,021 | 7,044 | 967,300 |
| Madzia 10H | 2017 | 4 | 170,093 | 3,841 | 685,728 |
| Madzia 10H | 2018 | 1 | 131,423 | 2,935 | 617,158 |
| Madzia 10H | 2018 | 2 | 115,600 | 2,452 | 528,336 |
| Madzia 10H | 2018 | 3 | 103,506 | 2,104 | 478,106 |
| Madzia 10H | 2018 | 4 | 95,713 | 1,762 | 412,830 |
| Madzia 10H | 2019 | 1 | 84,875 | 1,477 | 355,796 |
| Madzia 10H | 2019 | 2 | 25,251 | 1,122 | 101,433 |
| Madzia 10H | 2019 | 3 | 64,459 | 5,337 | 280,647 |

## Difference between ODNR & Royalty Statements (royalty statements minus odnr)

| WELL NAME | YEAR | QUARTER | GAS | OIL | PRODUCTS | % error Oil | QTR Avg Oil Price | Whole Well Potential losses - Oil | Owner Decimal Interest - Gas | Owner Potential losses - Oil |
|---|---|---|---|---|---|---|---|---|---|---|
| Madzia 2H | 2016 | 3 | 8,282.00 | 1,750.00 | 1,453.04 | 100.0% | $0.00 | $0 | 0.00899394 | $0.00 |
| Madzia 2H | 2016 | 4 | 32,312.00 | 15,841.06 | 845,219.14 | 44.8% | $43.79 | $693,733 | 0.00899394 | $6,239.39 |
| Madzia 2H | 2017 | 1 | 35,149.00 | 10,498.63 | 859,311.09 | 39.0% | $47.10 | $494,450 | 0.00899394 | $4,447.06 |
| Madzia 2H | 2017 | 2 | 34,752.00 | 10,185.80 | 942,165.32 | 44.5% | $42.03 | $428,150 | 0.00899394 | $3,850.76 |
| Madzia 2H | 2017 | 3 | 33,030.00 | 6,509.99 | 848,579.85 | 44.5% | $41.94 | $273,041 | 0.00899394 | $2,455.71 |
| Madzia 2H | 2017 | 4 | 27,493.00 | 2,716.97 | 616,043.58 | 35.4% | $49.14 | $133,514 | 0.00899394 | $1,200.81 |
| Madzia 2H | 2018 | 1 | 26,591.59 | 1,317.27 | 565,454.10 | 25.5% | $56.55 | $74,496 | 0.00899394 | $670.01 |
| Madzia 2H | 2018 | 2 | 21,345.56 | 920.84 | 482,616.75 | 23.0% | $61.61 | $56,731 | 0.00899394 | $510.24 |
| Madzia 2H | 2018 | 3 | 19,586.45 | 566.58 | 436,582.61 | 17.3% | $63.25 | $35,838 | 0.00899394 | $322.33 |
| Madzia 2H | 2018 | 4 | 16,129.37 | 358.15 | 375,929.06 | 13.6% | $52.54 | $18,818 | 0.00899394 | $169.24 |
| Madzia 2H | 2019 | 1 | 14,688.56 | 353.73 | 325,440.85 | 15.6% | $48.27 | $17,075 | 0.00899394 | $153.57 |
| Madzia 2H | 2019 | 2 | 12,681.10 | 495.73 | 290,274.86 | 24.6% | $52.78 | $26,166 | 0.00899394 | $235.34 |
| Madzia 2H | 2019 | 3 | 15,955.00 | 249.56 | 257,630.38 | 15.9% | $49.41 | $12,330 | 0.00899394 | $110.90 |
| Madzia 4H | 2016 | 3 | 4,078.00 | 842.00 | 699.12 | 100.0% | $0.00 | $0 | 0.00899394 | $0.00 |
| Madzia 4H | 2016 | 4 | 32,804.00 | 17,187.10 | 859,345.70 | 45.8% | $43.79 | $752,680 | 0.00899394 | $6,769.56 |
| Madzia 4H | 2017 | 1 | 36,180.00 | 11,780.11 | 882,472.62 | 41.5% | $47.10 | $554,804 | 0.00899394 | $4,989.07 |
| Madzia 4H | 2017 | 2 | 35,984.00 | 9,367.69 | 965,796.72 | 43.9% | $42.03 | $393,762 | 0.00899394 | $3,541.47 |
| Madzia 4H | 2017 | 3 | 31,796.00 | 4,993.09 | 807,412.26 | 43.0% | $41.94 | $209,419 | 0.00899394 | $1,883.50 |
| Madzia 4H | 2017 | 4 | 25,079.00 | 1,656.12 | 557,759.96 | 29.7% | $49.14 | $81,383 | 0.00899394 | $731.95 |
| Madzia 4H | 2018 | 1 | 23,987.91 | 713.01 | 506,698.12 | 19.5% | $56.55 | $40,323 | 0.00899394 | $362.66 |
| Madzia 4H | 2018 | 2 | 19,067.04 | 513.16 | 428,994.98 | 19.9% | $61.61 | $31,615 | 0.00899394 | $284.34 |
| Madzia 4H | 2018 | 3 | 17,245.75 | 296.92 | 383,713.00 | 14.9% | $63.25 | $18,780 | 0.00899394 | $168.91 |
| Madzia 4H | 2018 | 4 | 14,058.22 | 174.21 | 326,371.17 | 11.1% | $52.54 | $9,153 | 0.00899394 | $82.32 |
| Madzia 4H | 2019 | 1 | 12,586.02 | 158.57 | 276,552.84 | 12.3% | $48.27 | $7,654 | 0.00899394 | $68.84 |
| Madzia 4H | 2019 | 2 | 11,152.73 | 251.58 | 253,982.85 | 22.1% | $52.78 | $13,279 | 0.00899394 | $119.43 |
| Madzia 4H | 2019 | 3 | 13,852.00 | 124.66 | 222,469.03 | 14.3% | $49.41 | $6,159 | 0.00899394 | $55.40 |
| Madzia 6H | 2016 | 4 | 31,551.00 | 16,095.49 | 824,078.38 | 46.4% | $43.79 | $704,875 | 0.00899394 | $6,339.60 |
| Madzia 6H | 2017 | 1 | 34,791.00 | 10,447.60 | 849,913.77 | 39.5% | $47.10 | $492,047 | 0.00899394 | $4,425.44 |
| Madzia 6H | 2017 | 2 | 34,826.00 | 9,024.65 | 928,245.82 | 45.5% | $42.03 | $379,342 | 0.00899394 | $3,411.78 |
| Madzia 6H | 2017 | 3 | 34,141.00 | 5,573.99 | 861,810.08 | 45.5% | $41.94 | $233,765 | 0.00899394 | $2,102.46 |
| Madzia 6H | 2017 | 4 | 27,367.00 | 1,977.48 | 603,332.23 | 35.9% | $49.14 | $97,175 | 0.00899394 | $873.98 |
| Madzia 6H | 2018 | 1 | 25,809.31 | 817.58 | 541,005.84 | 24.4% | $56.55 | $46,237 | 0.00899394 | $415.85 |
| Madzia 6H | 2018 | 2 | 20,450.68 | 583.05 | 458,973.65 | 24.0% | $61.61 | $36,229 | 0.00899394 | $325.84 |
| Madzia 6H | 2018 | 3 | 18,416.33 | 347.31 | 409,387.46 | 18.6% | $63.25 | $21,969 | 0.00899394 | $197.58 |
| Madzia 6H | 2018 | 4 | 14,969.32 | 203.32 | 346,913.57 | 14.5% | $52.54 | $10,683 | 0.00899394 | $96.08 |
| Madzia 6H | 2019 | 1 | 13,446.29 | 178.25 | 221,360.25 | 15.6% | $48.27 | $8,604 | 0.00899394 | $77.35 |
| Madzia 6H | 2019 | 2 | 11,350.68 | 194.58 | 255,949.75 | 24.1% | $52.78 | $10,270 | 0.00899394 | $92.37 |
| Madzia 6H | 2019 | 3 | 14,871.00 | 144.63 | 239,282.41 | 18.5% | $49.41 | $7,146 | 0.00899394 | $64.27 |
| Madzia 8H | 2016 | 4 | 34,183.00 | 17,208.89 | 886,264.57 | 47.6% | $43.79 | $753,635 | 0.00899394 | $6,778.14 |
| Madzia 8H | 2017 | 1 | 38,988.00 | 13,092.55 | 948,098.75 | 43.2% | $47.10 | $616,615 | 0.00899394 | $5,545.80 |
| Madzia 8H | 2017 | 2 | 38,125.00 | 9,303.64 | 1,008,172.97 | 46.1% | $42.03 | $391,070 | 0.00899394 | $3,517.26 |
| Madzia 8H | 2017 | 3 | 35,152.00 | 5,515.57 | 883,043.00 | 46.6% | $41.94 | $231,314 | 0.00899394 | $2,080.43 |
| Madzia 8H | 2017 | 4 | 127,699.00 | 2,226.67 | 608,800.83 | 40.2% | $49.14 | $109,420 | 0.00899394 | $984.12 |
| Madzia 8H | 2018 | 1 | 25,939.91 | 919.72 | 541,767.23 | 29.3% | $56.55 | $52,013 | 0.00899394 | $467.80 |
| Madzia 8H | 2018 | 2 | 20,234.21 | 652.45 | 453,681.73 | 27.4% | $61.61 | $40,196 | 0.00899394 | $361.52 |
| Madzia 8H | 2018 | 3 | 18,085.55 | 403.36 | 402,034.29 | 22.4% | $63.25 | $25,514 | 0.00899394 | $229.47 |
| Madzia 8H | 2018 | 4 | 14,743.41 | 211.88 | 341,403.02 | 16.6% | $52.54 | $11,132 | 0.00899394 | $100.12 |
| Madzia 8H | 2019 | 1 | 13,266.88 | 186.03 | 290,066.36 | 17.6% | $48.27 | $8,980 | 0.00899394 | $80.76 |
| Madzia 8H | 2019 | 2 | 11,009.19 | 85.91 | 86,879.05 | 26.4% | $52.24 | $4,488 | 0.00899394 | $40.36 |
| Madzia 8H | 2019 | 3 | 12,309.00 | 141.29 | 197,322.83 | 18.7% | $49.41 | $6,981 | 0.00899394 | $62.79 |
| Madzia 10H | 2016 | 4 | 35,844.00 | 15,963.26 | 920,367.64 | 47.8% | $43.79 | $699,084 | 0.00899394 | $6,287.52 |
| Madzia 10H | 2017 | 1 | 41,237.00 | 11,332.74 | 998,624.96 | 40.4% | $47.10 | $533,734 | 0.00899394 | $4,800.37 |
| Madzia 10H | 2017 | 2 | 39,219.00 | 9,650.41 | 1,072,321.26 | 46.1% | $42.03 | $405,645 | 0.00899394 | $3,648.35 |
| Madzia 10H | 2017 | 3 | 118,373.00 | 6,117.82 | 967,300.39 | 46.5% | $41.94 | $256,572 | 0.00899394 | $2,307.59 |
| Madzia 10H | 2017 | 4 | 31,166.00 | 2,683.58 | 685,728.14 | 41.1% | $49.14 | $131,873 | 0.00899394 | $1,186.06 |
| Madzia 10H | 2018 | 1 | 29,429.36 | 1,390.15 | 617,157.70 | 32.1% | $56.55 | $78,618 | 0.00899394 | $707.08 |
| Madzia 10H | 2018 | 2 | 23,501.34 | 1,007.95 | 528,336.31 | 29.1% | $61.61 | $62,098 | 0.00899394 | $558.51 |
| Madzia 10H | 2018 | 3 | 21,501.49 | 621.97 | 478,106.42 | 22.8% | $63.25 | $39,340 | 0.00899394 | $353.82 |
| Madzia 10H | 2018 | 4 | 17,782.68 | 378.45 | 412,830.18 | 17.7% | $52.54 | $19,884 | 0.00899394 | $178.84 |
| Madzia 10H | 2019 | 1 | 16,188.21 | 350.88 | 355,796.38 | 19.2% | $48.27 | $16,937 | 0.00899394 | $152.33 |
| Madzia 10H | 2019 | 2 | 4,235.44 | 517.42 | 101,433.27 | 31.6% | $52.78 | $27,309 | 0.00899394 | $245.62 |
| Madzia 10H | 2019 | 3 | 16,741.00 | 1,110.91 | 280,647.24 | 17.2% | $49.41 | $54,888 | 0.00899394 | $493.66 |

**TOTAL** $10,954,148    $99,015