IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **SCOTT A. MADZIA, et al.**, | |
| Plaintiffs, | Case No. 2:20-CV-2608 |
| v. | Judge Graham |
| **SWN PRODUCTION (OHIO) LLC,** | Magistrate Judge Jolson |
| Defendant. | |

**OPINION AND ORDER**

Pending before the Court are cross-motions for summary judgment, Doc. 38 and 39, in an oil royalties dispute. Plaintiffs Scott A. Madzia, Richard D. Beckert, Joy K. Beckert, Deborah A. McDonough, David J. McDonough, Wells Mineral LLC, and Beckert Minerals, LLC (collectively "Plaintiffs') assert that Defendant SWN Production (Ohio) LLC misinterpreted the royalties provisions of their leases and amendments and failed to pay the full amount of oil royalties due under oil and gas leases on property located in Harrison County, Ohio.

### I.      Introduction

The leases were executed in 2006 and the following year Defendant's predecessor drilled wells on the leased property. These wells were shallow conventional wells which produced oil from the Clinton sandstone formation. Chase Report at ¶ 21. The oil was pumped into a vented storage tank where any volatile components, such as natural gas, were permitted to evaporate. *Id.* at ¶ 23. The oil was sold and trucked away from the storage tank. *Id.* at ¶ 22. Royalties were paid on the volume of the oil sold, which Defendant reported as the volume of oil produced at the wellhead. *Id.* at ¶ 23.

1

The leases were amended in 2013 to permit the pooling of Plaintiff's leases with those of other landowners in order to permit the drilling of much deeper horizontal "fracked" wells with long hydraulically fractured laterals drilled into shale formations. Five such wells were drilled in 2014, (the "Madzia Wells"). *See id.* at ¶ 25. These wells produce a variety of hydrocarbons in liquid and gaseous form, quite different from the oil produced by the original wells. *See id.* at ¶ 26. The parties' dispute arises from a disagreement about how the language of the leases apply to the hydrocarbons produced by the fracked wells.

## II.     Procedural History

 On May 22, 2020, Plaintiffs filed a complaint asserting that Defendant has been improperly calculating the oil royalties due to them. *See generally* Doc. 4. Plaintiffs bring three causes of action: (I) declaratory judgment; (II) breach of contract; and (III) breach of the covenant of good faith and fair dealing. *See generally* Doc. 4.

Plaintiffs move for summary judgment on Counts I and II and request further proceedings to determine the amount of damages. Doc. 38-1 at 31. Defendant moves for summary judgment on all of Plaintiffs' claims. *See* Doc. 39 at 1.

## III.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential

element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## IV. Background

In Ohio, oil and gas production began around the middle of the nineteenth century and from then until quite recently it usually involved drilling a vertical hole to depths of 3,000 to 5,000 feet with the hope of encountering a reservoir of oil or gas or both in a subterranean sandstone formation. *See* Chase Report at ¶ 21; State of Ohio Department of Natural Resources, *Oil and Gas Fields Map of Ohio*, (2014) https://ohiodnr.gov/static/documents/geology/MiscMap_OhioOilGas-Fields_2004.pdf. Such wells usually had a bottom pressure of 1,500 PSI or less and were lined with a steel pipe several inches in diameter. It intersected the reservoir at a single point from which oil or gas (or both) flowed, or was pumped to the surface. *See* Chase Report at ¶ 21. The oil was a viscous liquid. *See id.* The industry called it crude oil or petroleum. *See id.* The gas was almost pure methane, called natural gas. Oil and gas leases usually referred to these hydrocarbons as "oil" and "gas."

Radical change in Ohio's oil and gas industry began early in the decade of 2010, with the advent of hydraulically fractured wells drilled into Utica/Point Pleasant shale formations. State of Ohio Department of Natural Resources, *Oil and Gas Fields Map of Ohio*, (2014) https://ohiodnr.gov/static/documents/geology/MiscMap_OhioOilGasFields_2004.pdf. These wells are drilled to a depth of 8,000 to 10,000 feet and have bottom pressures in the rage of 5,200 PSI. They have horizontal lateral extensions which are often two miles or more in length. Chase Report at ¶ 24. These laterals are punctured with explosive charges and injected with water under high pressure. The water exits the penetrations, causing fractures in the shale rock, releasing the hydrocarbons trapped therein. U.S. Energy Information, *Hydraulically Fractured Horizontal Wells Account for Most New Oil and Natural Gas Wells*, (Jan. 30, 2018) https://www.eia.gov/todayinenergy/detail.php?id=34732. When the gaseous hydrocarbons reach the surface, the reduced

4

pressures and temperatures cause a large amount of the gas to condense and be transformed into a watery liquid mixture called condensate. The remaining gas is called "wet gas." Michael Ratner & Mary Tiemann, *An Overview of Unconventional Oil and Natural Gas: Resources and Federal Actions*, pg. 4 (April 22, 2015) https://sgp.fas.org/crs/misc/R43148.pdf. It contains not only methane, but also heaver gasses such as ethane, butane, and propane, called NGLs (Natural Gas Liquids) which are separated and sold. *Id.* Condensate also contains dissolved NGLs which are removed by processing and sold. Chase Report at ¶ 26.

The density or specific gravity of hydrocarbons are important to their handling, value, and ultimate use. The industry standard for density is the American Petroleum Institute index referred to as the "API." The index ranks density on a scale of units called degrees. The higher the number, the lighter or less dense the substance is. The following API scale is from the report of Plaintiff's expert witness:



Vass Report as 7.

The value of a hydrocarbon liquid or gas varies in relation to its capacity to produce heat or energy per unit of volume, sometimes expressed in "BTUs" (British Thermal Units). *See id.* at 6. The difference in value can be very significant. For example, condensate with an API of above 60 sold for $47.03 per barrel while NGLs with an API of about 80 sold for $0.55 per barrel. *Id.* at 5.

## V. Analysis

Plaintiffs' three causes of action – declaratory judgment, breach of contract, and breach of the covenant of good faith and fair dealing – are based on their assertion that Defendant is misapplying the oil royalty provisions in the leases and amendments. Plaintiffs argue that they are entitled to the value of 1/8 of the volume of liquid hydrocarbons produced by the Madzia Wells at the wellhead and that the royalties should be based on the value of "oil" sold from the storage tanks. Defendant argues that the liquid hydrocarbons produced by the Madzia Wells is too volatile to be marketed and does not become "oil" until it is processed, which results in substantial shrinkage and oil royalties should be based on that lesser volume.

**A. Breach of Good Faith and Fair Dealing**

Starting with Plaintiffs' last cause of action first, Plaintiffs' claim for breach of good faith and fair dealing fails as a matter of law. Ohio law imposes a duty on the parties of a contract to act in good faith when a contract is silent on an issue. *Eclipse Res.-Ohio, LLC v. Madzia*, 717 F. App'x 586, 599 (6th Cir. 2017) (citation omitted). A cause of action for the breach of good faith exists only when the contract is silent on the relevant issue. *Id.* (citation omitted).

Plaintiffs allege a breach of good faith with regard to the calculation of royalty payments. The calculation of royalty payments is addressed in the leases and Plaintiffs bring claims for the

6

alleged breach of those provisions. Therefore, Plaintiffs cannot also bring a breach of good faith cause of action.

**B. Declaratory Judgment & Breach of Contract**

Plaintiffs move the Court to find that the oil leases entitle them to receive 1/8 of the value of the liquid hydrocarbons produced by the Madzia Wells calculated on the volume of liquids produced at the wellhead without reduction for shrinkage but priced at the sale price after processing. They allege that Defendant's practice of paying the value of 1/8 of the liquids after processing constitutes actionable breach, reserving the issue of the amount of damages for a future proceeding. Defendant moves for the Court to find that the royalty payments it has made are consistent with the lease and, even if they are not, that Plaintiffs failed to show damages and they are entitled to summary judgment on the damage claims.

1. **The Leases**

The Ohio Supreme Court has held that oil and gas leases are contracts and, as such, are to be read by the terms of the written instrument to carry out the intent of the parties. *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (citation omitted). Extrinsic evidence may be used to determine the intent of the parties only when the contract is unclear, ambiguous, or circumstances around the contract give the language special meaning. *Id.* (citation omitted). Neither party has suggested that the interpretation of the leases require extrinsic evidence.

The leases, identical in all material respects, treat oil and gas differently for purposes of calculating royalties. The provision for oil states:

> Lessee shall deliver to the credit of Lessor, in tanks or pipelines, free of all costs and expenses, except taxes applicable thereto, a royalty of one-eighth (1/8) of the oil produced.

7

Doc. 4 at 14. Plaintiff's claims relate only to the five horizontal, hydraulically fractured wells referred to as the "Madzia Wells." Plaintiffs do not assert any claims relating to gas royalties. Their claims are limited to oil royalties due on the production of the Madzia Wells.

2. **The Madzia Wells**

All of the gas, liquids and solids which come out of the ground at the wellhead of the Madzia Wells (gaseous hydrocarbons, liquid hydrocarbons, brine, sand and rocks) enter a single pipe. First Pottmeyer Dep. at 41:14-43:5, 97:19-25. They proceed about 100 feet to a sand trap, which captures the sand and rock, and then into a gas processing unit ("GPU") which separates them into three separate streams: gaseous hydrocarbons, liquid hydrocarbons (condensate), and brine or wastewater. *Id.* at 99:9-100:20, 76:5-77:2. Meters inside the GPU measure the volume of each, which are required to be reported to The Ohio Department of Natural Resources ("ODNR") separately as gas, oil, and water. *Id.* at 77: 4-5; Doc. 38-7 at 1. Upon exiting the GPU, the condensate and water from all five Madzia Wells are combined into a single liquids pipeline, which, after being combined with the output from wells of other owners, are conveyed about 2.5 miles to the Mizer Central Gathering Facility ("Mizer CGF"). *Id.* at 136:21-137:3. Gaseous hydrocarbons which flow from the five Madzia Wells are handled in similar fashion. They are combined with each other and with the gas output of wells of other owners and piped to the Mizer CGF. First Pottmeyer Dep. at 195:19-25; Second Pottmeyer Dep at 12:22-13:5. Defendant contracts with the owners of this facility to process, transport and market or otherwise dispose of the materials it receives. *Id.* at 199:5-10.

The Mizer CGF separates the water from the condensate and deposits it in wastewater tanks. *Id.* at 202:1-7. The condensate is stabilized by heating it to vaporize lighter hydrocarbons

(NGLs) which are captured and diverted into the gas stream. *Id.* at 202:7-15. The stabilized condensate is pumped into storage tanks and sold. *Id.* at 213:7-18.

The gas stream is run through vessels that collect heaver hydrocarbons that condensate out of the stream, some of which are diverted to the condensate stream while others such as ethane, propane, (NGLs) are delivered to a pressurized storage tank and sold. *Id.* at 196:13-197:1. The gas stream is put into a pipeline and piped to another processing facility where the NGLs are removed and the remaining gas is sold. *See id.* at 196:23-197:3.

Defendant has been paying royalties on the production of the Madzia Wells based on the sale price of all of the natural gas, NGLs and stabilized condensate. Plaintiffs claim that Defendant has breached the terms of the lease by failing to pay royalties for oil on the volume of unstable condensate reported to the ODNR as oil. The Court disagrees.

The conventional vertical wells first drilled under the leases produced oil – a viscous liquid hydrocarbon with an API of about 35. Chase Report at ¶ 21. The Madzia Wells on the other hand produce a thin, watery liquid hydrocarbon called condensate, with an API generally between 75 and 90 degrees. *See id.* at ¶ 24; Doc. 47 at 1. It is not oil. The industry does not refer to it as oil. Neither of the experts in this case refer to the liquid hydrocarbons produced by the Madzia Wells as oil. Instead, they refer to it as condensate. Vass Report at 8 ("The API value of the liquid hydrocarbons at the central gathering facility demonstrate that anything referred to as oil is actually condensate."); Chase Report at ¶ 26 ("The wells also yield an un-stabilized condensate mixture that is made up of stabilized condensate, NGL's, and wet natural gas."). Defendant's senior production foreman Derrick Pottmeyer was repeatedly asked in his deposition whether the Madzia Wells ever produced any oil and always responded in the negative. First Pottmeyer Dep. at 72:6-19; 140:21-25; 218:20-24. Defendant has measured the API of the liquid hydrocarbons produced

by the Madzia Wells from the beginning of production and it has always exceeded 69 degrees which is defined as condensate, not oil, in the API chart submitted by Plaintiff's expert. *See* Pottmeyer Decl. Ex. 1, Doc. 47; Vass Report at 7.

The Ohio Department of Natural Resources ("ODNR") is the state agency responsible for regulating the oil and gas industry. Owners of oil and gas wells are required to file quantity reports of oil, gas, and brine produced on ODNR form 10-H. *See* Ohio Rev. Code § 1509.11; Doc. 31-2 at 84-87. The instructions on the form state "Ohio law does not require the separate reporting of Natural Gas Liquids (NGLs) or condensate. NGLs ***must*** be reported as gas and condensate ***must*** be reported as oil." Doc. 31-2 at 84 (emphasis in original).

It is important to note that this form does not purport to define condensate as oil. It seems likely that the ODNR requires owners to report condensate as oil because the state has chosen to tax the value of condensate production in the same fashion as it taxes oil production. Ohio oil and gas production is taxed as real estate. *See* Ohio Rev. Code §§ 5713.05, 5713.06. The value of production is based on a rate per barrel per day. Ohio Rev. Code § 5713.051(A)(6); The Ohio and Gas Association and Energy in Depth, *Ohio's Oil and Gas Industry Property Tax Payments*, (2017), https://energyindepth.org/wp-content/uploads/2017/02/Ohios-Oil-and-Gas-Industry-Property-Tax-Payments2.pdf.

Ohio Revised Code § 1509.01(B) defines "oil" as:

> [C]rude petroleum oil and all other hydrocarbons, regardless of gravity, that are produced in liquid form by ordinary production methods, but does not include hydrocarbons that were originally in a gaseous phase in the reservoir.

The Ohio Revised Code does not define "ordinary production methods" but it seems clear to this Court that such would not include laterally drilled, hydraulically fractured "fracked" wells. Fracked wells may have become common in certain parts of Ohio, but they are not in any sense

10

"ordinary." Instead, they are highly controversial, strictly regulated, and banned in some states because of concern over their impact on the environment. *See generally* Lauren Karam, *Fracking Across the Globe: The Debate in the United States and Europe and the Role of Federal, State, and Local* Regulations, 41 SUFFOLK TRANSNAT'L L. REV. 173 (2018); 29 Vt. Stat. Ann. tit. 29, § 571.

Insomuch as the liquid hydrocarbons produced by the Madzia Wells were not produced by "ordinary production methods" they are not oil. Furthermore, insomuch as this liquid hydrocarbon is referred to by both expert witnesses as "condensate" it must have been in a gaseous form in the reservoir which also excludes it from the statute's definition of "oil." *See Condense*, Cambridge English Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/condense (last visited Sept. 14, 2022) ("to change . . . from a gas to a liquid or solid state").

Ohio Revised Code § 1509.01(D) defines "condensate" as "liquid hydrocarbons separated at or near the well pad or along the gas production or gathering system prior to gas processing." This definition fits the description of the liquid hydrocarbons flowing from the wellheads of the Madzia Wells in the uncontradicted deposition testimony of Defendant's production manager Derrick Pottmeyer. Pottmeyer explained how the unstable condensate naturally separates from the gas and water in a three-phase horizontal separator shortly after leaving the wellhead and before entering the GPU at the wellhead of the Madzia Wells. Frist Pottmeyer Dep. at 80:6-81:11.

As noted earlier, both expert witnesses in this case have stated that the liquid hydrocarbons produced by the Madzia Wells are condensate. Thus, under the evidence and Ohio law, the liquid hydrocarbons produced by the Madzia Wells are not oil. They are condensate.

Ohio Revised Code § 1509.01(C) defines "gas" as "all natural gas and all other fluid hydrocarbons that are not oil, including condensate." Condensate is a fluid hydrocarbon that is not oil and is defined by the Ohio Revised Code as gas. Condensate is explicitly referred to in the

11

statutory definition of "gas" as any of a class of fluid hydrocarbons that "are not oil." *Id.* Thus, under Ohio law condensate is gas.

Having determined that condensate is gas the Court concludes that the liquid hydrocarbons produced by the Madzia Wells (unstable condensate) measured at the GPU and reported to the ODNR as oil are governed by the royalty provision of the leases relating to gas. Those provisions entitle the Plaintiffs to:

> one-eighth (1/8) of the proceeds realized at the well from the sale of all gas marketed from the premises after deduction of all costs attributable to marketing the gas, including, but not limited to, costs to transport, collect, compress, dehydrate and make the gas ready for market.

Doc. 4 at 14. When the leases were amended in 2016 a cost-free royalty provision was added which eliminated the deduction of charges relating to production, marketing, and transportation of "the oil, gas, and other products produced hereunder." Doc. 4 at 28. It is noteworthy that the 2016 amendments explicitly contemplated the payment of royalties on not only oil and gas but "other products produced" such as condensate and NGLs.

Defendant asserts that it has paid Plaintiffs one eighth of the proceeds of the sale of all of the hydrocarbons produced by the Madzia Wells including all condensate, gas, and NGLs. Plaintiffs have failed to offer any evidence from which a reasonable jury could reach a contrary conclusion.

### 3. The Vass Report

Plaintiffs retained Vass Engineering and Mineral Appraisals, PLLC to conduct an audit of the royalties paid on the production of the Madzia Wells. The audit was done by Rachel L. Vass, registered professional geologist and certified mineral appraiser. In an expert report dated October 30, 2020, Vass concluded that Plaintiffs have been underpaid in the amount of $643,641.94.

Vass arrived at the number by comparing the oil production reported to the ODNR and the oil production reported in the royalty statements which accompanied Defendant's royalty payments. Vass Report at 8. She deducted the amount of oil reported on the royalty statements from the much larger amount of oil reported on the ODNR report. She treated the deficit as an underpayment and applied the sale price of the stabilized condensate to determine the dollar amount of the alleged underpayment.

In these calculations, Vass mistakenly assumed that the amount of oil reported to ODNR was stabilized condensate when, in fact, it was unstable condensate. Stabilized condensate would have been only about one third of the liquid reported to the ODNR as oil. *See* Chase Report at ¶ 35.

Vass apparently knew she was missing information – early in her audit report she said: "One of the issues that I recommended to be investigated further was an apparent discrepancy in oil volumes reported to ODNR and oil volumes paid on royalty statements." Vass Report at 3. If such an investigation had been done it would have revealed that the ODNR reports were based on the volume of unstable condensate flowing from the well and that the royalty payments were based on the much lesser volume of stabilized condensate sold from the storage tanks. Investigation would also have revealed that Defendant measured the API gravity of the unstable condensate reported as oil to the ODNR and that it ranged from 67.3 to 99.4 API. Doc. 47. Vass reported that the API of the condensate sold and used to calculate royalties averaged 60.72. Vass Report at 7. If she had compared the API of the condensate sold with the API of the unstable condensate reported to the ODNR as oil, she would have seen that they were quite different in density. Dr. Chase succinctly stated the nature of Vass's error:

> VEMA has wrongly assumed that the Plaintiffs have not been compensated for the value of the hydrocarbons consisting of the un-stabilized condensate mixture and

13

> wet natural gas being metered at the GPU's and reported to ODNR from the five Madzia wells. They state in Table 1 that 140,154 barrels of oil were produced at the wellhead as rightly reported to the ODNR. They note that 83,002 barrels of condensate were marketed to Marathon. They wrongly claim that the Plaintiffs were not compensated for the difference or 57,152 barrels of condensate when, in fact, Plaintiffs were compensated for the equivalent hydrocarbon content of the un-stabilized condensate mixture in the form of pipeline quality natural gas and NGL's that were ultimately removed from it.
>
> * * *
>
> As previously discussed, the un-stabilized condensate mixture metered at the GPU's and reported to ODNR is an inflated value and subject to significant shrinkage after capturing the NGL's and wet natural gas contained in the un-stabilized condensate mixture.

Chase Report at ¶¶ 44, 46.

If Vass had compared the API of the unstable condensate reported to the ODNR as oil (67.3 – 99.4, Doc. 47) with the API of the stabilized condensate sold to Marathon (55.97-64.49 degrees, Vass Report at 7) she would have seen they were different materials with different values. Vass's conclusions are not supported by the evidence and do not support Plaintiffs' claim for money damages.

### 4. Combined Production

The stabilized condensate produced by the Madzia Wells is combined with the stabilized condensate produced by twelve other wells, deposited into storage tanks, and sold. Defendant calculates each owner's royalties based on the sale price and their share of the volume of condensate sold. Defendant uses the measurements of the volume and API of each owners' unstable condensate measured at the GPU to calculate the volume of that owner's share of the stabilized condensate sold using a mathematical formula which calculates a shrinkage rate based on the API. *See* Frist Pottmeyer Dep. at 210:18-213:5. The formula used is based on Defendant's experience using historical data and vouched for by Defendant's production manager, Pottmeyer, as "very accurate" *See id.* at 222.

14

Plaintiffs argue that these procedures violate a provision of the lease relating to pooling; specifically, the language in the 2013 lease amendment that:

> There shall be allocated to the portion of the Leased Premise included in any unit, pooling or re-pooling the proportion of the actual production from all lands unitized, pooled or re-pooled as the portion of Leased Premises, computed on an acreage basis, bears to the entire acreage of the lands unitized, pooled or re-pooled.

Doc. 4 at 27. Plaintiffs say that Defendant's calculations are not based on actual production because Defendant uses an estimate of shrinkage in its calculation. Plaintiffs assert that Defendant "impermissibly pools the Madzia wells' hydrocarbons with those of twelve other horizontal wells . . . ." Doc. 38-1 at 24.

The lease amendment may have contemplated combining the production of wells of different ownership in order to share treatment and refining facilities as well as pipelines, storage, and stabilizing facilities, but no evidence in the record or language in the lease amendment support that proposition. Therefore, the Court finds that the leases and amendments do not permit combining the production of the wells or contemplate how a combined production should be allocated.

However, Plaintiffs have failed to show that they have been damaged by combining the production of the wells. Plaintiffs argue that they were damaged because Defendant's calculation may have resulted in them receiving a royalty of less than 1/8 of that produced. They present this argument without pointing to any supporting evidence. On the other hand, Defendant offers the testimony of its senior production foreman to show that its method of calculating the portion of products attributable to each well is "very accurate" and in accordance with the industry standard. First Pottmeyer Dep. at 136:16-17, 208:16-17, 222:11-16.

The liquid hydrocarbons produced by each well will have a different shrinkage rate when processed. *See Id.* 65:2-12, 211:10-212:6. Defendants estimate the amount of shrinkage based on

15

the measured API of the output of Plaintiff's wells. *Id.* at 222:11-16. Plaintiffs have produced no evidence that these estimates of shrinkage are inaccurate. Their expert has not criticized Defendant's methodology in using this estimate. Therefore, Plaintiffs have failed to meet their burden of showing that a genuine issue of material fact exists on whether they were damaged or the amount of any such damage.

5. **Hydrocarbons used or lost**

Plaintiffs claim that hydrocarbons produced by the Madzia Wells are either used or lost at various points between the wellhead (where the hydrocarbons are produced) and the Mizer load-out (where the condensate is sold). This includes hydrocarbons adhering to sand or dissolved in wastewater, accumulating over time as residue in the GPU and meters, and used to provide power for equipment at the Mizer CGF. *See* Doc. 38-1 at 23. In the absence of any evidence to the contrary, the Court will presume that these alleged losses are the usual and customary incidentals of such operations and are unavoidable and de minimis.

6. **Alternate Disposition of Claim for Money Damages**

Assuming arguendo that Plaintiffs are correct in their contention that condensate is oil and they are entitled to be compensated for the quantity of "oil" reported to the ODNR, the Court would nevertheless find that Plaintiffs have failed to produce any evidence from which a reasonable jury could find that Defendant's action has caused them financial harm. If the oil royalty clause applies to the liquid hydrocarbons produced by the Madzia Wells it should be noted that the royalty for oil is a 1/8 royalty in kind, i.e. delivery of 1/8 of the oil itself, "in tanks or pipelines." Doc. 4 at 14. Plaintiffs have failed to produce any evidence of the value of the highly volatile liquid they were entitled to have delivered to them. Indeed, the only evidence in the record is that it was unmarketable, hence without value or even worse, dangerous. Hutchinson Dep. at 24:1-3 ("To my

16

knowledge, none of the purchasers are willing to pick up this unstabilized condensate. It's just too volatile.").

## VI. Conclusion

The Court finds that the liquid hydrocarbons produced by the Madzia Wells are condensate, not oil. The Court further finds that under Ohio law condensate is defined as gas, thus the leases and amendments require royalties on condensate be paid pursuant to the gas royalty provision, to wit: 1/8 of the proceeds realized at sale. The Court further finds that combing the production of the Madzia Wells with the wells of other owners and calculating Plaintiffs' share of such production on the basis of an estimated shrinkage is not permitted under the leases and amendments, instead Plaintiffs are entitled to be paid royalties on the actual production of their wells. Plaintiffs failed to present any evidence showing they received less than 1/8 of the proceeds realized from the sale of the condensate. Therefore, Plaintiffs' motion for summary judgment on liability for money damages, Doc. 38, is **DENIED** and Defendant's motion for summary judgment, Doc. 39, is **GRANTED**. The Court's rulings recited in this opinion and order shall constitute the declaration of the parties' rights and obligations under the leases and amendments as requested in the Plaintiffs' complaint. The clerk shall enter final judgment for Defendant on the issue of money damages.

**IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 14, 2022